Nos. 2021-2049, 2024-1084, 2024-1159

# United States Court of Appeals
# for the Federal Circuit

PAUL E. ARLTON and DAVID J. ARLTON,

*Plaintiffs-Appellants,*

v.

AEROVIRONMENT, INC.,

*Defendant-Cross-Appellant.*

*On Appeals from the United States District Court for the*
*Central District of California in Case No. 2:20-cv-07438-AB-GJS*

## APPELLANTS' NON-CONFIDENTIAL MOTION TO STRIKE IN PART THE BRIEF FOR UNITED STATES AS *AMICUS* CURIAE

DEBORAH POLLACK-MILGATE
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
(317) 236-1313
Deborah.PollackMilgate@btlaw.com

HEATHER B. REPICKY
BARNES & THORNBURG LLP
One Marina Park Drive
Suite 1530
Boston, MA 02210
(617) 316-5310
hrepicky@btlaw.com

*Counsel for Appellants*

MAY 9, 2024

## STATEMENT OF OPPOSITION

The Appellants represent that counsel discussed the relief requested in this motion with the United States, which indicated that it objects to this filing and intends to file a response.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 21-2049; 24-1084; 24-1159

**Short Case Caption** Arlton et al. v. AeroVironment

**Filing Party/Entity** Appellants Paul E. Arlton and David J. Arlton

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: May 9, 2024

Signature: /s/ Deborah Pollack-Milgate

Name: Deborah Pollack-Milgate

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Paul E. Arlton (an individual) | Lite Machines Corp. | |
| David J. Arlton (an individual) | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

iii

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Seth A. Gold<br>Barnes & Thornburg (Los Angeles, CA) | Joseph L. Fehribach<br>Barnes & Thornburg LLP (Indianapolis, IN) | |
| Roya Rahmanpour<br>Barnes & Thornburg (Los Angeles, CA) | Jonathan Boustani<br>Barnes & Thornburg (Los Angeles, CA) | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF OPPOSITION.................................................................i

CERTIFICATE OF INTEREST ................................................................ii

TABLE OF CONTENTS ...........................................................................v

TABLE OF AUTHORITIES ......................................................................vi

INTRODUCTION .......................................................................................1

BACKGROUND ..........................................................................................2

ARGUMENT ...............................................................................................8

    I.    An *amicus* curiae cannot inject into the case new facts or arguments not addressed before the district court. ................................................8

    II.    The Government's *amicus* brief impermissibly seeks to expand the factual record. ...................................................................................11

    III.    The Government seeks to interpose on appeal a legal argument that was never presented by the parties or considered by the district court. .........................................................................................................13

CONCLUSION ..........................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advanced Software Design Corp. v. FRB of St. Louis*,
  583 F.3d 1371 (Fed. Cir. 2009) ...................................................... 14, 15

*In re Alappat*,
  33 F.3d 1526 (Fed. Cir. 1994) ............................................................. 11

*Biery v. United States*,
  818 F.3d 704 (Fed. Cir. 2016) ............................................................... 8

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) .............................................................................. 10

*Christian v. United States*,
  337 F.3d 1338 (Fed. Cir. 2003) ........................................................... 11

*Estee Lauder Inc. v. L'Oreal*,
  S.A., 129 F.3d 588 (Fed. Cir. 1997) ...................................................... 8

*F.T.C. v. Phoebe Putney Health Sys., Inc.*,
  568 U.S. 216 (2013) .............................................................................. 10

*Kirshner v. Uniden Corp. of Am.*,
  842 F.2d 1074 (9th Cir. 1988) ............................................................... 9

*Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*,
  969 F.2d 764 (9th Cit. 1992) ................................................................. 9

*Richardson v. Alabama State Bd. of Educ.*,
  935 F.2d 1240 (11th Cir. 1991) ........................................................... 10

*Smith v. United States*,
  343 F.2d 539 (5th Cir. 1965) ................................................................. 9

*United Parcel Service, Inc. v. Mitchell*,
  451 U.S. 56 (1981) ........................................................................ 10, 11

*United States v. Allen*,
    93 F.4th 350 (6th Cir. 2024) ................................................. 8

*United States v. Miller*,
    832 F.3d 703 (7th Cir. 2016) ............................................... 9

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    754 F.3d 712 (9th Cir. 2014) ............................................. 10

*Weathersby v. One Source Mfg. Tech., L.L.C.*,
    378 F. App'x 463 (5th Cir. 2010) ....................................... 9

*Whitserve, LLC v. Computer Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012) ............................................. 8

## Statutes

28 U.S.C. § 1498 ........................................................ 1, 2, 3, 14

## Other Authorities

Federal Rule of Appellate Procedure 10 .................................. 8

## INTRODUCTION

On April 24, 2024, the Department of Justice on behalf of the United States (the "Government") submitted an *amicus* brief pursuant to Federal Rule of Appellate Procedure 29(a)(2) (the "Gov't Br."). Through its brief, the Government seeks to inject into this appeal evidence and argument never presented to or considered by the district court. For the first time the Government now alleges that "Terry was . . . ***ultimately*** used to support the Mars mission" and that the Government consented to AeroVironment's use of the Arltons' technology for that purpose. Gov't Br. at 7 (emphasis added). The Government further asserts that the manufacture of Terry, the terrestrial version of the Mars Helicopter Ingenuity, should fall under the cloak of 28 U.S.C. § 1498. *Id.*; *see also id.* at 17–18. Because the Government's allegations and argument concerning Terry before this Court stand in stark contrast to its silence below, Paul E. Arlton and David J. Arlton (the "Arltons") request that the Court strike the Government's *amicus* brief as it relates to AeroVironment's manufacture and uses of Terry. Absent this relief, the

1

record on appeal would be impermissibly expanded.[1]  Moreover, the Government's identification of a purported use for Terry seemingly **after** it was made presents a novel legal question concerning whether the manufacture of this device by AeroVironment, Inc. ("AeroVironment")— regardless of its original purpose or intent—can retroactively be deemed "for the Government" for purposes of Section 1498.  The parties never presented this issue to the district court or raised it on appeal.  The Government should not be permitted to introduce it now through the side door of an *amicus* brief, particularly when, in this respect, the Government is not an impartial friend of the Court.

## BACKGROUND

These appeals generally concern assertions of infringement of U.S. Patent No. 8,042,763B2 (the "'763 patent") vis-à-vis AeroVironment's activities related to two devices: the Mars Helicopter Ingenuity and Terry.[2]

---

[1] Because the Government filed its brief as an *amicus* curiae, the Arltons do not have a right to file a response to substantively address the facts and arguments raised therein.  Accordingly, this motion is not prohibited under Federal Circuit Rule 27(e).

[2] In their opening brief filed on February 5, 2024, the Arltons provide a comprehensive statement of the case as it relates to the issues they present on appeal.  Br. at 4–24.  The background provided here is directed

When the Arltons initiated this litigation on August 17, 2020 the only infringing device known to the Arltons and at issue before the district court was the Mars Helicopter Ingenuity. *See* Ex. 1 (Complaint); Ex. 2 at 5 (identifying "Mars Helicopter"); Ex. 3 at 3, 5–6 (describing the unveiling of Terry in May 2021). That helicopter, together with the Mars 2020 Perseverance Rover, launched from Cape Canaveral Air Force Station on July 30, 2020. Ex. 1 at 3. AeroVironment primarily defended against the Arltons' infringement claims by asserting that—because its work on Ingenuity was both for and with the authorization of the Government—AeroVironment was immune from suit under 28 U.S.C. § 1498. *See* Ex. 2 at 5–6. Six months into the case, AeroVironment moved for summary judgment based on this immunity defense. *See id.* at 1, 8–13. Simultaneously, the Government appeared before the district court and filed a "Statement of Interest" on behalf of the National Aeronautics and Space Administration ("NASA"). *See* Ex. 4. In that Statement, the Government asserted that it had granted AeroVironment its authorization and consent for the manufacture and use of the inventions

---

more narrowly to the Government's appearance (or lack of appearance) before the district court.

3

claimed in the '736 patent as to AeroVironment's "work . . . on the Mars

Helicopter pursuant to subcontract number 1512602." *Id.* at 6–7.

On April 22, 2021, the district court granted AeroVironment's

motion for summary judgment. Ex. 2. In doing so, the district court not

only rejected the Arltons' legal arguments concerning the Government's

ability to lawfully and properly consent to AeroVironment's infringement

in connection with Ingenuity, but it expressly relied on the Government's

Statement of Interest. It found:

> To the extent there was any question whether the
> Government consented to the use and manufacture of the
> particular technology described in the '763 Patent, the
> Government also filed a Statement of Interest in this case
> providing express consent to the accused activities. (*See* Dkt.
> No. 37.) Thus, there is no genuine dispute that the
> Government provided authorization and consent.

Ex. 2 at 12. At the same time, the district court denied the Arltons'

request for additional discovery into any uses of the invention claimed in

the '763 patent beyond the Mars Helicopter Ingenuity, characterizing

such request as "the object of pure speculation" given that

AeroVironment had represented it had no other plans to utilize the

Arltons' technology. *See id* at 14 (quotations and citations omitted).

4

Just seventeen days after the Court issued its summary judgment order and three days before judgment entered, AeroVironment "appeared in a 60 Minute segment with Anderson Cooper and introduced 'Terry,' a terrestrial version of the Mars Helicopter Ingenuity that is manually controlled by a pilot." Ex. 5 at 2; *see also* Ex. 3 at 3.[3] AeroVironment also stated its intention in a press release "to use the technology developed through the Ingenuity project in commercial applications." Ex. 2 at 6; *see also* Ex. 5 at 2. On May 26, 2021, in light of the public unveiling of Terry and AeroVironment's statements, the Arltons moved for relief from or to alter the judgment. *See* Ex. 2 at 3. The Court granted that motion and reopened the case "for the limited purpose of addressing the newly-discovered evidence (the Terry helicopter)." *Id.* at 7.

During the additional discovery period, AeroVironment's technical lead testified that Terry was, in fact, his idea. Ex. 7 at 36. He stated that:

> [T]he primary purpose was to have a *marketing* visual aid that we could use to promote AeroVironment's capabilities, you know, technical capabilities.

---

[3] AeroVironment revealed that it had completed Terry on April 11, 2021, which was only a few days before the 60 Minutes segment featuring Terry aired. *See, e.g.*, Ex. 6 at 3.

5

*Id.* Discovery also revealed that following the manufacture of Terry, AeroVironment not only publicly displayed the device on national television, but used it on several other occasions, including at a conference of the Association of Unmanned Vehicle Systems International. *See* Ex. 7 at 130–132. In addition, AeroVironment asserted that the Government sought to use Terry "to support ongoing acoustic investigations of Ingenuity on the surface of Mars . . . ." *See* Ex. 16 at 5.[4] Critically, the Government's use of Terry for this specific use was undertaken months *after* AeroVironment had already made and displayed Terry publicly. *See, e.g.*, Ex. 8. In total, AeroVironment produced 160,000 pages of documents related to Terry, revealing AeroVironment's use and intended use of this infringing device. Br. at 48. Following the production of these documents, the parties filed supplemental briefs with respect to whether AeroVironment "sold or offered for sale [Terry] commercially, or otherwise used [it] commercially in a substantial way." *See* Ex. 3 at 6 (setting forth the inquiry to be answered); *see also* Ex. 10 (showing submission of supplemental briefs).

---

[4] The Government also built two other engineering development models ("EDMs") to use in flight and environmental testing. Ex. 9 at 2.

6

During discovery and the supplemental briefing period that followed, the Government never submitted a statement of interest or took any positions regarding Terry. Nor did AeroVironment seek to introduce any evidence directly from the Government through, for example, a declaration. In fact, AeroVironment opposed the Arltons' request to serve a third-party subpoena on the Government for information regarding the Government's knowledge of Terry and its consent to AeroVironment's use of the Arltons' technology in connection with same. *See, e.g.*, Ex. 11 at 11. And on July 23, 2021, the district court held that the Arltons were "not entitled to discovery regarding the authorization and consent of the government for the Terry product." Ex. 12 at 1.

On August 15, 2023, the district court affirmed its summary judgment ruling and extended immunity to AeroVironment for its manufacture and uses of Terry. Ex. 13. Although the Arltons demonstrated that Terry was neither manufactured for the Government nor used for the Government when AeroVironment repeatedly displayed it at trade shows and flew it at press events, the district court discounted many of AeroVironment's action as "related to" protected activity. *Id.* at 6. This finding was consistent with the district court's earlier factual

determination that Terry "was developed as part of the Mars Ingenuity helicopter program and thus is covered under the government's same broad grant of authorization and consent that the Mars Ingenuity helicopter received." Ex. 3 at 6. The district court deemed the remaining activities the Arltons enumerated either "*de minimis*" or "non-actionable," emphasizing the lack of a sale or offer for sale of the Arltons' technology. Ex. 13 at 6–7.

## ARGUMENT

### I.  An *amicus* curiae cannot inject into the case new facts or arguments not addressed before the district court.

The facts presented in any appeal are limited to what is contained in the record of the proceedings before the district court. *Biery v. United States*, 818 F.3d 704, 710 (Fed. Cir. 2016). An appeal rests on this record established and it is not a place for fact-finding. *See generally* Fed. R. App. P. 10. This record prevents counsel from making statements on appeal that are not supported by the record, as "'arguments of counsel cannot take the place of evidence lacking in the record.'" *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 23 (Fed. Cir. 2012) (quoting *Estee Lauder Inc. v. L'Oreal*, S.A., 129 F.3d 588, 595 (Fed. Cir. 1997)); *see also United States v. Allen*, 93 F.4th 350, 358 (6th Cir. 2024).

This bedrock rule creates a bar against parties using their briefs to introduce new facts once a case is on appeal. "Litigants generally are not allowed to bypass the district court and present evidence for the first time to the court of appeals." *United States v. Miller*, 832 F.3d 703, 704 (7th Cir. 2016). Unless a party uses the process for amending the record under Federal Rule 10(e), it may only rely on facts supported by the record. *Id*. And attempts to slip new evidence into appellate proceedings may be stricken by the courts. *Weathersby v. One Source Mfg. Tech., L.L.C.*, 378 F. App'x 463, 466 (5th Cir. 2010); *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988).

An amicus curiae is not excused from this fundamental aspect of the appellate process. *Smith v. United States*, 343 F.2d 539, 541 (5th Cir. 1965) ("The Court must decline to consider the merits of issues based on new evidence furnished for the first time on appeal in the form of affidavits presented by the amicus."). A court cannot "consider the new factual material included in the brief of the amicus." *Id*. *See also Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 773 (9th Cit. 1992) ("We decline to go outside the record to consider new facts submitted by a non-party at this stage of these proceedings.").

9

For instance, the Ninth Circuit declined to consider an amicus brief from the U.S. Solicitor General that "characterize[d] the facts in a way that conflicts with the complaint, the record before us and the parties' positions." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712, 724–25 (9th Cir. 2014). This "factual discrepancy" made the court "wary of giving too much credence to the Solicitor General's brief because it demonstrates that the Solicitor General goes beyond explaining federal foreign policy and appears to make factual determinations." *Id*.

Amicus also may not raise arguments or legal issues not addressed by the parties before the district court. *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 n.4 (2013) ("Because this argument was not raised by the parties or passed on by the lower courts, we do not consider it.") (citing *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 60, n.2 (1981)); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720–21 (2014). "In the absence of exceptional circumstances, amici curiae may not expand the scope of an appeal to implicate issues not presented by the parties to the district court." *Richardson v. Alabama State Bd. of Educ.*, 935 F.2d 1240, 1247 (11th Cir. 1991).

The Federal Circuit recognized this limitation on the role of an amicus curiae in *Christian v. United States*, 337 F.3d 1338, 1345 (Fed. Cir. 2003). In that case, the Court refused to allow a group of amici to raise a waiver argument that none of the parties addressed: "Since none of the parties has made or adopted either argument, we decline to consider them." *Id.* In rejecting the amici's argument, the Court relied on the Supreme Court's instruction that an "amicus may not rely on new arguments not presented below." *Mitchell,* 451 U.S. at 60, n.2; s*ee also In re Alappat,* 33 F.3d 1526, 1536 (Fed. Cir. 1994).

## II.    The Government's *amicus* brief impermissibly seeks to expand the factual record.

Despite both the opportunity and means to be heard by the district court, the Government chose to remain silent with respect to Terry. Having made that decision, it should not now be allowed to expand the record with new facts before this Court through an *amicus* brief.

In juxtaposition to its submission with regard to the Mars Helicopter Ingenuity, *see* Ex. 4, the Government below filed no "Statement of Interest" and provided no evidence concerning its knowledge of, directions regarding, uses for, or authorization related to Terry. *See supra* at 7. The Government was mute even after the Arltons

11

expressly argued to the district court that "Terry was not made by or for the Government" in June 2021.  *See, e.g.*, Ex. 14 at 3; *see also id.* a 5 (stating that nothing "put forward by AeroVironment demonstrate[s] that the Government has consented to AeroVironment's infringement."). And, in March 2023 the Arltons submitted as a disputed fact whether "the government authorized and consented to infringement of the '763 patent" in reliance, in part, on the Government's silence in connection with the supplemental briefing on summary judgment.  Ex. 15 at 6.[5]  At bottom, during nearly three years of proceedings, including when Terry first came to light, while the parties engaged in additional discovery, and as the Court sought to evaluate Terry's purpose and uses, the Government decided to say nothing.

Given the Government's decision below, this Court should not entertain its presentation of new facts relevant to Terry.  For example, the Government now maintains that "the United States hereby provides its authorization and consent" to the use of Terry "in the tests for

---

[5] The Arltons also asserted that it was undisputed that "AeroVironment has developed its 'Terry' helicopter, a privately funded, non-government copy of the Mars Helicopter, that likewise incorporates the technology of the '763 patent."  *See* Ex. 15 at 18.

resolution of Ingenuity's audio anomalies." Gov't Br. at 18.[6]  Of even more significance, however, is the Government's contention that its authorization and consent extend to the manufacture of Terry. *Id.*  The Arltons were not only deprived of the ability to seek discovery into the contested issue of the Government's consent to Terry's manufacture before the district court, but the Government should not be permitted to attempt to resolve disputed issues of material fact or provide evidence that goes to the credibility of AeroVironment's claims by lobbing new evidence into this appeal.[7]

## III.    The Government seeks to interpose on appeal a legal argument that was never presented by the parties or considered by the district court.

Not only does the Government provide new facts in its amicus brief,

---

[6] Separate and apart from the legal question of whether the Government had the ability to lawfully provide its consent to AeroVironment, the factual issues of whether the Government's uses of Terry for purposes of acoustic testing were "for the government" and purported to be "with the authorization or consent of the Government" were not disputed below.

[7] On a record that was incomplete, at best, and even before the Arltons were permitted limited discovery, the district court concluded that "[t]he 'Terry' helicopter was developed as part of the Mars Ingenuity helicopter program and thus is covered under the government's same broad grant of authorization and consent hat the Mars Ingenuity helicopter received." Ex. 3 at 6.  Below, there was no undisputed evidence to suggest this finding given that, among other things, the governmental uses were identified *after* Terry was made and publicly displayed. *See supra* at 6.

but its argument concerning Section 1498's applicability to the manufacture of Terry gives rise to a novel legal issue never raised or addressed below.

The determination of whether a particular manufacture or use of a patented invention falls within the scope of Section 1498 relies on a two-part analysis. *See, e.g.*, *Advanced Software Design Corp. v. FRB of St. Louis*, 583 F.3d 1371, 1375–76 (Fed. Cir. 2009). This analysis requires an inquiry into whether the activity is both "for the Government" and "with the authorization and consent of the Government." *Id.* (quoting from 28 U.S.C. § 1498). Here, the Government's express and belated assertion that—in addition to the Government's use of Terry "for acoustic investigations"—AeroVironment's earlier manufacture of that device was "for the Government" changes the legal framework in a manner not presented to the district court. While ample case law addresses the timing of consent, the question of whether the Government can declare a manufacture "for the Government" retroactively by virtue of its mere say-so is a different matter entirely.[8] The Government's broad sweep—now

---

[8] The Government attempts to by-pass the necessary two-part legal analysis by focusing solely upon its provision of authorization and consent to the manufacture of Terry as opposed to whether that

14

stepping forth to agree with AeroVironment that Terry was used with the Government's authorization and consent for one purpose and conclusion that, "[a]ccordingly, the government's authorization and consent extend to the manufacture of Terry . . . ."—raises a new legal question.  Namely, is the *manufacture* of an infringing product retroactively "for the Government" because the government eventually finds a use for it?

Had the Government intervened below with respect to Terry, Arltons would have sought the opportunity to explore these facts and their significance to the question of whether the manufacture of "Terry" itself was "for the Government" pursuant to this Court's binding case law, including *Advanced Software*.    Indeed, the Arltons specifically highlighted the question of whether Terry was made or used "for the Government" or consented to Terry's manufacture as questions requiring the Court to vacate its initial summary judgment order in June 2021.  Ex. 14 at 4–7.  This new legal theory, i.e., that any governmental use can retroactively establish that an act was "for the government" and with its

---

manufacture—a separate act of infringement from Terry's use—was "for the Government."  This is separately objectionable.

authorization and consent, was never raised by the Government or AeroVironment below and should be stricken.

## CONCLUSION

For the foregoing reasons, the Arltons respectfully request that the Court strike those portions of the Brief of the United States as *Amicus Curiae* to the extent it concerns Terry under Federal Rule of Appellate Procedure 26 and Federal Circuit Rule 26.1.

Dated:  May 9, 2024

> /s/ *Deborah Pollack-Milgate*
> Deborah Pollack-Milgate
> BARNES & THORNBURG LLP
> 11 S. Meridian Street
> Indianapolis, IN 46204
> Tel: (317) 231-7339
> Deborah.PollackMilgate@btlaw.com
>
> Heather B. Repicky
> BARNES & THORNBURG LLP
> One Marina Park Drive, Suite 1530
> Boston, MA 02210
> (617) 316-5310
> hrepicky@btlaw.com
>
> *Counsel for Appellants*
> *Paul E. Arlton and David J. Arlton*

# EXHIBITS

# TABLE OF CONTENTS
# EXHIBITS

Nos. 2021-2049, 2024-1084, 2024-1159

A copy of the Order Approving Stipulated Protective Order (D.I. 85) is provided before Exhibit 1.

| Ex. | Description |
|-----|-------------|
| 1 | Complaint [D.I. 1] |
| 2 | Order Regarding Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Leave to File First Amended Complaint and Join Lite Machines Corporation as a Plaintiff (D.I. 58) |
| 3 | Order Regarding Plaintiffs' Motion for Relief from Judgment under Fed. R. Civ. P. 60 and Motion to Alter Judgment Pursuant to Fed. R. Civ. P. 59 and Defendant's Motion for Attorney's Fees and Costs (D.I. 77) |
| 4 | Statement of Interest of the United States (D.I. 37) |
| 5 | Declaration of David J. Arlton in Support of Plaintiffs' Notice of Motion and Motion for Relief from Judgment (D.I. 66-1) |
| 6 | Declaration of Matthew Keenon in Support of AeroVironment's Opposition to Plaintiffs' Motion for Relief from Judgment (D.I. 69-1) |
| 7 | Relevant excerpts of the transcripts of the deposition of Matt Keenon dated January 31, 2023 (D.I. 119-3) |
| 8 | Email chain dated July 13, 2021 (AV-00001952–1946) (D.I. 112-1) |
| 9 | Pipenberg, Benjamin T. et al., "Design and Fabrication of the Mars Helicopter Rotor, Airframe, and Landing Gear" (D.I. 40-6) |

| Ex. | Description |
|-----|-------------|
| 10 | Relevant excerpts of Docket Sheet in *Paul E. Arlton et al. v. AeroVironment, Inc.*, C.A. No. 2:20-cv-07438-AB-GJS (C.D. Cal.) |
| 11 | Joint Status Report (D.I. 78) |
| 12 | Order Regarding the Parties' Joint Status Report (D.I. 79) |
| 13 | Further Order Regarding Defendant's Motion for Summary Judgment (D.I. 133) |
| 14 | Plaintiffs' Reply in Support of Motion for Relief from Judgment (D.I. 71) |
| 15 | Statement of Disputed Facts and Additional Material Facts for Renewed Opposition to AeroVironment's Motion for Summary Judgment (D.I. 119-1) |
| 16 | Relevant excerpts of Defendants AeroVironment's Brief in Support of Reaffirming Summary Judgment (D.I. 130) |

CONFIDENTIAL MATERIAL OMITTED

Material subject to a Protective Order entered by the United States District Court for the Central District of California has been redacted. Exhibit 8 contains confidential and proprietary business information designated by the Appellee relating to AeroVironment's communications with NASA.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

PAUL E. ARLTON, an individual
and DAVID J. ARLTON, an
individual,

                Plaintiffs,

        v.

AEROVIRONMENT, INC., a
Delaware corporation,

                Defendant.

Case No. 2:20-cv-07438-AB (GJSx)

[~~PROPOSED~~] ORDER
APPROVING STIPULATED
PROTECTIVE ORDER

1.      A. PURPOSES AND LIMITATIONS

        Discovery in this action is likely to involve production of confidential,
proprietary, trade secret, and/or private information for which special protection
from public disclosure and from use for any purpose other than prosecuting this
litigation may be warranted.  Accordingly, the parties hereby stipulate to and
petition the Court to enter the following Stipulated Protective Order.  The parties
acknowledge that this Order does not confer blanket protections on all disclosures or
responses to discovery and that the protection it affords from public disclosure and
use extends only to the limited information or items that are entitled to confidential
treatment under the applicable legal principles.

        B. GOOD CAUSE STATEMENT

        This action, which relates to Defendant's performance of various United States
Government contracts and subcontracts, is likely to involve trade secrets, cost and

pricing information, contractor bid and proposal information, and other valuable research, development, commercial, financial, technical and/or proprietary information, including information subject to the Procurement Integrity Act (41 U.S.C. §§ 2101-2107), and for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, source selection and contractor bid or proposal information, or other confidential research, development, or commercial information, information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, contract(s) or common law. Accordingly, to expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such information is justified in this matter. It is the intent of the parties that information will not be designated as confidential for tactical reasons and that nothing be so designated without a good faith belief that it has been maintained in a confidential, non-public manner, and there is good cause why it should not be part of the public record of this case.

### C. ACKNOWLEDGMENT OF PROCEDURE FOR FILING UNDER SEAL

The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases.  In connection with non-dispositive motions, good cause must be shown to support a filing under seal.  *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006), *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002), *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause or compelling reasons with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal.  The parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL or HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause.

Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected.  *See Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 677-79 (9th Cir. 2010).  For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order.  Again, competent evidence supporting the application to file documents under seal must be provided by declaration.

Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted.  If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document, shall be filed.  Any application that seeks to file documents under seal in their

3

entirety should include an explanation of why redaction is not feasible.

2.  DEFINITIONS

2.1  Action: *Arlton v. AeroVironment, Inc.*, Case No. 2:20-cv-07438-AB (GJSx).

2.2  Challenging Party:  a Party or Non-Party that challenges the designation of information or items under this Order.

2.3  "CONFIDENTIAL" Information or Items:  information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c), and as specified above in the Good Cause Statement. Certain limited types of "CONFIDENTIAL" Information may be further designated, as defined and detailed below, as "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY."

2.4  Counsel:  Outside Counsel of Record and House Counsel (as well as their support staff).

2.5  Designating Party:  a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL-ATTORNEYS' EYES ONLY."

2.6  Disclosure or Discovery Material:  all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.7  Expert:  a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this Action.

2.8  "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" Information or Items: extremely  sensitive "CONFIDENTIAL" Information or Items, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means. This type of

4

information and items includes, but is not limited to, pending patent application, products currently in development and not yet commercially released, technical specifications, documents regarding the design or development of the accused product or system, current business/ strategic plans, future sales/financial projections, future marketing plans, detailed sales and financial data, source selection information, contractor bid and proposal information, or other highly sensitive or proprietary competitive or financial information. Notwithstanding the foregoing, information contained in one of these categories is not "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" merely because it relates to one or more of the designated categories, but only if disclosure of such "CONFIDENTIAL" information would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9    House Counsel:  attorneys who are employees of a party to this Action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.10    Non-Party:  any natural person, partnership, corporation, association or other legal entity not named as a Party to this action.

2.11    Outside Counsel of Record:  attorneys who are not employees of a party to this Action but are retained to represent or advise a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm that has appeared on behalf of that party, and includes support staff.

2.12    Party:  any party to this Action, including all of its officers, directors, employees, consultants, and retained experts.

2.13    Producing Party:  a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

2.14    Professional Vendors:  persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium)

and their employees and subcontractors.

2.15   <u>Protected Material</u>:  any Disclosure or Discovery Material that is designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY."

2.16   <u>Receiving Party</u>:  a Party that receives Disclosure or Discovery Material from a Producing Party.

3.   <u>SCOPE</u>

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material.

Any use of Protected Material at trial shall be governed by the orders of the trial judge.  This Order does not govern the use of Protected Material at trial.

4.   <u>DURATION</u>

FINAL DISPOSITION of the action is defined as the conclusion of any appellate proceedings, or, if no appeal is taken, when the time for filing of an appeal has run.  Except as set forth below, the terms of this protective order apply through FINAL DISPOSITION of the action.  The Parties may stipulate that they will be contractually bound by the terms of this agreement beyond FINAL DISPOSITION, but will have to file a separate action for enforcement of the agreement once all proceedings in this case are complete.

Once a case proceeds to trial, information that was designated as CONFIDENTIAL or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" or maintained pursuant to this protective order used or introduced as an exhibit at trial becomes public and will be presumptively available to all members of the public, including the press, unless compelling reasons supported by specific factual findings to proceed otherwise are made to the trial judge in advance of the trial.  *See*

*Kamakana*, 447 F.3d at 1180-81 (distinguishing "good cause" showing for sealing documents produced in discovery from "compelling reasons" standard when merits-related documents are part of court record). Accordingly, for such materials, the terms of this protective order do not extend beyond the commencement of the trial.

5.   DESIGNATING PROTECTED MATERIAL

   5.1   Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items or oral or written communications that qualify so that other portions of the material, documents, items or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

   Mass, indiscriminate or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions.

   If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all, or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other Parties that it is withdrawing the inapplicable designation.

   5.2   Manner and Timing of Designations. Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

   Designation in conformity with this Order requires:

7

(a)  for information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix at a minimum, the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" (hereinafter the "CONFIDENTIAL legend" or the "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY legend," respectively), to each page that contains protected material.  If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

A Party or Non-Party that makes original documents available for inspection need not designate them for protection until after the inspecting Party has indicated which documents it would like copied and produced.  During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order.  Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL legend" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY legend" to each page that contains Protected Material.  If only a portion of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b) for testimony given in depositions that the Designating Party identifies the Disclosure or Discovery Material on the record, before the close of the deposition all protected testimony, and specifies the level of protection being asserted.  Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have

been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements.

(c)  for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY." If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3    Inadvertent Failures to Designate.  If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.    CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1    Timing of Challenges.  Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.

6.2    Meet and Confer.  The Challenging Party shall initiate the dispute resolution process under Local Rule 37.1 *et seq.*

6.3    Burden of Persuasion.  The burden of persuasion in any such challenge proceeding shall be on the Designating Party.  Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions.  Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is

entitled under the Producing Party's designation until the Court rules on the challenge.

7.      ACCESS TO AND USE OF PROTECTED MATERIAL

7.1     Basic Principles.  A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this Action only for prosecuting, defending or attempting to settle this Action.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order.  When the Action has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2     Disclosure of "CONFIDENTIAL" Information or Items.  Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a)  the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b)  the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit A);

(c)  Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), and subject to compliance with Section 7.4;

(d)  the court and its personnel;

10

1    (e)  court reporters and their staff and who have signed the
2    "Acknowledgement and Agreement to Be Bound" (Exhibit A);

3    (f)  professional jury or trial consultants, mock jurors, and Professional
4    Vendors to whom disclosure is reasonably necessary for this Action and who have
5    signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

6    (g)  the author or recipient of a document containing the information or a
7    custodian or other person who otherwise possessed or knew the information;

8    (h)  during their depositions, witnesses, and attorneys for witnesses, in the
9    Action to whom disclosure is reasonably necessary provided: (1) the deposing party
10   requests that the witness sign the "Acknowledgment and Agreement to Be Bound"
11   (Exhibit A); and (2) they will not be permitted to keep any confidential information
12   unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A),
13   unless otherwise agreed by the Designating Party or ordered by the court.  Pages of
14   transcribed deposition testimony or exhibits to depositions that reveal Protected
15   Material may be separately bound by the court reporter and may not be disclosed to
16   anyone except as permitted under this Stipulated Protective Order; and

17   (i)  any mediator or settlement officer, and their supporting personnel,
18   mutually agreed upon by any of the parties engaged in settlement discussions.

19   7.3    Disclosure of "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES
20   ONLY" Information or Items. Unless otherwise ordered by the court or permitted in
21   writing by the Designating Party, a Receiving Party may disclose any information or
22   item designated "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" to
23   the same categories of persons listed with respect to "CONFIDENTIAL Information
24   or Items" in Sections 7.2(a), (c)-(i) above, but in any event, not information or item
25   designated "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" may be
26   disclosed to the Receiving Party's officers, directors, and employees (including
27   House Counsel).

28   7.4    Counsel desiring to disclose Protected Information to an Expert

according to Section 7.2(c) or 7.3(b) shall provide all Parties with the identity, professional address, and curriculum vitae (which shall include an identification of all current and past four years of employment and consulting relationships, including an identification of litigation deposition and trial testimony, the case in which it was given, and the party on whose behalf the Expert was retained) of such Expert at least ten (10) business days prior to the first disclosure of any Protected Information to such Expert.  If a Party objects to disclosure of the Protected Information to the Expert, it shall make its objections known in writing, in detail, within such period.  A Party that receives a timely written objection must meet and confer with the objecting Party to try to resolve the matter by agreement within ten (10) business days of the written objection.  If no agreement is reached, the Party seeking to make the disclosures to the Expert may file a motion as provided in Local Civil Rule 37 (and in compliance with Local Civil Rule 79-5, if applicable) seeking permission from the Court to do so.

8.   <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION</u>

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this Action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" that Party must:

(a)  promptly notify in writing the Designating Party.  Such notification shall include a copy of the subpoena or court order;

(b)  promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order.  Such notification shall include a copy of this Stipulated Protective Order; and

(c)  cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission.  The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

9.    <u>A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION</u>

(a)  The terms of this Order are applicable to information produced by a Non-Party in this Action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL—ATTORNEYS' EYES ONLY." Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order.  Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b)  In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

(1)  promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2)  promptly provide the Non-Party with a copy of the Stipulated Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3)  make the information requested available for inspection by the

13

Non-Party, if requested.

(c) If the Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

11. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

When a Producing Party gives notice to Receiving Parties that certain inadvertently produced material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work

14

1  product protection, the parties may incorporate their agreement in the stipulated

2  protective order submitted to the court.

3  12.    <u>MISCELLANEOUS</u>

4      12.1   Right to Further Relief.  Nothing in this Order abridges the right of any

5  person to seek its modification by the Court in the future.

6      12.2   Right to Assert Other Objections.  By stipulating to the entry of this

7  Protective Order, no Party waives any right it otherwise would have to object to

8  disclosing or producing any information or item on any ground not addressed in this

9  Stipulated Protective Order.  Similarly, no Party waives any right to object on any

10  ground to use in evidence of any of the material covered by this Protective Order.

11      12.3   Filing Protected Material.  A Party that seeks to file under seal any

12  Protected Material must comply with Local Civil Rule 79-5.  Protected Material

13  may only be filed under seal pursuant to a court order authorizing the sealing of the

14  specific Protected Material at issue.  If a Party's request to file Protected Material

15  under seal is denied by the court, then the Receiving Party may file the information

16  in the public record unless otherwise instructed by the court.

17  13.    <u>FINAL DISPOSITION</u>

18      After the final disposition of this Action, as defined in paragraph 4, within 60

19  days of a written request by the Designating Party, each Receiving Party must return

20  all Protected Material to the Producing Party or destroy such material.  As used in

21  this subdivision, "all Protected Material" includes all copies, abstracts, compilations,

22  summaries, and any other format reproducing or capturing any of the Protected

23  Material.  Whether the Protected Material is returned or destroyed, the Receiving

24  Party must submit a written certification to the Producing Party (and, if not the same

25  person or entity, to the Designating Party) by the 60 day deadline that (1) identifies

26  (by category, where appropriate) all the Protected Material that was returned or

27  destroyed and (2) affirms that the Receiving Party has not retained any copies,

28  abstracts, compilations, summaries or any other format reproducing or capturing any

of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

14.    <u>VIOLATION</u>

Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

Dated:  August 6, 2021          **BARNES & THORNBURG LLP**

By: */s/ Roya Rahmanpour*
Deborah Pollack-Milgate
Joseph L. Fehribach
Seth A. Gold
Roya Rahmanpour
Jonathan J. Boustani
Attorneys for Plaintiffs Paul E. Artlton and David J. Arlton

Dated:  August 6, 2021          **K&L GATES LLP**

By: */s/ Zachary T. Timm*
Christina N. Goodrich
Zachary T. Timm
Attorneys for Defendant AeroVironment, Inc

**FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.**

DATED:     August 9, 2021

HON. GAIL J. STANDISH
United States Magistrate Judge

16

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Central District of California on [date] in the case of *Arlton v. Aerovironment, Inc*. (Case No. 2:20-cv-07438-AB (GJSx)).  I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt.  I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Central District of California for enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

17

# EXHIBIT 1

Seth Alan Gold (SBN 163220)
Seth.Gold@btlaw.com
Roya Rahmanpour (SBN 285076)
Roya.Rahmanpour@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 284-3880
Facsimile: (310) 284-3894

Deborah Pollack-Milgate (*Pro hac vice forthcoming*)
Deborah.PollackMilgate@btlaw.com
Joseph L. Fehribach (*Pro hac vice forthcoming*)
Joseph.Fehribach@btlaw.com
**BARNES & THORNBURG LLP**
11 S. Meridian Street
Indianapolis, IN 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433

Attorneys for Plaintiffs Paul E.
Arlton and David J. Arlton

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL E. ARLTON, an individual, and DAVID J. ARLTON, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> AEROVIRONMENT, INC., a Delaware corporation <br><br> Defendant. | Case No.: _____ <br><br> COMPLAINT FOR: <br><br> DIRECT PATENT INFRINGEMENT, WILLFUL PATENT INFRINGEMENT, AND DECLARATORY RELIEF <br><br> DEMAND FOR JURY TRIAL |

**PLAINTIFFS' COMPLAINT**

Plaintiffs Paul and David Arlton, for their Complaint against Defendant
AeroVironment, Inc., hereby allege, through their attorneys Barnes & Thornburg LLP,
as follows:

## BACKGROUND AND THE PARTIES

1.      This case involves patent infringement and arises under the Patent Laws of
the United States, Title 35, United States Code. Thus, this Court has subject matter
jurisdiction under at least 28 U.S.C. § 1331 (federal question) and § 1338 (patent
actions), as well as 28 U.S.C. § 2201 (declaratory relief).

2.      The Plaintiffs Paul Arlton and David Arlton ("Plaintiffs" or "the Arltons")
are residents of the State of California.

3.      Plaintiffs are the developers of technology related to rotary wing vehicles,
and in particular to small unmanned aerial vehicles ("UAVs").  Plaintiffs' UAVs are
extraordinarily compact, lightweight, and stable, and include cyclic pitch control and a
separate drive motor for each of the rotary wings, and a hollow, non-rotating structural
backbone which functions as both a rigid airframe and a central conduit for electrical
wiring.

4.      Plaintiffs are also the owners of all rights, title, and interest in United States
Patent No. 8,042,763B2 ("the '763 patent"), entitled "Rotary Wing Vehicle," and issued
on October 25, 2011.

5.      Plaintiffs' technology, as reflected in the '763 patent, has been utilized in
the production of hundreds of UAVs, including for delivery in connection with
government contracts and applications for the Navy, Air Force, Army and Special
Operations Command.

6.      The Arltons' ingenuity is well known within the UAV community. They
were pioneers in drone technology and computerized manufacturing of miniature
helicopters in the late 1980's. Their early exploits were chronicled in Tooling and
Production magazine (CAD/CAM Takes Models from Art to Part) and RC Modeler
magazine (The Little Chopper That Could) in 1994 and 1995. Their UAV technologies

2

have been described in more than 60 domestic and international patent applications and issued patents since 2002, highlighted in the television production of Modern Marvels Extreme Aircraft II in 2007, developed with Congressional appropriations in 2007 and 2008, selected for technology demonstrations by the United States Air Force in its Unmanned Aircraft Systems Flight Plan in 2009, presented to the 68th American Helicopter Society at its annual forum in 2012, and featured in Popular Mechanics (Tomorrow's Warplane is a Mothership Packed with Expendable Drones) in 2016.

7.   Defendant AeroVironment, Inc. ("AeroVironment") is a corporation organized and existing under the laws of the State of Delaware and has its principle place of business at 900 Innovators Way, Simi Valley, CA.

8.   Upon information and belief, AeroVironment has worked with the Jet Propulsion Laboratory (hereinafter "JPL") at the National Aeronautics and Space Administration (hereinafter "NASA") since at least 2013 to build a UAV helicopter for use on the planet Mars (hereinafter the "Mars Helicopter" or the "Accused Product"). The Mars Helicopter has been aptly named "Ingenuity."

9.   JPL and NASA have now sent the Mars Helicopter to Mars with NASA's Mars 2020 Perseverance Rover as a part of NASA/JPL's Mars Exploration Program. The Mars Rover, with the Mars Helicopter aboard, launched on July 30, 2020 from Cape Canaveral Air Force Station in Florida.

10.  According to AeroVironment, its contributions to the Mars Helicopter include design and development of the helicopter's airframe and major subsystems, including its rotors, rotor blades, electric rotor hubs, and flight control mechanisms.

11.  Defendant AeroVironment, however, is not the developer of the primary technology related to the Mars Helicopter including the helicopter's airframe and major subsystems, such as its electric rotor drive systems and flight control mechanisms. Indeed, it was not AeroVironment's ingenuity at all that made the Mars Helicopter possible. Instead, on information and belief, AeroVironment willfully copied significant portions of the Arltons' technology for the Mars Helicopter. The enabling technology

AeroVironment copied from the Arltons is critical to the first successful flight of an aircraft on another planet – Mars. Credit and remuneration for this triumph of technology rightfully belongs to the Arltons, not AeroVironment.

    12.    Plaintiffs therefore seek relief in the form of a declaratory judgment that the Mars Helicopter infringes one or more claims of the Arltons' '763 patent as well as monetary damages for patent infringement.

## JURISDICTION AND VENUE

    13.    This case involves patent infringement and arises under the Patent Laws of the United States, Title 35, United States Code. Thus, this Court has subject matter jurisdiction under at least 28 U.S.C. § 1331 (federal question) and § 1338 (patent actions).

    14.    Subject matter jurisdiction also exists pursuant to 28 U.S.C. § 2201 (declaratory judgment).

    15.    This Court has personal jurisdiction over AeroVironment at least because AeroVironment has its principal place of business in the State of California, and, upon information and belief, AeroVironment has engaged in continuous and systematic business activities in the State of California.

    16.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1400(b) at least because, upon information and belief, the alleged acts of infringement were committed in this judicial district and AeroVironment has a regular and established place of business in this judicial district.

## FACTUAL BACKGROUND

    17.    AeroVironment worked with JPL and NASA to build the Mars Helicopter, Ingenuity, that recently launched to Mars along with the Mars Rover, Perseverance.

    18.    Upon information and belief, AeroVironment began working with JPL and NASA on the Mars Helicopter in 2013. AeroVironment delivered rotor and landing gear

prototypes to JPL and NASA in May 2016. AeroVironment delivered additional subsystems to JPL and NASA for the Mars Helicopter in the fall of 2017.

19.    AeroVironment's claimed contributions to the Mars Helicopter include purported design and development of the helicopter's airframe and major subsystems, including its rotors, rotor blades, electric rotor hubs, and flight control mechanisms. AeroVironment has also purportedly developed and built high-efficiency, lightweight propulsion motors, control electronics, landing gear, load-bearing structures, and the thermal enclosure for NASA/JPL's avionics, sensors, and software systems that are included in the Mars Helicopter.

20.    Upon information and belief, however, the most critical elements of this technology necessary for the first flight of an aircraft on Mars, such as the helicopter's airframe and major subsystems, including its rotors, electric rotor drive systems and flight control mechanisms, were copied from the Arltons' patented technology.

## THE INFRINGED PATENT

21.    U.S. Patent No. 8,042,763 ("the '763 Patent"), entitled "ROTARY WING VEHICLE," was issued by the United States Patent & Trademark Office on October 25, 2011, to the Arltons.

22.    The Arltons are the owners of all rights, title, and interest in the '763 Patent.

23.    The '763 Patent has not expired and is in full force and effect.

## COUNT I: DIRECT INFRINGEMENT OF THE '763 PATENT

24.    Each of the foregoing paragraphs is incorporated by reference herein.

25.    AeroVironment has directly infringed and continues to directly infringe, either literally or pursuant to the doctrine of equivalents one or more claims of the '763 Patent, including at least claim 1 of the '763 Patent, in violation of 35 U.S.C. § 271(a),

**PLAINTIFFS' COMPLAINT**

at least by making, using, offering to sell, and selling the Accused Product in the United States.

26.     The Mars Helicopter includes each of the elements of at least claim 1 of the '763 patent. *See* https://mars.nasa.gov/resources/24935/nasa-mars-helicopter-ingenuity-animations; https://mars.nasa.gov/resources/24887/mars-helicopter-ingenuity-fact-sheet/; B.T. Pipenberg, M. Keennon, J. Tyler, B. Hibbs, S. Langberg, J. Balaram, H. F. Grip, and J. Pempejian (2019). Design and Fabrication of the Mars Helicopter Rotor, Airframe, and Landing Gear Systems. *AIAA Scitech 2019 Forum*. https://doi.org/10.2514/6.2019-0620 (hereinafter "Pipenberg Article"); and Balaram, B.; Canham, T.; Duncan, C.; Grip, H. F.; Johnson, W.; Maki, J.; Quon, A.; Stern, R.; Zhu, D. (2018). Mars Helicopter Technology Demonstrator. *AIAA SciTech 2018 Forum,* AIAA Atmospheric Flight Mechanics Conference. https://doi.org/10.2514/6.2018-0023 (hereinafter "Balaram Article").

27.     AeroVironment has made, used, offered to sell, and sold the Accused Product in the United States.

28.     The Accused Product is a rotary wing aircraft. *See* Pipenberg Article, Abstract.

29.     The Accused Product includes a non-rotating structural backbone. *See, e.g.,* Pipenberg Article, "Rotor System Design," page 4: "The main mast tube is a non-rotating hollow composite structure…."

30.     The Accused Product includes a first rotor system. *See* Pipenberg Article, section titled "Rotor System Design," page 4.

31.     The Accused Product includes a first rotor system coupled to the non-rotating structural backbone. *See* Pipenberg Article, section titled "Rotor System Design," page 4; *see also* Balaram Article, Figures 6 and 7.

32.     The Accused Product includes a first rotor system including first variable pitch rotor blades supported by a first rotor shaft for rotation about an axis of rotation in

**PLAINTIFFS' COMPLAINT**

a first rotor plane. *See* Pipenberg Article, section titled "Rotor System Design," page 4; *see also* Balaram Article, Figures 6 and 7.

33.    The Accused Product includes a first rotor system including first variable pitch rotor blades controlled by a first blade pitch controller. *See* Pipenberg Article, section titled "Rotor System Design," page 4 and section titled "Swashplate and Servo Assemblies," page 6; *see also* Balaram Article, Figures 6 and 7.

34.    The Accused Product includes a first rotor system including first variable pitch rotor blades controlled by a first blade pitch controller which includes cyclic pitch control. *See* Pipenberg Article, page 2: "The helicopter is controlled by varying the blade pitch through collective and cyclic control action on each rotor." *See also* Balaram Article, Figures 6 and 7.

35.    The Accused Product includes a first rotor system coupled to the non-rotating structural backbone including first variable pitch rotor blades supported by a first rotor shaft for rotation about an axis of rotation in a first rotor plane and controlled by a first blade pitch controller which includes cyclic pitch control. *See* Pipenberg Article, section titled "Rotor System Design," page 4; *see also* Balaram Article, Figures 6 and 7.

36.    The Accused Product includes a second rotor system. *See* Pipenberg Article, section titled "Rotor System Design," page 4; *see also* Balaram Article, Figures 6 and 7.

37.    The Accused Product includes a second rotor system coupled to the non-rotating structural backbone. *See* Pipenberg Article, section titled "Rotor System Design," page 4; *see also* Balaram Article, Figures 6 and 7.

38.    The Accused Product includes a second rotor system including second variable pitch rotor blades supported by a second rotor shaft for rotation about an axis of rotation in a second rotor plane. *See* Pipenberg Article, section titled "Rotor System Design," page 4; *see also* Balaram Article, Figures 6 and 7.

7

**PLAINTIFFS' COMPLAINT**

39.     The Accused Product includes a second rotor system including second variable pitch rotor blades controlled by a second blade pitch controller. *See* Pipenberg Article, section titled "Rotor System Design," page 4 and section titled "Swashplate and Servo Assemblies," page 6; *see also* Balaram Article, Figures 6 and 7.

40.     The Accused Product includes a second rotor system including second variable pitch rotor blades controlled by a second blade pitch controller which includes cyclic pitch control. *See* Pipenberg Article page 2: "The helicopter is controlled by varying the blade pitch through collective and cyclic control action on each rotor." *See also* Balaram Article, Figures 6 and 7.

41.     The Accused Product includes a second rotor plane being positioned to lie in axially spaced apart relation to a first rotor plane along an axis of rotation. *See* Pipenberg Article, Figure 3; *see also* Balaram Article, Figures 6 and 7.

42.     The Accused Product includes a second rotor system coupled to the non-rotating structural backbone including second variable pitch rotor blades supported by a second rotor shaft for rotation about the axis of rotation in a second rotor plane and controlled by a second blade pitch controller which includes cyclic pitch control, the second rotor plane being positioned to lie in axially spaced apart relation to the first rotor plane along the axis of rotation. *See* Pipenberg Article, Figure 3; *see also* Balaram Article, Figures 6 and 7.

43.     The Accused Product includes a first blade pitch controller coupled to a non-rotating structural backbone so that neither a first rotor shaft nor a second rotor shaft of the Accused Product extends through the first blade pitch controller. *See* Pipenberg Article, Figure 3; *see also* Balaram Article, Figures 6 and 7.

## COUNT II: WILLFUL INFRINGEMENT OF THE '763 PATENT

44.     Each of the foregoing paragraphs is incorporated by reference herein.

45.     AeroVironment's infringement has been willful, thereby justifying enhanced damages pursuant to 35 U.S.C. § 284.

**PLAINTIFFS' COMPLAINT**

46.     Upon information and belief, AeroVironment, with its long-time focus on small unmanned aerial vehicles, is familiar with the Arltons' technology, the '763 patent, and Arltons' efforts to obtain government contracts focused on UAV technology. In brief, the Arltons are fierce competitors to AeroVironment.

47.     Upon information and belief, and through discovery in this matter, the Arltons expect to discover additional information demonstrating both knowledge of the '763 patent and copying of the technology as disclosed and claimed therein.

48.     Upon information and belief, AeroVironment's infringement of the '763 Patent has been and continues to be willful.

## COUNT III: DECLARATORY JUDGMENT ACTION

49.     Each of the foregoing paragraphs is incorporated by reference herein.

50.     Section 2201 of Chapter 28 of the United States Code permits a declaration of the rights and other legal relations of any interested party seeking such declaration, in the case of an actual controversy between the parties.

51.     Here, there exists a case or controversy with regard to Defendant's infringement of the '763 patent.

52.     Defendant's manufacture, use, offer for sale, and selling of the Mars Helicopter infringes at least claim 1 of the '763 patent.

53.     Therefore, Arltons are entitled to a declaration stating that the Mars Helicopter made by AeroVironment is a product that incorporates and infringes upon the Arltons' patented technology, namely, by practicing one or more claims of the '763 patent. Arltons likewise seek a declaration that such infringement has been willful.

## PRAYER FOR RELIEF

Wherefore, the Arltons demand judgment in their favor and against AeroVironment as follows:

**PLAINTIFFS' COMPLAINT**

1.     A judgment under 35 U.S.C. § 271(a) that AeroVironment has directly infringed the '763 Patent;

2.     An order under 35 U.S.C. § 283 preliminarily and permanently enjoining AeroVironment and its officers, agents, subsidiaries, successors, employees, representatives, and assigns from further infringement of the '763 Patent;

3.     An award of damages under 35 U.S.C. § 284 adequate to compensate the Arltons for AeroVironment's infringement of the '763 Patent and an accounting to determine the proper amount of such damages;

4.     An award under 35 U.S.C. § 284 of costs and prejudgment and post judgment interest on the compensatory damages to be awarded to the Arltons, along with treble damages as a result of Defendant's willful infringement;

5.     An award under 35 U.S.C. § 285 of the Arltons attorney's fees incurred in this action; and

6.     Pursuant to 28 U.S.C. § 2201, a declaration that the Mars Helicopter infringes one or more claims of the '763 patent, and that such infringement is willful; and

7.     Such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs Paul E. Arlton and David J. Arlton demand a trial by jury on all matters herein so triable.

Dated:  August 17, 2020         **BARNES & THORNBURG LLP**

By: /s/ *Seth A. Gold*
    Seth A. Gold
    Roya Rahmanpour

    Attorneys for Plaintiffs Paul E.
    Arlton and David J. Arlton

**PLAINTIFFS' COMPLAINT**

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-07438-AB-GJS | Date: | April 22, 2021 |

| Title: | *Paul E. Arlton et al v. Aerovironment, Inc.* |

| Present: The Honorable | **ANDRÉ BIROTTE JR., United States District Judge** |

| Carla Badirian | N/A |
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None Appearing | None Appearing |

**Proceedings:** **[IN CHAMBERS] ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 35), AND PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND JOIN LITE MACHINES CORPORATION AS A PLAINTIFF (DKT. NO. 46)**

Defendant AeroVironment, Inc. ("AeroVironment" or "Defendant") moved for summary judgement in its favor on its 28 U.S.C. § 1498 defense on February 16, 2021. ("Motion," Dkt. No. 35.) On March 5, 2021, Plaintiffs Paul E. Arlton and David J. Arlton (collectively, "the Arltons" or "Plaintiffs") filed an opposition. ("Opposition," Dkt. No. 40.) On March 12, 2021, Defendant filed a reply. ("Reply," Dkt. No. 41.) On March 22, 2021, Plaintiffs filed a sur-reply. ("Sur-reply," Dkt. No. 47.)

The same day Plaintiffs filed their Sur-reply, Plaintiffs also moved for leave to file a first amended complaint and to join Lite Machines Corp. as a plaintiff. (Dkt. No. 46.) On April 2, 2021, Defendant filed an opposition. (Dkt. No. 56.) On April 9, 2021, Plaintiffs filed a reply. (Dkt. No. 57.)

On March 26, 2021, the Court held a hearing on Defendant's Motion, and the Motion was taken under submission. (Dkt. 55.) Additionally, finding Plaintiffs' motion suitable for resolution without oral argument, the Court **VACATES** the hearing set for April 23, 2021. (Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.)

After considering the parties' arguments, the Court **GRANTS** Defendant's Motion and **DENIES** Plaintiffs' motion for leave to file a first amended complaint and to join Lite Machines Corp. as a plaintiff.

## I. BACKGROUND

### A. Plaintiffs' Background

Plaintiffs Paul E. Arlton and David J. Arlton are brothers and founded Lite Machines Corporation ("Lite") together. ("Arlton Decl.," Dkt No. 40-2 ¶ 2.) Paul Arlton has been President of Lite since 1991. (*Id.*) "The Arltons are inventors and co-owners of United States Patent No. 8,042,763 [("the '763 Patent")], which issued on October 25, 2011." (Plaintiffs' Statement of Disputed Facts and Additional Material Facts ("SAF"), Dkt. No. 41-2 ¶ 6.) The '763 Patent is titled "Rotary Wing Vehicle" and "relates to aerial vehicles and particularly to unmanned aerial vehicles (UAV)." '763 Patent at 1:12–13. Plaintiffs purport to have licensed the '763 Patent to Lite "to commercialize this technology as the Voyeur UAV and the Tiger Moth UAV." (Dkt. No. 40-1 ¶ 7; Dkt. No. 40-2 ¶ 5.) Plaintiffs assert that "[b]oth the Voyeur UAV and Tiger Moth UAV include the features of at least claim 1 of the '763 patent." (*Id.*) Plaintiffs also provide photos of the Voyeur UAV and Tiger Moth UAV with their Opposition. (*See* "Arlton Decl., Ex. A," Dkt. No. 40-3 at 2–4.)

According to Plaintiffs, "[s]ince 2005, Lite has been awarded over $30 million in Small Business Innovation Research ('SBIR') and Small Business Technology Transfer ('STTR') sole-source prime contracts under 15 U.S.C. § 638 (the 'SBIR Statute') to develop and demonstrate the Voyeur UAV and Tiger Moth UAV for the Navy, Air Force, Army and Special Operations Command." (Dkt. No. 40-1 ¶ 8; Dkt. No. 40-2 ¶ 6.) Plaintiffs produce one such contract numbered FA8651-10-C-0337 and dated September 29, 2010 that Plaintiffs claim is "an SBIR Phase III sole-source prime contract[.]" ("Phase III Contract," Dkt. No. 40-4; Dkt. No. 40-1 ¶ 9; Dkt. No. 40-2 ¶ 7.)[1] The Phase

---

[1] Although the Phase III Contract does not use the phrase "Phase III," it does include a provision titled "SMALL BUSINESS INNOVATION RESEARCH (SBIR) PHASE I AND PHASE II CONTRACT REQUIREMENTS (DEC 2005) (TAILORED)," as well as several "FEDERAL ACQUISITION REGULATION CONTRACT CLAUSES" and at least one "DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT CONTRACT CLAUSE" directed to "small business concerns" and the SBIR. (*See* Dkt. No. 40-4 at 14 (*citing* 52.219-06, 52.219-08, 52.219-14, 52.219-28, and 252.227-7018).) Additionally, Exhibit E of the Arlton Decl., dated August 13, 2013, states, "In 2010, Lite Machines received Phase III funding of approximately $1.3 million from the Air Force

III Contract states that the Air Force contracted with Lite to pay $1,386,274 for "[f]ive (5) Tiger Moth V6.1 vehicles to support control system developments and flight testing to include software in an executable format on a CD or DVD and Installed on a Government control station or laptop computer." (Dkt. No. 40-4 at 1–2.)[2]

"In May 2012, the Arltons presented a scientific research paper titled, 'Control System Development and Flight Testing of the Tiger Moth UAV' at the American Helicopter Society 68th Annual Forum." ("Research Paper," Dkt. No. 40-5; Dkt. No. 40-1 ¶ 13; Dkt.No. 40-2 ¶ 13.) The Research Paper was co-authored by members of the Aeroflightdynamics Directorate (ARMDEC) of the U.S. Army Research, Development, and Engineering Command. (*See id.*)[3]

Plaintiffs further claim that "[b]etween 2013 and 2015 the Air Force authorized payment of license fees to the Arltons for the '763 Patent on multiple occasions." (Dkt. No. 40-1 ¶ 15; Dkt. No. 40-2 ¶ 15.)[4] Finally, Plaintiffs assert that on February 2, 2016, the Air Force informed Plaintiffs that there would be no more funding or "follow-on work." (Dkt. No. 40-1 ¶ 17; Dkt. No. 40-2 ¶ 18.)[5] According to Plaintiffs, the Arltons were then "forced to close Lite[.]" (*Id.*)

## B. The SBIR and STTR Programs

The Small Business Administration describes the SBIR and STTR Programs as "highly competitive programs that encourage domestic small businesses to engage in Federal Research/Research and Development (R/R&D) with the potential for commercialization. Through a competitive awards-based program, SBIR and STTR enable small businesses to explore their technological potential and provide the incentive to profit from its commercialization." *See* About – The SBIR and STTR Programs, SMALL BUS. ADMIN., https://www.sbir.gov/about (last visited March 22, 2021). The SBIR and STTR Programs are codified at § 9 of the Small Business Act, 15 U.S.C. § 638. The SBIR Statute defines the SBIR Program as "a program under which a portion of a Federal agency's research or research and development effort is reserved for award to small business concerns through a uniform process having" three phases. § 638(e)(4).

---

for an air launched-off board sensing small UAV." (Dkt. No. 40-7.)

[2] Exhibit E of the Arlton Decl., dated August 13, 2013, states that Lite also "received $1.5 million in SBIR Phase II funding." (Dkt. No. 40-7.) Plaintiffs otherwise do not produce any evidence that they received $30 million in SBIR funding. Presumably, the remainder of the funding was awarded in STTR sole-source prime contracts.

[3] Plaintiffs also state that the Research Paper was coauthored "by the lead helicopter expert and senior scientist at NASA Ames" that Plaintiffs purportedly awarded a subcontract to, but Plaintiffs did not produce such a subcontract and the Research Paper does not reference "NASA Ames." (Dkt. No. 40-1 ¶¶ 10–13; Dkt. No. 40-2 ¶¶ 10–13.)

[4] Plaintiffs provide no supporting documentation or testimony other than the Arlton Decl.

[5] Again, Plaintiffs provide no supporting documentation or testimony other than the Arlton Decl.

Similarly the SBIR Statute defines the STTR Program as a program "under which a portion of a Federal agency's extramural research or research and development effort is reserved for award to small business concerns for cooperative research and development through a uniform process having" three phases. § 638(e)(6).

The SBIR Statute states that the first phase of the SBIR program, referred to as Phase I, is used "for determining, insofar as possible, the scientific and technical merit and feasibility of ideas that appear to have commercial potential … submitted pursuant to SBIR program solicitations." § 638(e)(4)(A). The second phase of the SBIR Program, referred to as Phase II, is used to "further develop proposals which meet particular program needs, in which awards shall be made based on the scientific and technical merit and feasibility of the proposals, as evidenced by the first phase, considering, among other things, the proposal's commercial potential[.]" § 638(e)(4)(B). According to the SBIR Statute, a "proposal's commercial potential" is evidenced by:

(i)     small business concern's record of successfully commercializing SBIR or other research;

(ii)    the existence of second phase funding commitments from private sector or non-SBIR funding sources;

(iii)   the existence of the third phase [of the SBIR Program, referred to as Phase III,] follow-on commitments for the subject of the research; and

(iv)    the presence of other indicators of the commercial potential of the idea[.]"

*See id*. The SBIR Statue defines Phase III as follows:

[W]here appropriate, a third phase for work that derives from, extends, or completes efforts made under prior funding agreements under the SBIR program—

(i) in which commercial applications of SBIR-funded research or research and development are funded by non-Federal sources of capital or, for products or services intended for use by the Federal Government, by follow-on non-SBIR Federal funding awards; or

(ii) for which awards from non-SBIR Federal funding sources are used for the continuation of research or research and development that has been competitively selected using peer review or merit-based selection procedures.

§ 638(e)(4)(c). The three phases of the STTR Program are similarly defined, with the exception that Phases I and II of the STTR Program do not require that the proposals have "commercial potential." *See* § 638(e)(6).

Under the subsection titled "Phase III agreements, competitive procedures, and justification for awards," the SBIR Statute states, "In the case of a small business concern

that is awarded a funding agreement for Phase II of an SBIR or STTR program, a Federal agency may enter into a Phase III agreement with that business concern for additional work to be performed during or after the Phase II period." § 638(r)(1). The subsection also states, "[t]o the greatest extent practicable, Federal agencies and Federal prime contractors shall … issue, without further justification, Phase III awards relating to technology, including sole source awards, to the SBIR and STTR award recipients that developed the technology." § 638(r)(4).

## C. Defendant's Background

Between 2013 and 2019, Defendant entered into at least three subcontracts with the Jet Propulsion Laboratory ("JPL") "to build a UAV helicopter for use in the planet Mars (hereinafter the 'Mars Helicopter'[)]." (Defendant's Statement of Uncontroverted Facts ("SUF"), Dkt. No. 35-1 ¶ 3; "Complaint," Dkt. No. 1 ¶ 8; "2013 Subcontract," Dkt. No. 36-1; "2014 Subcontract," Dkt. No. 36-2; "2019 Subcontract," Dkt. No. 36-3 (collectively, "the Subcontracts").) "JPL is a federally funded research and development center ('FFRDC') managed by the California Institute of Technology ('Caltech') under a prime contract with [the National Aeronautics and Space Administration ('NASA')][.]" (Dkt. No. 35 at 3 (*citing* "Beckham Decl.," Dkt. No. 36 ¶ 8; "Prime Contract," Dkt. No. 36-4 at AV-00000007).) "The subcontracts between JPL and [Defendant] fall 'UNDER JPL's NASA PRIME CONTRACT.'" (Dkt. No. 35-1 ¶ 4 (*citing* Dkt. No. 36 ¶ 7; Dkt. No. 36-1 at AV-00000511; Dkt. No. 36-2 at AV-00000526; Dkt. No. 36-3 at AV-00000764; Dkt. No. 36-4 at AV-00000001).)

"JPL's prime contract with NASA includes [a Federal Acquisition Regulation ('FAR')] authorization and consent clause, Alternate I (FAR 52.227-1, Alt. I)." (Dkt. No. 35-1 ¶ 5 (*citing* Dkt. No. 36 ¶ 10; Dkt. No. 36-4 at AV-00000152).) Each of the Subcontracts includes FAR clause 52.227-1, Alt. I as well. (Dkt. No. 35-1 ¶ 6 (*citing* Dkt. No. 36 ¶¶ 11–12; Dkt. No. 36-1 at AV-00000512; Dkt. No. 36-2 at AV-00000527; Dkt. No. 36-3 at AV-00000765; Dkt. No. 36-5 at AV-00000876–77 (JPL General Provisions incorporated into 2013 Subcontract); Dkt. No. 36-6 at AV-00000820 (JPL General Provisions incorporated into 2014 Subcontract); Dkt. No. 36-7 at AV-00000948 (JPL General Provisions incorporated into 2019 Subcontract)).)

## D. Litigation History

On August 17, 2020, Plaintiffs filed a Complaint in this Court accusing Defendant of infringing at least claim 1 of the '763 Patent by "at least by making, using, offering to sell, and selling [the Mars Helicopter] in the United States [(collectively, "the Accused Activities")]." (Dkt. No. 1 ¶¶ 25–26.) On September 10, 2020, Defendant filed an Answer, which asserts throughout that "Plaintiffs have no remedy against AeroVironment due to the applicability of 28 U.S.C. § 1498[.]" (Dkt. No. 19 ¶ 1.)

The parties participated in a Rule 26(f) conference on November 17, 2020. (Dkt. No. 41-1, Ex. A.) On November 19, 2020, Plaintiffs served their First Set of Requests for Production of Documents. (Dkt. No. 40-8 ¶ 2; Dkt. No. 40-9.) On November 24, 2020, Defendant's counsel emailed Plaintiffs' counsel to inform them that Defendant intended "to move for early summary judgment on its defense under 28 U.S.C. § 1498" and requested that Plaintiffs identify any discovery they believed was necessary to evaluate its § 1498 defense. (*Id*.) On November 27, 2020, the parties filed a joint 26(f) report. (Dkt. No. 29.) In the report, Defendant stated that it sought "leave to file an early motion for summary judgment on its Section 1498 defense." (*Id*. at 9.) Plaintiffs' statement in the report responded to Defendant's arguments, but did not mention the SBIR program. (*Id*. at 11–12.)

On December 12, 2020, the Court issued its Order Re: Jury/Court Trial requesting that the parties "meet and confer on Defendant's anticipated Section 1498 motion, and insofar as discovery may be necessary, they should seek to agree to conduct the relevant discovery first." (Dkt. No. 33 at 2.) The Court also stated, "If the parties cannot agree, Defendant may file an early motion for summary judgment on the Section 1498 defense only, and if Plaintiffs think they need discovery, they can seek a continuance pursuant to Fed. R. Civ. P. 56(d)." (*Id*.) The Court also set the deadline for the last date to hear a motion to amend the pleadings and add parties as February 12, 2021. (*Id*. at 3.)

On December 21, 2020, Defendant responded to Plaintiffs' First Set of Requests for Production of Documents. (Dkt. No. 40-8 ¶ 3; Dkt. No. 40-10.) Defendant declined to produce documents in response to many of the requests, stating, "Any discovery on the merits should proceed, if at all, only after the Court resolves AeroVironment's motion for summary judgment on its Section 1498 defense, consistent with Congress's intent 'to relieve private Government contractors from expensive litigation with patentees.'" (*Id*.)

On January 8, 2021, the parties met and conferred regarding what discovery needed to be conducted before Defendant brought its motion. (Dkt. No. 35-2 ¶ 8; Dkt. No. 40-8 ¶ 4.) "Plaintiffs agreed to outline in greater detail the reasons that discovery was necessary to respond to an anticipated summary judgment motion by Defendant" and provided its response on January 14, 2021. (Dkt. No. 40-8 ¶¶ 4–5.)

On February 3, 2021, Defendant responded to Plaintiffs' January 14, 2021 letter, stating that it planned to file its Motion on February 12, 2021 if Plaintiffs did not offer to settle the case. (Dkt. No. 41-1 ¶ 5; *id*., Ex. C.) On February 16, 2021, Defendant filed its Motion. (Dkt. No. 35.) On February 17, 2021, NASA filed a "Statement of Interest of the United States" stating that the United States granted its authorization and consent for Defendant's alleged use and manufacture of patented inventions claimed in the '763 Patent. ("Statement of Interest," Dkt. No. 37.)

## II.  LEGAL STANDARD

### A. Summary Judgment

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994); Fed. R. Civ. P. 56(c) (motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Anderson,* 477 U.S. at 255). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

### B. 28 U.S.C. § 1498

Section 1498 is an affirmative defense, not a jurisdictional bar. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990). Section 1498 "relieves a third party from patent infringement liability, and it acts as a waiver of sovereign immunity and consent to liability by the United States." *Madey v. Duke Univ.*, 307 F.3d 1351, 1359 (Fed. Cir. 2002). A § 1498 affirmative defense is a highly factual determination, whereby a defendant must establish that "(1) the [infringing] use is 'for the Government'; and (2) the [infringing] use is 'with the authorization and consent of the Government.'" *Sevenson Env'l. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007). "The burden is initially upon the movant to establish the absence of any genuine issue of material fact and entitlement to judgment as a matter of law." *Crater Corp. v. Lucent Techs.*, 255 F.3d 1361, 1366 (Fed. Cir. 2001) (*citing Celotex*, 477 U.S. at 323–34).

## C. Leave to Amend

To determine whether a proposed amendment to pleading should be allowed after the scheduling order deadline for amending pleadings has expired, there are typically two steps: (1) the party seeking amendment must show good cause to allow modification of the scheduling order under Rule 16, and (2) the court must determine whether amendment is proper under Rule 15. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992); *Eckert Cold Storage, Inc. v. Behl*, 943 F. Supp. 1230, 1232–33 (E.D. Cal. 1996).

"Only after the moving party has demonstrated diligence under Rule 16 does the court apply the standard under Rule 15 to determine whether the amendment was proper." *Id*. (citations omitted). Rule 15(a)(2) instructs the court to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Foman v. Davis*, 371 U.S. 178, 182 (1962).

"This policy is to be applied with extreme liberality." *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014) (citation omitted); *see also DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (citation omitted) ("Amendment is to be liberally granted where from the underlying facts or circumstances, the [claimant] may be able to state a claim.") Even so, "[l]eave to amend is not automatic[,]" *Kaneka Corp. v. SKC Kolon PI, Inc.*, No. CV 11-03397 JGB (RZx), 2013 WL 11237203, at *2 (C.D. Cal. May 6, 2013). In the Ninth Circuit, courts consider five factors in deciding whether to grant leave to amend: "bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint." *Id*. (citing *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004)); *see also Forman v. Davis*, 371 U.S. 178, 182 (1962). "Futility alone can justify the denial of a motion for leave to amend." *Nunes*, 375 F.3d at 808.

The party opposing amendment bears the burden of showing prejudice, which is the "touchstone of the inquiry under [R]ule 15(a)." *Eminence Capital, LLC v. Aspen, Inc.*, 316 F.3d 1048, 1052 (internal quotation marks omitted) (citation omitted); *see also Johnson*, 975 F.2d at 609 ("Rule 15(a)'s liberal amendment policy . . . focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party"). Ultimately, leave to amend lies "within the sound discretion of the trial court." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981); *see also Rich v. Shrader*, 23 F.3d 1205, 1208 (9th Cir. 2016).

## III.  ANALYSIS

### A. Defendant's Summary Judgement Motion

Defendant seeks a summary judgment determination that the Accused Activities of are immune from patent infringement liability under § 1498. (*See generally* Dkt. No. 35.) Defendant argues that its Mars Helicopter was specifically designed and made for the Government as evidenced by the Subcontracts, the Prime Contract, and Plaintiffs' own allegations in the Complaint. (*See id*. at 8–9.) Defendant also contends that the Accused

Activities were done with the Government's express authorization and consent as evidenced by the inclusion of FAR clause 52.227-1 in each of the Subcontracts and the Prime Contract, as well as the Statement of Interest filed by NASA. (*See id*. at 9–13.)

Plaintiffs respond that the Court should deny the Motion or at least defer ruling on it until after the parties conduct additional discovery. (*See generally* Dkt. No. 40.) *First*, Plaintiffs argue that Defendant's allegedly infringing activities could not be "for the Government" because they were contrary to the Government's established policy under the SBIR Program. (*See id*. at 11–13.) *Second*, for similar reasons, Plaintiffs assert that the Government lacked authority to authorize and consent to the accused infringing activity because it was obligated to contract with the Alrtons and Lite under the SBIR Program. (*See id*. at 13–16.) *Third,* Plaintiffs request that it be permitted additional discovery to show that the Government did not actually authorize and consent to accused infringing activities, stating, "If this Court indeed is to determine that the Statute is as broad as AeroVironment contends, it should do so against a full factual record." (*See id*. at 16–21.)

In its Reply, Defendant emphasizes that Plaintiffs do not dispute any of the facts put forth by Defendant. (*See* Dkt. No. 41 at 2–3.) Defendant argues that "[a]s a threshold matter, this Court cannot entertain Plaintiffs' argument about the propriety of the award of the Mars Helicopter Subcontracts to [Defendant]" because the Court of Federal Claims ("COFC") retains exclusive jurisdiction for such claims. (*Id*. at 4.) Defendant also argues that the COFC already rejected Plaintiffs' argument in *Lite Machines Corp. v. United States*, 143 Fed. Cl. 267, 281 (2019). (*See id*. at 5–7.) Further, Defendant asserts that Plaintiffs' arguments about the SBIR Program are irrelevant to whether § 1498 applies. (*See id*. at 7–11.) Finally, Defendant argues that Plaintiffs' request for additional discovery is speculative and irrelevant. (*See id*. at 11–15.)

In its Sur-reply, Plaintiffs respond that this Court should ignore the COFC's decision in *Lite Machines Corp.* because "the court in *Lite Machines Corp.* did not address the question pending before this Court; (2) the court's decision was factually and legally erroneous, and has been subject to a motion to reconsider, yet to be ruled upon, and pending since June 2019; and (3) portions of the *Lite Machines Corp. v. United States* matter have been deemed classified." (Dkt. No. 47 at 1.)

The Court considers each of these arguments in turn.

### i. Whether the Accused Activities Were Done "For the Government"

Defendant argues that the Accused Activities related to the Mars Helicopter were done "for the Government."

"A use [or manufacture] is 'for the Government' if it is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" *Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc*., 369 F. Supp. 3d 963, 977 (C.D. Cal. 2019) (*quoting Madey*, 413 F. Supp. 2d at 607).

This prong is satisfied where "the use or manufacture of a patented method or apparatus occur pursuant to a contract with the government and for the benefit of the government." *Sevenson*, 477 F.3d at 1365–66; *see also Saint-Gobain,* 369 F. Supp. 3d at 977. Further, the Government's benefit need not be the "primary purpose" of a government contract. *See Sevenson*, 477 F.3d at 1365–66.

The Accused Activities related to the Mars Helicopter were clearly "for the Government." There is no genuine dispute of fact that Defendant is a subcontractor for the Government contracted specifically to work on the Mars Helicopter. (*See* Dkt. No. 1 ¶ 8; Dkt. No. 36-1; Dkt. No. 36-2; Dkt. No. 36-3; Dkt. No. 36-4.) The Prime Contract states that JPL's "primary mission is to support the NASA Science Mission Directorate (SMD) in carrying out the specific objectives identified in the SMD Science Plan," describes specific areas to be addressed, and lists goals for the JPL to achieve its mission. (Dkt. No. 36-4 at AV-00000019.) The 2013 Subcontract states that Defendant "shall provide support to the development of a proposal to the Mars 2020 Announcement of Opportunity for the Mars Heli-Scout air vehicle propulsion subsystem." (Dkt. No. 36-1 at AV-00000514.) The 2014 Subcontract states that Defendant "shall develop conceptual designs for a Vertical Take-off and Landing (VTOL) aircraft suitable for demonstration of free flight in a simulated Mars atmosphere," which "will build on previous coaxial helicopter design work developed under [the 2013 Subcontract]." (Dkt. No. 36-2 at AV-00000529.) And the 2019 Subcontract states that Defendant "shall furnish the personnel to assist JPL, to the extent requested by JPL, in connection with the Mars Helicopter Project (MHP)." (Dkt. No. 36-3 at AV-00000766.) Thus, the express language of the Prime Contract and Subcontracts shows that Defendant worked with JPL to support NASA in connection with the Mars Helicopter Program, which is 'in furtherance and fulfillment of a stated Government policy' which serves the Government's interests and which is 'for the Government's benefit.'" *Saint-Gobain*, 369 F. Supp. 3d at 977.

Plaintiffs do not dispute the stated purposes of the Subcontracts and Contract but rather argue that the Subcontracts were contrary to the Government's policies articulated in the Policy Directives issued in connection with the SBIR Program. (Dkt. No. 40 at 11–13 (*citing* "SBIR Policy Directive," (effective May 2, 2019), *available at* https://www.federalregister.gov/documents/2019/04/02/2019-06129/small-businessinnovation-research-program-and-small-business-technology-transfer-program-policy).) According to Plaintiffs, Lite "was clearly entitled to the Mars Helicopter contracts that were awarded to [Defendant] … based on a plain reading of the SBIR Statute, unless the Mars Helicopter Program were to forego use of [Plaintiffs'] technology." (Dkt. No. 40 at 12.) Thus, Plaintiffs contend that "application of Section 1498 here would undermine [the government policy] that has been lauded by the Small Business Administration." (*Id*.)

The Court declines to read into § 1498 a requirement that the "stated Government policy" does not conflict with another policy. Section 1498 only requires that the accused activities be "for the Government," and the Federal Circuit has held that the benefit need not be the primary purpose of the contract, so long as it is more than an incidental benefit. *See Sevenson*, 477 F.3d at 1365–66; *IRIS Corp. v. Japan Airlines Corp*., 769 F.3d 1359, 1362 (Fed. Cir. 2014) ("Incidental benefit to the government is insufficient, but it is not

necessary for the Government to be the sole beneficiary....") (internal quotations omitted). Plaintiffs do not provide any legal support for their position that when a "stated Government policy" articulated in a government contract conflicts with another stated Government policy that the contract cannot be "for the Government." To impose such a requirement would require the Court to speculate which policy the Government intended to control, which the Court will not do.

The legislative purpose of § 1498 also supports Defendant's position. Section § 1498(a) was first enacted in 1910, and was later broadened in order to aid the Government's procurement efforts during World War I. As the Court explained in *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 345 (1928): "The intention and purpose of Congress in the act of 1918 was to stimulate contractors to furnish what was needed for the war, without fear of becoming liable themselves for infringements to inventors or the owners or assignees of patents." The Federal Circuit has expressly held that, "the coverage of § 1498 should be broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement." *TVI Energy*, 806 F.2d at 1060. In other words, § 1498 was enacted to give the Government the freedom to contract with whomever it chooses in order to procure goods or services while providing immunity to those contractors. Deciding who to contract with often may require choosing between competing policy interests. It follows that § 1498 also allows the Government to decide between these policy interests, and the Court will not question the Government's decision to choose one policy over another.

Accordingly, the Court finds that the accused activities were "for the Government."

### ii.  Whether the Accused Activities Were Done with the Government's "Authorization and Consent"

Defendant also argues that the accused activities were done with the express "authorization and consent of the Government."

Under § 1498, the "authorization and consent" of the government may be express or implied. *Golden v. United States*, 137 Fed. Cl. 155, 175 (Fed. Cl. 2018); *TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1060 (Fed. Cir. 1986) ("In proper circumstances, Government authorization can be implied.") "When the Government provides express consent, that consent may be very broad, extending to any patented invention and any infringing use, or may be limited to only certain patented inventions or to only those uses that are necessary or are specifically consented to by the Government." *Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 608 (M.D.N.C. 2006) (*citing Carrier Corp. v. United States*, 534 F.2d 244, 249 (Ct. Cl. 1976)). "Such express consent is often contained in the language of the Government contract itself, or in other formal, written authorization from the Government." *Id*. at 607–608. "Where, as here, a government contract contains an explicit authorization and consent clause (and the parties have alleged no alternative source for government authorization and consent), the scope of the government's authorization and consent to liability naturally hinges on the language of that clause." *Sevenson*, 477 F.3d at 1366–67.

The Government provided authorization and consent in this case. The Prime Contract and each of the Subcontracts include FAR clause 52.227-1, Alt. I, titled "Authorization and Consent," which broadly states, "The Government authorizes and consents to *all* use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier." 48 C.F.R. § 52.227–1, Alt. I (emphasis added). To the extent there was any question whether the Government consented to the use and manufacture of the particular technology described in the '763 Patent, the Government also filed a Statement of Interest in this case providing express consent to the accused activities. (*See* Dkt. No. 37.) Thus, there is no genuine dispute that the Government provided authorization and consent.

Plaintiffs argue that NASA and JPL lacked the authority to contract with Defendant, and therefore could not authorize and consent to the accused activities. Specifically, Plaintiffs argue that the Government "was obligated to award an SBIR Phase III sole-source prime contract to Lite for the Mars Helicopter program to the greatest extent practicable[,]" and that it violated the SBIR Statute and SBIR Policy Directive by awarding the contract to Defendant. (Dkt. No. 40 at 14.)[6]

The Court finds that the Government did not lack the authority to contract with Defendant. Although not binding, the COFC's analysis of the SBIR Statute in *Lite Machines* is persuasive. In evaluating whether the SBIR Statute required the Government to continue to contract with Lite, the court found the SBIR Statute "does not require that the government award a Phase III contract to a recipient of a Phase I or Phase II SBIR award under which the relevant technology was developed." *Lite Machines*, 143 Fed. Cl. at 283. As the Court reasoned, "§ 638(e)(4)(c) indicates that Phase III contracts are to be awarded 'where appropriate.'" *Id.* (*citing* § 638(e)(4)(c)); *see also id.* at 284 (*citing* § 638(r)(1) (stating that, when a small business concern is awarded a Phase II agreement, "a Federal agency *may* enter into a Phase III agreement with that business concern for additional work to be performed during or after the Phase II period") (emphasis added)). Moreover, as evidence by the use of the phrase "[t]o the greatest extent practicable," "§ 638(r)(4) appears to be aimed at encouraging, but not requiring, an agency to seriously consider awarding a contract to the developer of the technology in the context of a SBIR Phase III award relating to technology developed as part of the SBIR program." *Id.*

Further, in considering a related subsection of the SBIR Statute, the Federal Circuit has held that "§ 638 imposes no duty on the government to award a Phase III contract to a concern that successfully completes a Phase II contract." *Night Vision Corp. v. United*

---

[6] Additionally, Plaintiffs argue that the Prime Contract includes a clause that "specifically prohibits JPL from competing with commercial enterprises such as Lite." (*Id.* (*citing* Dkt. No. 36-4 at AV-00000007 (stating that JPL "shall not use its privileged information or access to facilities to compete with the private sector in contravention of FAR 35.017")).) Plaintiffs do not provide any evidence that JPL competes in the private sector, however, and the Court is not persuaded by Plaintiffs' argument.

*States*, 469 F.3d 1369, 1374 (Fed. Cir. 2006) (addressing § 638(j)(2)(C), which states, "Not later than 90 days after October 28, 1982, the Administrator shall modify the policy directives issued pursuant to this subsection to provide for … procedures to ensure, *to the extent practicable*, that an agency which intends to pursue research, development, or production of a technology developed by a small business concern under an SBIR program enters into follow-on, non-SBIR funding agreements with the small business concern for such research, development, or production.") (emphasis added). The Federal Circuit reasoned that to hold otherwise "would seriously limit the government's ability to select the form of procurement that it considers most appropriate in the particular situation." *Id.* The same reasoning applies here. *See TVI Energy*, 806 F.2d at 1060 ("the coverage of § 1498 should be broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement"). Thus, contrary to Plaintiffs' assertion, the Government was not obligated to contract with Lite.[7]

Plaintiffs also argue that the Government could have "tried to meet its obligations to the Arltons and Lite by instructing AeroVironment not to use the Arltons' technology, either directly or indirectly, for the Mars Helicopter, but AeroVironment disregarded those instructions, putting the Government in a bind." (Dkt. No. 40 at 15–16.) But the broad authorization and consent clause included in the Subcontracts and the Statement of Interest show otherwise. Further, assuming the Government did instruct Defendant to avoid the technology claimed in the '763 Patent, the Statement of Interest shows that the Government retroactively authorizes and consents to the Accused Activities. *See Auerbach v. Sverdrup Corp.*, 829 F.2d 175, 179–180 (Fed. Cir. 1987) (noting that for purposes of § 1498, "express documentary evidence" of the government's consent "[o]bviously ... will do," and that "the form of the [government's] consent" may include "retroactive consent"); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976) (stating that "post hoc intervention of the Government in pending infringement litigation against individual contractors" establishes authorization and consent).

Accordingly, the Court finds that the Government provided "authorization and consent."[8]

### iii. Whether Plaintiffs Are Entitled to Additional Discovery

The Court also denies Plaintiffs' request for additional discovery.

Federal Rule of Civil Procedure 56(d) provides, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer consideration of the motion or deny it; (2)

---

[7] Plaintiffs' attempts to distinguish *Night Vision* in their Sur-reply are unpersuasive.

[8] Underlying much of Plaintiffs' argument is the mistaken belief that Plaintiffs would have no recourse for Defendant's alleged infringement if § 1498 applies. Section 1498 provides that "the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture." § 1498(a).

allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." The burden is on Plaintiffs to show that the evidence sought likely exists and that it would prevent summary judgment. *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n.6 (9th Cir. 2001). The district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past; or, put differently, the district court only abuses its discretion "if the movant diligently pursued its previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment." *Id.* (internal citations omitted). The purpose of Rule 56(d) is to prevent the nonmoving party from being "railroaded" by a premature summary judgment motion.

Plaintiffs argue that discovery is necessary to show "whether the Government had the obligation to award an SBIR Phase III contract to the Arltons, whether Section 1498 can apply in view of what the Arltons believe the Government's obligations to them were under the SBIR Statute, and whether the Government provided any directions to AeroVironment to avoid the Arltons' technology, such that consent was either not given, or even expressly revoked." (Dkt. No. 40 at 17.) These issues were already explicitly addressed in Plaintiffs' Opposition, though, and as stated above, the Court rejects each of these arguments as a matter of law. Moreover, "the evidence sought by Plaintiff[s] is the 'object of pure speculation.'" *Richter v. United States*, No. 2:01-CV-5240, 2002 WL 31031777, at *7 (C.D. Cal. Apr. 2, 2002) (*quoting Exxon Corp. v. Federal Trade Comm'n*, 663 F.2d 120, 127 (D.C. Cir. 1980)) (denying Rule 56(f) request for additional discovery). For instance, Plaintiffs argue that "Request [for Production] No. 4 is also relevant to the question of any plans to otherwise utilize the Arltons' technology[,]" but concede that "Defendant has indicated there are no such plans" and offers no other support for its request. (Dkt. No. 40 at 20.)

Accordingly, the Court finds that Plaintiffs' Rule 56(d) request for additional discovery is unwarranted.

### B. Plaintiffs' Motion for Leave to File a First Amended Complaint and to Join Lite as a Plaintiff

Plaintiffs also move for leave to file a first amended complaint and to join Lite as a plaintiff. (Dkt. No. 46.) Specifically, Plaintiffs seek to add claims pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 and the California Uniform Trade Secrets Acts, Cal. Civ. Code §§ 3426–3426.11. (*See id.* at 1.) Plaintiffs argue that they exercised diligence in pursing their trade secret claims and established good cause for modifying the scheduling order. (*See id.* at 6–9.) Plaintiffs assert that they were not aware of the facts necessary to add its trade secret claims until after Defendant produced certain documents. (*See id.*) According to Plaintiffs, on receiving these documents, "on or about January 31, 2021, the Arltons began considering the instant theft of trade secrets claims." (*Id.* at 7.)

Defendant responds that Plaintiffs' were not diligent in seeking leave to amend. (*See* Dkt. No. 56 at 3–6.) Specifically, Defendant argues that Plaintiffs filed their complaint eight months ago and the Court's Scheduling Order adopted Plaintiffs' suggested date of February 12, 2021 for the deadline to add parties and amend pleadings

in this case. (*See id.* at 1, 3.) Defendant also emphasizes that Plaintiff conceded "that [Plaintiffs] had fully 'corroborated' their claim nearly two weeks before the deadline to amend pleadings and nevertheless chose to ignore the court's deadline." (*Id.* at 4.) Defendant also asserts that Plaintiffs' proposed amended complaint is futile. (*See id.* at 6–13.) Finally, Defendant argues that Plaintiffs were also not diligent in seeking leave add Lite. (*See id.* at 15–16.)

Plaintiffs reply that they brought this motion as soon as was practical under the circumstances. (*See* Dkt. No. 57 at 2–4.) Plaintiffs also argue that their amendment is not futile. (*See id.* at 4–9.)

The Court agrees with Defendant that Plaintiffs were not diligent in seeking leave to amend the Complaint and has not shown good cause to amend the Court's Scheduling Order. Plaintiffs received Defendant's only production on December 30, 2020. (*See* Dkt. No. 46 at 2.) Despite this, Plaintiffs state that it did not start contemplating seeking leave to amend until about January 31, 2021, which Plaintiffs admit was after the January 8, 2021 deadline to file a motion for leave to amend. (*See id.* at 7; Dkt. No. 57 at 2.) Yet Plaintiffs did not seek leave to amend until nearly two months after this date on March 22, 2021. Notably, Plaintiffs waited until after Defendant's dispositive motion on its § 1498 defense was fully briefed to file its motion for leave to amend.

Additionally, Plaintiff admits that the details regarding the specific characteristics of the Mars Helicopter that they claim relate to their trade secrets were publicly available. (*See* Dkt. 46 at 3.) Plaintiffs also admit that they "suspected that the Mars Helicopter Ingenuity incorporated trade secret information from the Arltons" "as of the filing of the Original Complaint on August 17, 2020." (*See* id. at 1.) Plaintiffs only assert that the produced documents suggested that Defendant did not independently develop the technology, but Plaintiffs still could have sought leave to amend prior to Defendant's production and later supplemented their pleadings. (*See id.* at 3.) Thus, the Court finds that Plaintiffs were not diligent in seeking leave to amend and have not shown good cause to modify the Scheduling Order.

Accordingly, the Court **DENIES** Plaintiffs' motion for leave to file a first amended complaint and to join Lite as a plaintiff.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs' claim for patent infringement is barred by § 1498 as a matter of law and **GRANTS** Defendant's motion for summary judgment. Because the Court grants the Motion, the Court declines to consider Defendant's evidentiary objections. (*See* Dkt. No. 41-3.) The Court also **DENIES** Plaintiffs' motion for leave to file a first amended complaint and to join Lite as a plaintiff. Defendant shall file a proposed judgment within 14 days of the issuance of this order for this case.

The Pretrial Conference and Jury Trial dates are vacated.
**IT IS SO ORDERED.**

# EXHIBIT 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# JS-5

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-07438-AB-GJS | Date: | June 24, 2021 |
|---|---|---|---|

| Title: | *Paul E. Arlton et al v. Aerovironment, Inc.* |
|---|---|

Present: The Honorable **ANDRÉ BIROTTE JR., United States District Judge**

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:** **[IN CHAMBERS] ORDER REGARDING PLAINTIFFS'
MOTION FOR RELIEF FROM JUDGEMENT UNDER FED.
R. CIV. P. 60 AND MOTION TO ALTER JUDGMENT
PURSUANT TO FED. R. CIV. P. 59 (DKT. NO. 66) AND
DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND
COSTS (DKT. NO. 67)**

Defendant AeroVironment, Inc. ("AeroVironment" or "Defendant") moves for
attorney's fees under 35 U.S.C. § 285 and 28 U.S.C. § 1927, and costs. ("Fees Motion,"
Dkt. No. 67.) Plaintiffs Paul E. Arlton and David J. Arlton (collectively, "the Arltons" or
"Plaintiffs") filed an opposition. ("Fees Opposition," Dkt. No. 68.) Defendant filed a
reply. ("Fees Reply," Dkt. No. 73.)

Additionally, Plaintiffs move for relief from judgment under Fed. R. Civ. P. 60 or
to alter the judgment under Fed. R. Civ. P. 59. ("Relief Motion," Dkt. No. 66.) Defendant
filed an opposition. ("Relief Opposition," Dkt. No. 69.) Plaintiffs filed a reply. ("Relief
Reply," Dkt. No. 71.)

Finding the parties' motions suitable for resolution without oral argument, the Court **VACATES** the hearing set for June 25, 2021. (Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.)

After considering the parties' arguments, the Court **GRANTS** Plaintiffs' Relief Motion and **DENIES** Defendant's Fees Motion.

## I. BACKGROUND

The Court described the factual and procedural background to this case in detail in the Court's Order on Defendant's summary judgment motion on its 28 U.S.C. § 1498 defense, the relevant details of which are repeated below. (*See* "MSJ Order," Dkt. No. 58 at 2-6.) On August 17, 2020, Plaintiffs filed a Complaint in this Court accusing Defendant of infringing at least Claim 1 of the '763 Patent by "at least by making, using, offering to sell, and selling [the Mars Helicopter] in the United States." (Dkt. No. 1 ¶¶ 25-26.) On September 10, 2020, Defendant filed an Answer, which asserts throughout that "Plaintiffs have no remedy against AeroVironment due to the applicability of 28 U.S.C. § 1498[.]" (Dkt. No. 19 ¶ 1.)

The parties participated in a Rule 26(f) conference on November 17, 2020. (Dkt. No. 41-1, Ex. A.) On November 19, 2020, Plaintiffs served their First Set of Requests for Production of Documents. (Dkt. No. 40-8 ¶ 2; Dkt. No. 40-9.) On November 24, 2020, Defendant's counsel emailed Plaintiffs' counsel to inform them that Defendant intended "to move for early summary judgment on its defense under 28 U.S.C. § 1498" and requested that Plaintiffs identify any discovery they believed was necessary to evaluate its § 1498 defense. (*Id*.) On November 27, 2020, the parties filed a joint 26(f) report. (Dkt. No. 29.) In the report, Defendant stated that it sought "leave to file an early motion for summary judgment on its Section 1498 defense." (*Id*. at 9.) Plaintiffs' statement in the report responded to Defendant's arguments, but did not mention the Small Business Innovation Research ('SBIR') program. (*Id*. at 11-12.)

On December 12, 2020, the Court issued its Order Re: Jury/Court Trial requesting that the parties "meet and confer on Defendant's anticipated Section 1498 motion, and insofar as discovery may be necessary, they should seek to agree to conduct the relevant discovery first." (Dkt. No. 33 at 2.) The Court also stated, "If the parties cannot agree, Defendant may file an early motion for summary judgment on the Section 1498 defense only, and if Plaintiffs think they need discovery, they can seek a continuance pursuant to Fed. R. Civ. P. 56(d)." (*Id*.) The Court also set the deadline for the last date to hear a motion to amend the pleadings and add parties as February 12, 2021. (*Id*. at 3.)

On December 21, 2020, Defendant responded to Plaintiffs' First Set of Requests for Production of Documents. (Dkt. No. 40-8 ¶ 3; Dkt. No. 40-10.) Defendant declined to produce documents in response to many of the requests, stating, "Any discovery on the merits should proceed, if at all, only after the Court resolves AeroVironment's motion for summary judgment on its Section 1498 defense, consistent with Congress's intent 'to relieve private Government contractors from expensive litigation with patentees.'" (*Id*.)

On January 8, 2021, the parties met and conferred regarding what discovery needed to be conducted before Defendant brought its motion. (Dkt. No. 35-2 ¶ 8; Dkt. No. 40-8 ¶ 4.) "Plaintiffs agreed to outline in greater detail the reasons that discovery was necessary to respond to an anticipated summary judgment motion by Defendant" and provided its response on January 14, 2021. (Dkt. No. 40-8 ¶¶ 4–5.)

On February 3, 2021, Defendant responded to Plaintiffs' January 14, 2021 letter, stating that it planned to file its Motion on February 12, 2021 if Plaintiffs did not offer to settle the case. (Dkt. No. 41-1 ¶ 5; *id.*, Ex. C.) On February 16, 2021, Defendant filed its Motion. (Dkt. No. 35.) On February 17, 2021, NASA filed a "Statement of Interest of the United States" stating that the United States granted its authorization and consent for Defendant's alleged use and manufacture of patented inventions claimed in the '763 Patent. ("Statement of Interest," Dkt. No. 37.)

On February 16, 2021, Defendant moved for summary judgement in its favor on its 28 U.S.C. § 1498 defense. (Dkt. No. 35.) On March 5, 2021, Plaintiffs filed an opposition. (Dkt. No. 40.) On March 12, 2021, Defendant filed a reply. (Dkt. No. 41.) On March 22, 2021, Plaintiffs filed a sur-reply. ("Sur-reply," Dkt. No. 47.) The same day Plaintiffs filed their sur-reply, Plaintiffs also moved for leave to file a first amended complaint and to join Lite Machines Corp. as a plaintiff. (Dkt. No. 46.) On April 2, 2021, Defendant filed an opposition. (Dkt. No. 56.) On April 9, 2021, Plaintiffs filed a reply. (Dkt. No. 57.)

On March 26, 2021, the Court held a hearing on Defendant's summary judgment motion. (Dkt. No. 55.) When asked whether Defendant had any plans to sell the accused technology to a party other than the government, Defendant responded "I'm certainly not aware of any plans of that nature. The technology is the helicopter that is designed to fly on Mars. So, you know, it's certainly not supported in the summary judgment record, but I would be surprised if that was going to be sold on any commercial market." (*See* Dkt. No. 64 at 14:2–11.) On April 22, 2021, the Court granted Defendant's summary judgment motion and denied Plaintiffs' motion for leave to amend. (Dkt. No. 58.) Specifically, the Court found that Plaintiff's arguments regarding the conflict between § 1498 and the SBIR program were unpersuasive, that Plaintiff failed to show that further discovery was necessary to decide the issue, and that Plaintiffs' motion to amend was untimely. (*See generally id.*) On May 12, 2021, the Court entered judgment in favor of Defendant, finding Defendant to be the prevailing party and stating that Defendant must seek cost within 14 days after the entry of judgment. (Dkt. No. 61.)

On May 9, 2021, Defendant "appeared in a 60 Minute segment with Anderson Cooper and introduced 'Terry,' a terrestrial version of the Mars Helicopter Ingenuity that is manually controlled by a pilot with a hand controller." (Dkt. No. 66 at 2.) On May 26, 2021, Plaintiff moved for relief from judgment or to alter the judgment in light of Defendant's previously undisclosed "Terry" helicopter. (*See generally id.*) The same day, Defendant moved for fees and costs pursuant to the Court's entry of judgment. (*See generally* Dkt. No. 67.)

## II.   LEGAL STANDARD

### A. Fed. R. Civ. P. 59 and 60

Motions to alter a judgment or for reconsideration may be brought under Fed. R. Civ. P. ("Rule") 59(e) or 60(b). *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442 (9th Cir. 1991).

A Rule 59(e) motion to amend a judgment may be granted when (1) the judgment is based on manifest errors of law or fact, (2) the moving party presents newly discovered or previously unavailable evidence, (3) it is necessary to prevent manifest injustice, or (4) there is an intervening change in controlling law. *Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003); *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999). Relief through Rule 59(e) generally is reserved for highly unusual circumstances. *School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). Rule 59(e) is not a vehicle to rehash arguments previously presented, or to present "contentions which might have been raised prior to the challenged judgment." *Costello v. United States*, 765 F. Supp. 1003, 1009 (C.D. Cal. 1991). A Rule 59(e) motion must be filed by 28 days after the entry of judgment.

Rule 60(b) allows for relief from a judgment or order only upon a showing of (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that by due diligence could not have been discovered before the court's decision; (3) fraud by the adverse party; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) any other reason justifying relief. *See* Fed. R. Civ. P. 60(b). Subparagraph (6) requires a showing of extraordinary grounds for relief. *Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981). The mere belief that the court's decision was wrong does not justify reconsideration. *Id*. A Rule 60(b) motion "must be made within a reasonable time – and for reasons (1), (2), and (3) no more than a year after entry of judgment or order or the date of the proceeding."

Local Rule 7-18 provides that a motion for reconsideration may only be made because of:

(a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

A motion for reconsideration may not repeat any oral or written argument made in support of or in opposition to the original motion. *Id.* Indeed, "a mere attempt by [the moving party] to reargue its position by directing [the] court to additional case law and... argument[s] which [it] clearly could have made earlier, but did not ... is not the purpose of motions for reconsideration ...." *Yang Ming Marine Transp. Corp. v. Oceanbridge Shipping Int'l, Inc.*, 48 F. Supp. 2d 1049, 1057 (C.D. Cal. 1999).

## III.   ANALYSIS

### A. Plaintiffs' Motion for Relief from Judgment or to Alter the Judgment

Plaintiffs move for relief from judgment or to alter the judgment entered because of the newly discovered "Terry" helicopter that Defendant publicly showcased after judgment was filed. (*See generally* Dkt. No. 66.) Plaintiffs assert that Defendant never disclosed the "Terry" helicopter to Plaintiffs despite discovery requests directed to products related to the Mas Ingenuity helicopter. (*See id.* at 11-12.) Plaintiffs also argue that their concerns that the Defendant plans to sell the technology commercially are now more than speculation as Defendant's statements to the media suggest that it may do so. (*See id.* at 12.) Further, Plaintiff requests that the Court permit discovery into products other than just the "Terry" helicopter to ensure that Defendant has no other products related to the Mars Ingenuity helicopter that it plans to sell commercially. (*See id.* at 14-15.) Finally, Plaintiffs request leave to amend its complaint to add its trade secret claims. (*See id.* at 15.)

Defendant responds that the "Terry" helicopter is also covered by § 1498 and even if it did disclose the "Terry" helicopter to Plaintiff sooner, it would not have changed the outcome of Defendant's summary judgment motion. (*See* Dkt. No. 69 at 2-3.) Defendant asserts that the "Terry" helicopter was developed as part of the Mars Ingenuity program and "is intended for use for Government purposes, just like Ingenuity." (*See id.* at 5.) Defendant also argues that "Terry was not completed until April 11, 2021, after the summary judgment hearing, and it is intended for research and demonstration purposes in support of United States Government program opportunities, not for commercial sale." (*See id.* at 9.) Further, Defendant argues that Plaintiffs' discovery requests were overly broad. (*See id.* at 9-10.)

In reply, Plaintiffs argue that Defendant spent funds "independent of any government contract or even proposal" on the "Terry" helicopter and thus, it was not for the government. (*See* Dkt. No. 71 at 1-2, 4-7.) Plaintiffs also argue that Defendant's excuses for not disclosing the "Terry" during discovery are "both wrong and speculative." (*See id.* at 2-3, 7-10.) Further, Plaintiffs argue that they are irreparably harmed by Defendant's use of the "Terry" product, but do not explain how this is relevant in the context of Defendant's § 1498 defense or its Relief Motion. (*See id.* at 3, 10-11.)

The Court finds that relief from judgment is appropriate. Defendant's "Terry" helicopter is a "Terrestrial version of [the Mars Ingenuity Helicopter]" "built entirely by Aerovironment, not JPL," and bears Defendant's logo. (*See* Dkt. No. 66 at 8 (citing "Arlton Decl.," Dkt. No. 66-1 ¶¶ 4-5 (citing Aerovironment, *Mars Ingenuity Press Event*,

Vimeo (May 13, 2021) https://vimeo.com/548603486) (hereinafter, "Ingenuity Press Event")); *see also* Dkt. No. 66-2 (explaining that "Terry has an airframe identical to Ingenuity and that structure composites and mechanism were built from the same molds as the Mars version.").) Defendant did not disclose the "Terry" helicopter to Plaintiffs or publicly until after it submitted its proposed judgement to the Court, and Defendant does not meaningfully dispute that it is newly discovered evidence. Further, the "Terry" helicopter is clearly related to the Mars Ingenuity project and should have at least been disclosed to Plaintiffs. That Plaintiffs' discovery requests were overly broad and that "Terry" was not completed until April 12, 2021, does not excuse Defendant from failing to disclose that the "Terry" helicopter was in development.

The Court also finds that Plaintiffs have demonstrated the potential for the "Terry" helicopter to be sold for purposes other than "for the government" as with the Mars Ingenuity helicopter. Defendant states that it developed "Terry" for educational purposes and for future Mars helicopter research. (*See* "Keennon Decl.," Dkt. No. 69-1 ¶ 6; *see also* Ingenuity Press Event at 25:08-28.) But despite these statements, Defendant stated that it sells products commercially and it plans to use the technology developed through the Ingenuity project in commercial applications. (*See* Ingenuity Press Event at 3:50-4:10.) Thus, Plaintiffs have shown that their concern that Defendant may sell its helicopter technology commercially is more than mere speculation. Given the potential for Defendant to sell the "Terry" helicopter or other similar helicopters commercially, the Court will permit Plaintiffs limited discovery to determine whether Defendant intends to do so and to what extent. However, discovery will also be limited only to those helicopter products that were developed from the Mars Ingenuity program or that incorporate technology developed in that program.

The Court agrees with Defendant, however, that to the extent Defendant has no intention of selling the "Terry" helicopter or other similar helicopter commercially, then these helicopters are also subject to § 1498. The "Terry" helicopter was developed as part of the Mars Ingenuity helicopter program and thus is covered under the government's same broad grant of authorization and consent that the Mars Ingenuity helicopter received. The uses of the "Terry" helicopter for "educational purposes" and "future Mars helicopter research," as well as any sales to the government, would be "for the government" or at least *de minimis* non-governmental uses. *See Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F. Supp. 3d 963, 977–82 (C.D. Cal. 2019) (pre-contractual development activities were covered by § 1498 and marketing activities were *de mnimis*). Unless Plaintiffs show that Defendant sold or offered to sell these helicopters commercially, or otherwise used them commercially in a substantial way, the Court will reaffirm its grant of summary judgment in favor of Defendant.

Accordingly, the Court **GRANTS** Plaintiffs' Relief Motion. The Court also **DENIES** Plaintiffs' renewed request for leave to amend to add trade secret claims at this time.

### B. Defendant's Motion for Attorney's Fees

Because the Court grants Plaintiffs' motion for relief from judgment, the Court declines to consider Defendant's motion for attorney's fees. Accordingly, the Court **DENIES** Defendant's motion for attorney's fees.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Relief Motion and **DENIES** Defendant's Fees Motion. The Judgment (Dkt. No. 61) is hereby **VACATED** and the Court **ORDERS** the case **REOPENED** for the limited purpose of addressing the newly-discovered evidence (the Terry helicopter). Because the Court grants Plaintiffs' Relief Motion, the Court declines to consider Plaintiffs' evidentiary objections. (*See* Dkt. No. 72.) The parties shall also meet and confer and produce a joint status report addressing any discovery needs on or before July 9, 2021. The joint report should identify requested discovery and should include a discovery schedule, as well.

**IT IS SO ORDERED.**

# EXHIBIT 4

1   BRIAN M. BOYNTON
    Acting Assistant Attorney General
2   GARY L. HAUSKEN (CA Bar # 123514)
    Director
3   CONRAD J. DeWITTE, JR. (CA Bar # 236156)
    Assistant Director
4   Civil Division
    Department of Justice
5   Washington, D.C.  20530
    conrad.dewitte@usdoj.gov
6   Telephone:   (202) 307-0459
    Facsimile:   (202) 307-0345
7
    COUNSEL FOR THE UNITED STATES
8

9              UNITED STATES DISTRICT COURT FOR THE

10             CENTRAL DISTRICT OF CALIFORNIA

11   PAUL E. ARLTON, et al.,            Case No.  2−cv−07438−AB−GJS

12        Plaintiffs,

13        v.                            **STATEMENT OF INTEREST OF**
                                        **THE UNITED STATES**
14   AEROVIRONMENT, INC.,

15        Defendant.

16        The undersigned attorneys for the United States appear on behalf of the

17   National Aeronautics and Space Administration (NASA) pursuant to 28 U.S.C.

18   § 517[1] to inform the Court that the United States has granted AeroVironment, Inc.

19
    _____
20   [1] Section 517 provides, in pertinent part, that "any officer of the Department of
    Justice[] may be sent by the Attorney General to any . . . district to attend to the
21   interests of the United States in a suit pending in a court of the United States . . . or
    to attend to any other interest of the United States."
22                                      1

the Government's "authorization and consent" as to acts alleged to have been committed by it in this litigation. As explained below, the effect of such "authorization and consent" is to relieve the defendant of any liability for patent infringement resulting from such acts for the benefit of the United States and to transfer to the United States any liability for any manufacture or use of the inventions claimed in the patent in suit resulting from the authorized or consented acts.

The Government's "authorization and consent" relieves the Defendant from liability for all infringement for such acts, including indirect, induced, and/or contributory infringement. Accordingly, to the extent that liability exists for such acts, the patentee is limited to pursuing a claim against the United States in the Court of Federal Claims under 28 U.S.C. § 1498(a).

## I.       BACKGROUND

Paul E. Arlton and David J. Arlton (collectively, "Arlton") filed suit against AeroVironment, Inc., (AeroVironment) claiming infringement of U.S. Patent Number 8,042,763 ("the '763 patent"). The '763 patent purportedly covers a rotary wing aircraft. In the litigation, Arlton asserts that the airframe and major subsystems —including the rotors, electric rotor drive systems and flight control mechanisms— that AeroVironment provided to the Jet Propulsion Laboratory (JPL) in connection with the Mars Helicopter project infringed the '763 patent. As such, the complaint alleges acts of contributory infringement, *i.e.*, the provision of parts for the assembly by another into a patented device.

1    The National Aeronautics and Space Administration (NASA) is responsible

2    for unique scientific and technological achievements in human spaceflight,

3    aeronautics, space science, and space applications that have had widespread impact

4    on our nation and the world.  Forged in response to early Soviet space achievements,

5    NASA was organized as the locus of U.S. civil aerospace research and development.

6    *See* https://www.nasa.gov/content/nasa-history-overview.  JPL is a federally funded

7    research and development center managed for NASA by the California Institute of

8    Technology (Caltech).  *See* https://www.nasa.gov/centers/jpl/about/index.html.

9    The Mars Perseverance rover mission, launched in July 2020, is part of

10   NASA's Mars Exploration Program, a long-term effort for robotic exploration of

11   that planet.  *See* https://www.nasa.gov/perseverance/overview.  One of the rover's

12   missions is to test technologies to help pave the way for future human exploration

13   of Mars.  *See* https://mars.nasa.gov/mars2020/mission/overview/.  Of significance

14   here, the rover is carrying a technology demonstration device—the Mars Helicopter.

15   *Id.*  The Mars Helicopter will demonstrate the feasibility of powered flight on Mars.

16   https://mars.nasa.gov/technology/helicopter.

17   JPL's work for NASA is conducted by JPL pursuant to Prime Contract

18   80NM0018D0004.  That contract incorporates by reference Federal Acquisition

19   Regulation (FAR) clause 52.227-1, Alternate I (Apr. 1984), 48 C.F.R. § 52.227-1.

20   The Alternate I clause provides:

21

22                                       3

(a) The Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier.

JPL's work on the Mars Perseverance mission is performed pursuant to the Prime Contract.   AeroVironment's participation in the Mars Helicopter project was pursuant to subcontract number 1512602 to that Prime Contract.   This subcontract also incorporates by reference FAR clause no. 52.227-1, Alternate I.

## II.    DISCUSSION

"Authorization and consent" is a term of art.   It is defined by the first and second paragraphs of 28 U.S.C. § 1498(a), which provides, in pertinent part:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . .

For the purposes of this section, the use and manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the

1   Government and with the authorization or consent of the Government,

2   shall be construed as use or manufacture for the United States.

3   28 U.S.C. § 1498(a).  The granting of "authorization and consent" thus "relieves a

4   third party from patent infringement liability, and it acts as a waiver of sovereign

5   immunity and consent to liability [by the United States]." *Madey v. Duke Univ.*, 307

6   F.3d 1351, 1359 (Fed. Cir. 2002).

7   The purpose of Section 1498(a) is to "relieve the contractor entirely from

8   liability of every kind for the infringement of patents." *Richmond Screw Anchor Co.*

9   *v. United States*, 275 U.S. 331, 343 (1928).  "The word 'entire' emphasizes the

10  exclusive and comprehensive character of the remedy provided." *Id.*  As such, the

11  Government's authorization and consent relieves the defendant of liability with

12  respect to allegations of direct and indirect infringement, including both induced and

13  contributory infringement.  Section 1498 does not limit the grant of authorization

14  and consent to acts of direct (as opposed to indirect) infringement; rather, it may

15  apply whenever the patent is "used or manufactured . . . for the United States."

16  28 U.S.C. § 1498; *Advanced Aerospace Techs., Inc. v. United States*, 113 Fed. Cl.

17  265, 275–76 (2013) (explaining that Section 1498 does not use "the adjectives

18  'direct' or 'indirect,'" but Section 1498 is clear that infringement occurs by use or

19  manufacturing of a patented invention by or for the United States).

20  In a suit between private entities where the government is not a party, Section

21  1498 is treated as an affirmative defense.  *See Sperry Gyroscope Co. v. Arma Eng'g*

*Co.*, 271 U.S. 232, 235–36 (1926); *Manville Sales Corp. v. Paramount Sys.*, 917 F.2d 544, 554–55 & n.6 (Fed. Cir. 1990) (discussing how Section 1498(a) is not jurisdictional when raised by a private party as a defense but is jurisdictional when raised in a suit against the United States in district court).

Proof of authorization and consent requires "explicit acts or extrinsic evidence sufficient to prove the government's intention to accept liability for a specific act of infringement." *Auerbach v. Sverdrup Corp.*, 829 F.2d 175, 177 (D.C. Cir. 1987). But it need not be accomplished in any particular fashion. *See Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis*, 583 F.3d 1371, 1376 (Fed. Cir. 2009); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976) (stating that no "requirement that authorization or consent necessarily appear on the face of a particular contract"). And it may be granted at any time, including after the fact or during litigation. *See Advanced Software*, 583 F.3d at 1377–78; *Hughes*, 534 F.2d at 901. Further, Section 1498(a) "does not require that the government be party to any contract, but may apply to activities by 'any person, firm, or corporation' for the benefit of the government." *Advanced Software*, 583 F.3d at 1377.

Here, the inclusion of the "authorization and consent" clause, FAR 52.227-1, Alternate I, in subcontract number 1512602 establishes that the United States has granted its authorization and consent to the use and manufacture of patented inventions under Section 1498 in furtherance of that subcontract. Accordingly, with respect to all allegations of infringement based on the Defendant's work with JPL

and NASA on the Mars Helicopter pursuant to subcontract number 1512602,

AeroVironment should be relieved of liability.  Accordingly, the Court should enter

judgment in favor of AeroVironment as to all claims based on its work on the Mars

Helicopter.

Dated:  February 17, 2021                Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Acting Assistant Attorney General

                                         GARY L. HAUSKEN
                                         Director


                                           /s/ Conrad J. DeWitte, Jr.
                                         CONRAD J. DeWITTE, JR.
                                         Assistant Director
                                         Commercial Litigation Branch
                                         Civil Division
                                         Department of Justice

                                         COUNSEL FOR THE UNITED STATES

# EXHIBIT 5

Seth A. Gold (SBN 163220)
Seth.Gold@btlaw.com
Roya Rahmanpour (SBN 285076)
Roya.Rahmanpour@btlaw.com
Jonathan J. Boustani (SBN 274748)
Jonathan.Boustani@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 284-3880
Facsimile: (310) 284-3894

Deborah Pollack-Milgate (Admitted Pro hac vice)
Deborah.PollackMilgate@btlaw.com
Joseph L. Fehribach (Admitted Pro hac vice)
Joseph.Fehribach@btlaw.com
**BARNES & THORNBURG LLP**
11 S. Meridian Street
Indianapolis, IN 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433

Attorneys for Plaintiffs
Paul E. Arlton and David J. Arlton

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PAUL E. ARLTON, an individual and DAVID J. ARLTON, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> AEROVIRONMENT, INC. a Delaware corporation, <br><br> Defendant. | Case No. 2:20-cv-07438-AB (GJSx) <br><br> [Assigned to the Hon. André Birotte Jr.] <br><br> **DECLARATION OF DAVID J. ARLTON IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60 AND MOTION TO ALTER JUDGMENT PURSUANT TO FED. R. CIV. P. 59** <br><br> Hearing Date: June 25, 2021 <br> Time: 10:00 a.m. <br> Location: Courtroom 7B <br><br> Complaint Filed: August 17, 2020 |

## DECLARATION OF DAVID J. ARLTON

1.     I, David J. Arlton, am a co-owner of U.S. Patent No. 8,042,763 ("the '763 Patent"). I submit this declaration in support of the Arltons' Motion for Relief from the Court's Judgment and Motion to Alter Judgment. This declaration is based on my personal knowledge, unless otherwise stated below. If called as a witness, I could and would testify to the matters discussed below.

2.     I am aware that the Court ruled in AeroVironment's favor on April 22, 2021, and that this Court entered Summary Judgment in favor of Defendant, AeroVironment, Inc., on Counts I, II, and II of the Arltons' Complaint on May 12, 2021.

3.     On May 9, 2021, CBS News published a "60 Minutes" segment about another AeroVironment product. This product is referred to as "Terry" and is separate and distinct from the Mars Helicopter Ingenuity. The segment can be found at the following link: https://www.cbsnews.com/video/60minutes-2021-05-09/. I first became aware of this segment on May 19, 2021 and viewed the full video personally. A still from the video is shown below.

4.     I subsequently became aware of a press event that AeroVironment held on May 13, 2021, at which its CEO, Wahid Nawabi, makes several comments about current and future uses of the technology included in Terry. The video can be found at AeroVironment's Vimeo® page at this link - https://vimeo.com/548603486 - and I viewed the full video personally. In this video, Nawabi states: "Learning here" (pointing at Terry) will be "applied to future programs and future innovation and creations of our teams and our customers." (*See* 34:47-35:06). In the video, the "AV" logo is visible. A still from the video is shown below.

5.     Matt Keennon, a technical lead at AeroVironment, is also featured in the May 13 video and explains that "Terry" is an abbreviation for "Terrestrial version of Ingenuity." (*See* 24:38-24:43). He points out that Terry is manually controlled by a pilot with a hand controller, while the Mars Helicopter Ingenuity is automatically controlled to fly a preprogrammed script on Mars. (*See* 26:39-26:46). Keennon also states that

2

Terry is "entirely built by AeroVironment" (*See* 25:45-26:05) and does not utilize JPL components. (*See* 26:00-26:05)

6.      On information and belief, based on rotor blade demonstrations conducted by several AeroVironment employees during the May 9 and May 13 videos, Terry incorporates trade secret rotor blade stiffness technology owned by my brother, Paul Arlton, and me. (*See* May 9 video 4:46-5:05, and May 13 video 18:20-18:56.)

7.      The San Fernando Valley Business Journal published an article on May 14, 2021 titled "AeroVironment Demonstrates Earth Version of Mars Helicopter." AeroVironment's Chief Executive Officer is quoted in the article stating: "[W]hat we learn here or there is cross-applicable to all of our products and businesses." A true and correct copy of the San Fernando Valley Business Journal article is attached to this declaration as **Exhibit A**.

8.      Upon information and belief, Terry infringes the '763 patent because it is a rotary wing aircraft having a coaxial rotor system characterized by a non-rotating structural mast and rotor control system in accordance with claim 1 of the '763 patent. In addition, it includes the same airframe and rotor assembly as the Mars Helicopter Ingenuity.

9.      Upon information and belief, AeroVironment currently infringes the '763 patent via Terry and will continue infringing the '763 patent based on statements made by AeroVironment's CEO.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 26, 2021 at Carlsbad, California.

**David J. Arlton**

3

May 9, 2021 ("Terry")



May 13, 2021 ("Terry")

**DECLARATION OF DAVID J. ARLTON IN SUPPORT OF MOTION FOR RELIEF FROM THE COURT'S JUDGMENT AND MOTION TO ALTER JUDGMENT**

# EXHIBIT 6

**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California 90067
Telephone: 310.552.5000
Facsimile: 310.552.5001
Christina N. Goodrich (SBN 261722)
Christina.goodrich@klgates.com
Zachary T. Timm (SBN 316564)
Zach.timm@klgates.com

**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
Telephone: 202.719.7000
Facsimile: 202.719.7049
Scott A. Felder (*Admitted pro hac vice*)
sfelder@wiley.law
Wesley E. Weeks (*Admitted pro hac vice*)
wweeks@wiley.law
Adrienne J. Kosak (*Admitted pro hac vice*)
akosak@wiley.law

Attorneys for Defendant
AeroVironment, Inc.

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL E. ARLTON, an individual and DAVID J. ARLTON, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> AEROVIRONMENT, INC. a Delaware corporation, <br><br> Defendant. | Case No. 2:20-cv-07438-AB (GJSx) <br> [Assigned to the Hon. André Birotte Jr.] <br><br> **DECLARATION OF MATTHEW KEENNON IN SUPPORT OF AEROVIRONMENT'S OPPOSITION TO PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT** <br><br> Hearing Date: June 25, 2021 <br> Time: 10:00 a.m. <br> Location: Courtroom 7B <br> Complaint Filed: August 17, 2020 <br> Trial Date: Vacated |

1

1.  My name is Matthew Keennon.  I am the technical lead on the Mars Helicopter program at AeroVironment, Inc. ("AeroVironment").  I submit this declaration in support of AeroVironment's Opposition to Plaintiffs' Motion for Relief from Judgment.

2.  This declaration is based on my personal knowledge and information.  If called as a witness, I could and would testify competently to the matters discussed below.

3.  On November 12, 2019, I met with Bob Balaram of JPL to discuss the future of possible Mars helicopter missions.  Bob is JPL's head engineer on the Mars Helicopter project.  *See* https://www.jpl.nasa.gov/news/the-man-who-wanted-to-fly-on-mars.  During this meeting, Bob suggested that there could be a use for a helicopter that functioned as a stand-alone science vehicle.  Whereas Ingenuity is a proof of concept, AeroVironment, for example, has considered equipping the new helicopter with a robot arm able to collect samples and wheels for ground exploration.

4.  Bob suggested that AeroVironment invest its independent research and development ("IR&D") funds in this project.  Because IR&D expenditures develop next-generation technology to be sold to the Government, contractors can recover a portion of their IR&D costs as an allowable indirect expense on government contracts.  *See* FAR 31.205-18.

5.  To meet JPL and NASA's needs, AeroVironment built a terrestrial copy of Ingenuity, named "Terry," using IR&D funds, as suggested by JPL.  Terry is almost a

**DECLARATION IN SUPPORT OF OPPOSITION TO MOTION FOR RELIEF FROM JUDGMENT**

carbon copy of Ingenuity, with small adjustments having been made to make it capable of flying in Earth's atmosphere. However, true to its lineage, Terry is also fully capable of flying in the Martian atmosphere, just like Ingenuity.

6.      The purpose of building Terry was twofold. First, as a terrestrial copy of Ingenuity, Terry can be used to develop and demonstrate the next-generation technologies for the science helicopter concept to JPL and NASA. Second, Terry is a useful educational tool to demonstrate the capabilities of Ingenuity here on Earth. While AeroVironment has prototypes that it developed as part of its work designing Ingenuity, those prototypes are adapted to flight on Mars and crash spectacularly when used as a demonstration here on Earth.

7.      Terry was completed on April 11, 2021, two days before the Sixty Minutes program featuring Terry was filmed.

8.      AeroVironment has no intention to sell Terry in the private sector. The only intended use for the technology embodied on Ingenuity and Terry is to use for the United States Government use in future space exploration programs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 4th day of June, 2021, in Simi Valley, California.


Matthew Keennon
Matthew Keennon

**DECLARATION IN SUPPORT OF OPPOSITION TO MOTION FOR RELIEF FROM JUDGMENT**

# EXHIBIT 7

Case 2:20-cv-07438-AB-GJS   Document 119-3   Filed 03/30/23   Page 2 of 84   Page ID #:1683

Videotaped Deposition of

**Matt Keennon**

January 31, 2023

Arlton

vs.

AeroVironment

**Confidential**



www.aptusCR.com | 866.999.8310

1          IN THE UNITED STATES DISTRICT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   PAUL E. ARLTON, an individual )
    And DAVID J. ARLTON, an       )
5   Individual,                   )
                                  )  No.
6               Plaintiffs,  )  2:20-cv-07438-AB
                                  )  (GJSx)
7        vs.                      )
                                  )  CONFIDENTIAL
8   AEROVIRONMENT, INC. A Delaware)
    corporation,                  )
9                                 )
                   Defendant.  )
10  _____)

11

12

13

14

15          VIDEOTAPED DEPOSITION OF

16               MATT KEENNON

17          LOS ANGELES, CALIFORNIA

18               JANUARY 31, 2023

19

20

21

22

23   Reported by:
     Susan Myong
24   CSR 13365

25   Job No. 10114500

Case 2:20-cv-07438-AB-GJS   Document 119-3   Filed 03/30/23   Page 4 of 84   Page ID
#:1685

**Confidential**

Matt Keennon                                                                    Arlton vs.
                                                                               AeroVironment

```
1              IN THE UNITED STATES DISTRICT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   PAUL E. ARLTON, an individual )
    And DAVID J. ARLTON, an       )
5   Individual,                   )
                                  )  No.
6               Plaintiffs,       )  2:20-cv-07438-AB
                                  )  (GJSx)
7        vs.                      )
                                  )  CONFIDENTIAL
8   AEROVIRONMENT, INC. A Delaware)
    corporation,                  )
9                                 )
                 Defendant.       )
10  _____)

11

12

13

14

15       VIDEOTAPED DEPOSITION OF MATT KEENNON,

16  taken on behalf of plaintiffs, at 2029 Century Park

17  East, Suite 300, Los Angeles, California, beginning

18  at 9:33 a.m., and ending at 6:50 p.m., on Tuesday,

19  January 31, 2023, before Susan Myong, Certified

20  Shorthand Reporter No. 13365.

21

22

23

24

25
```

**www.aptusCR.com**

**Confidential**

**Matt Keennon**                                                                                            **Arlton vs.
                                                                                                              AeroVironment**

```
 1                          EXAMINATION

 2    BY MS. POLLACK-MILGATE:

 3        Q.   Good morning, sir.

 4        A.   Good morning.

 5        Q.   Would you please state your name for the

 6    record.

 7        A.   Matthew Todd Keennon.

 8        Q.   And what is your address, sir?

 9        A.   My home address is 2038 Riverbirch Drive,

10    Simi Valley, California.

11        Q.   And are you currently employed?

12        A.   Yes.

13        Q.   And who is your current employer?

14        A.   AeroVironment, Inc.

15        Q.   And what is your position or your title

16    with AeroVironment?

17        A.   I've got many titles, but principal's

18    electromechanical engineer.

19        Q.   And what are the other titles?  When you

20    say -- you referred to many titles.  What are the

21    other ones you have?

22        A.   Project manager, technical project manager,

23    technical lead, chief engineer, senior electrical

24    engineer.  That's probably good cover.

25        Q.   And how do you decide what title to use,
```

**Confidential**

Matt Keennon

Arlton vs.
AeroVironment

```
 1   given the circumstances?
 2       A.   Just whatever is appropriate at the time.
 3   We don't -- we don't -- you know, we don't -- we
 4   don't dwell on titles.
 5       Q.   Do you have a signature block on your
 6   e-mail?
 7       A.   Yes.  I think it's project manager
 8   currently.  But I recently asked my boss, I don't
 9   think it's right, I should change it.  He never got
10   back to me, what it should be.
11       Q.   Have you ever been deposed before?
12       A.   No, I have not.
13       Q.   And you do understand you're under oath
14   today?
15       A.   Yes.
16       Q.   So one rule to be aware of is that the
17   court reporter is extraordinarily talented, her ways
18   are unknown to me, but one thing she cannot do is
19   listen to two of us talk at the same time.  So if
20   you would let me finish my answer -- or finish my
21   question before you answer, and I will do the same.
22   I will extend you the same courtesy and wait for you
23   to finish your answer before I ask another question.
24           Do you understand?
25       A.   Yup.
```

Confidential

Matt Keennon

Arlton vs.
AeroVironment

1     Q.   Okay.  And what is his expertise with

2  respect to Terry?

3     A.   Okay.  So Ben Pipenberg was the chief

4  engineer for the final phases of the Ingenuity

5  development.  I was the chief engineer for the

6  beginning.

7          And for Terry, Ben was basically a support

8  engineer.  I was the chief engineer for building

9  Terry, that was aside -- kind of an aside project,

10  and he helped aspects of the build that required his

11  expertise, particularly in fabrication.

12     Q.   And so from a technical perspective, what

13  is Mr. Pipenberg's expertise?

14     A.   Mechanical engineering.

15     Q.   And how does that differ from your

16  expertise --

17          MR. WEEKS:  Objection.  Lacks foundation.

18  BY MS. POLLACK-MILGATE:

19     Q.   -- if at all?

20     A.   So my expertise is mechanical electrical

21  software engineering at a lower level.  You know,

22  it's broader, and Ben is more specifically

23  mechanical.

24          THE REPORTER:  More specifically --

25          THE WITNESS:  More specifically educated

Matt Keennon

```
 1   and experienced in mechanical engineering.
 2   BY MS. POLLACK-MILGATE:
 3       Q.   There was one thing I didn't understand.
 4   You said something about at a lower level, your
 5   experience?
 6       A.   Well --
 7       Q.   What are you talking about?
 8       A.   Fewer years.  Fewer years, fewer hours
 9   applied to the type of engineering.
10       Q.   You're referring to Mr. Pipenberg?
11       A.   No, that was -- so I have -- I'm not sure
12   how I used that word.  But my engineering background
13   covers many aspects of engineering.  Ben was more
14   specifically mechanical engineering.  We all can
15   cover some aspects of just about every type of
16   aerospace engineering; right?  So we have our
17   strengths and our, you know, less strengths.  And
18   I'm broader, and Ben is more specific mechanical.
19   And I'm also more years.
20       Q.   And with respect to the creation of Terry,
21   who else was involved at AeroVironment?
22       A.   Okay.  Well, that could go on for a while.
23   So we'll have to talk about Ingenuity because Terry
24   uses all of the mechanical and aerodynamic designs
25   from Ingenuity.  So the rotor blades on Terry were
```

Confidential

Matt Keennon

Arlton vs. AeroVironment

```
1    used on Ingenuity and they were also used on the
2    Phase 3 demonstrator prototype helicopter, that was
3    the first helicopter flown in the test tube --
4           MR. WEEKS:  I'm going to interrupt for a
5    second.  Matt, just make sure you're not going to go
6    into any highly confidential technical information.
7           THE WITNESS:  Oh.
8           MR. WEEKS:  If you feel like you are, we
9    can go off the record and create an environment
10   where you're --
11          THE WITNESS:  Right.
12          MR. WEEKS:  -- able to discuss that freely.
13          THE WITNESS:  Yeah, thank you.  I think I
14   was heading there.
15          Okay.  But talking about who was involved.
16   So it goes back to the Phase 3 helicopter, and we
17   had Ben Pipenberg on the rotor blades, his name was
18   already mentioned, Bart Hibbs, aerodynamic analysis
19   on the rotor blades, Rip Rippey did the tooling
20   design -- Rip Rippey, tooling design for the rotor
21   blades.  We had Jim Hodge and George Lacquer in the
22   machining of the tooling.  We had Jeremy Tyler for
23   the servo linkages and the servo actuator detail
24   design, which pieces of that ended up going into
25   Terry.  Sarah Langberg, mechanical engineering for
```

Confidential

1  specific question, how did we do this, we're doing

2  it on Terry, can you help out, but I think I've got

3  the gist of the bulk of the team members that put

4  together Terry.

5      **Q.   What was the purpose of Terry?  Why did you**

6  **create it?**

7      A.   Well, that was my idea.  The primary

8  purpose was basically to have a marketing visual aid

9  that we could use to promote AeroVironment's

10  capabilities, you know, technical capabilities.  We

11  have a challenge with recruiting.  As an aerospace

12  company, we're -- I feel like we don't always

13  attract the same attention as Lockheed, you know,

14  with television ads.  So if we can have some better,

15  kind of, community outreach exposure to universities

16  with some exciting technology, I felt that would be

17  really useful.  Recruiting is extremely important to

18  me, personally.

19          There could be uses for testing.  This was

20  an idea that I had that maybe there would be some

21  aspect of Ingenuity's operations on Mars that we

22  could test on Earth, and that would be possibly

23  another good reason to have it.  And originally, if

24  there was an idea, if it happened to, you know, look

25  like it might be a good product of some sort that

**Confidential**

1   was in the mix as well.  But that was, like, the

2   lowest priority.

3       **Q.   So I think you've named off Terry, as its**

4   **purpose, was to have a marketing visual aid --**

5       A.   Uh-huh.

6       **Q.   -- as a recruiting tool, potential uses for**

7   **testing, and also for potential product development.**

8            **First of all, did I state those accurately?**

9            MR. WEEKS:  Objection.  The witness's

10  answer speaks for itself.

11           THE WITNESS:  Yeah.

12           MR. WEEKS:  But he may answer.

13           THE WITNESS:  I mean, sounds about right.

14  But if you wanted to read it back, what I said, read

15  it back.

16  BY MS. POLLACK-MILGATE:

17      **Q.   I can't because that would be like five**

18  **minutes, so I have to summarize.  And you tell me if**

19  **I'm wrong.  Sounds like you don't have any specific**

20  **objection with the way I characterized it.**

21           MR. WEEKS:  Objection.  Counselor, I don't

22  think that's appropriate.  We have a court reporter

23  transcribing every answer, so we do have a record of

24  the answers.  So --

25           THE WITNESS:  Yeah, just take --

Matt Keennon

**Highly Confidential**

Arlton vs.
AeroVironment

```
 1   exhibit where I comment on it.
 2        Q.   I don't know --
 3        A.   That would be embarrassing.
 4        Q.   I don't know for sure.  I'm not trying to
 5   trick you.  I swear.
 6        A.   No, I...
 7        Q.   So with respect to AUVSI, first of all,
 8   what does that refer to?
 9        A.   It's an aerospace trade show.  I couldn't
10   tell you what the acronym stands for if my mother's
11   life depended on it.  Yeah.
12        Q.   Okay.
13        A.   It's an aerospace trade show.
14        Q.   And have you attended this aerospace trade
15   show before?
16        A.   I have attended it I think two times.
17        Q.   Okay.  Is this a trade show that
18   AeroVironment routinely attends?
19        A.   Yes.
20        Q.   And do you see on the agenda for Tuesday,
21   August 17th, there's a reference to flying on Mars
22   development of the Ingenuity Mars Helicopter?
23        A.   That's what it says, yes.
24        Q.   Okay.  Do you know who provided that
25   presentation?
```

**Highly Confidential**

1    A.   The team.  Okay.  The team that supported

2    this event, I believe that was the members I had

3    mentioned before.  It should have been Ben

4    Pipenberg, Sarah Langburg, and Jeremy Tyler.  And I

5    believe they did a -- like a little breakout room

6    talk, and I think they had a little table at the

7    booth where it was on display and there was no

8    flying.  I'm pretty sure there is no flying.

9    **Q.   Okay.  So someone discussed with you at the**

10   **time what the plan was with respect to the**

11   **presentation by AeroVironment at this event?**

12   A.   With me, personally, I was in the loop on

13   this when we were trying to figure out a way to find

14   a space to fly it.  Because there is a ton of safety

15   issues, and there was -- I was -- you know, I was

16   making every effort to help facilitate flying it

17   there because it's cool to see.  It's a neat thing.

18   And kind of went around in circles with AUVSI

19   people, and yeah, didn't make any progress.

20        But when that kind of fell through, I don't

21   think I had much inputs on this event.  Because Ben

22   Pipenberg, he was the chief engineer, you know, at

23   the end of the program.  He and Sarah and Jeremy all

24   knew pretty much every -- well, they all knew more

25   technical content on Ingenuity than I did.  My

Highly Confidential

```
1   particular expertise over them was on some of the

2   details of Terry being built.  But they weren't even

3   going to fly it, so it wasn't really a need for me

4   to be tightly in the loop on this event.

5       Q.   So you mentioned safety concerns.

6       A.   Uh-huh.

7       Q.   What safety concerns?

8       A.   I don't know because I've flown Terry in

9   a -- in a room as small as this with six-year-old

10  kids sitting on the floor, just sitting, you know,

11  with no barriers or anything.  I just fly over them.

12  But, apparently, aerospace engineers are wimps and

13  they have to have some sort of cage.  It's kind of

14  sad.  But the little kids are just cool with it.

15  They just smile.  It's just -- you know, it's

16  lawyers.  They've got insurance and issues that they

17  don't allow.

18        Well, AUVSI has probably had a history of

19  accidents.  Because every drone maker goes to that

20  show and they fly.  And in the early days, I think

21  they didn't have nets, and would have had some

22  accidents.  But I had no safety concerns with Terry.

23      Q.   So what times did you personally attend

24  AUVSI?

25      A.   Oh, I was there once with the Hummingbird,
```

# EXHIBIT 8

**[Materials Subject to Protective Order]**

UNREDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL

# EXHIBIT A

# EXHIBIT 9

Case 2:20-cv-04597-AB-JPR   Document 426   Filed 03/05/21   Page 05/09/2024 Page ID #:462

10.2514/6.2019-0620

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

# Design and Fabrication of the Mars Helicopter Rotor, Airframe, and Landing Gear Systems

Benjamin T. Pipenberg[1], Matthew T. Keennon[2], Jeremy D. Tyler[3], Sara A. Langberg[4], and Bart Hibbs[5]
*Aerovironment, Inc., Simi Valley, CA, 93065, USA*

J. (Bob) Balaram[6], Håvard F. Grip[7], and Jack Pempejian[8]
*Jet Propulsion Laboratory, California Institute of Technology, Pasadena, CA 91109*

**The Mars Helicopter is an autonomous 1.8 kg co-axial, counter-rotating rotorcraft baselined to fly on the Mars 2020 mission to demonstrate aerial mobility on the surface of Mars. In this paper the authors describe the design, development, and fabrication of the rotor system, landing gear system, and auxiliary structures which are being integrated onto the helicopter. The rotor system has a diameter of 1.21 m and consists of the rotor blades and hubs, direct-drive brushless propulsion motors, swashplates and linkages, and servos that actuate the swashplate. The landing gear is comprised of four folding composite landing legs and suspension mechanisms that deploy upon egress from the rover. Several test campaigns were carried out on engineering development models in 2017/2018, and final assembly and testing of the flight model is expected to be complete by early spring 2019.**

## Nomenclature

| | | |
|---|---|---|
| AV | = | Aerovironment, Inc. |
| BEMT | = | Blade Element Momentum Theory |
| ETL | = | Environmental Test Laboratory |
| CTE | = | Coefficient of Thermal Expansion |
| $c_l$ | = | Coefficient of Lift (2-Dimensional) |
| DC | = | Direct Current |
| DoF | = | Degrees of Freedom |
| EDM | = | Engineering Development Model |
| ECM | = | Electronics Core Module |
| FEA | = | Finite Element Analysis |
| FM | = | Flight Model |
| HWEB | = | Helicopter Warm Electronics Box |
| JPL | = | Jet Propulsion Laboratory, California Institute of Technology |
| MAC | = | Mass Acceleration Curve |
| MHDS | = | Mars Helicopter Delivery System |
| MIL | = | Minimum Induced Loss |
| PEEK | = | Polyether ether ketone |

[1]Aerovironment Design Lead, Aeromechanical Engineer, MacCreadyWorks, pipenberg@avinc.com
[2]Aerovironment Technical Lead, Principal Engineer, MacCreadyWorks, keennon@avinc.com
[3]Aeromechanical Engineer, MacCreadyWorks, Tyler@avinc.com
[4]Aeromechanical Engineer, MacCreadyWorks, Langberg@avinc.com
[5]Aeromechanical Engineer, Senior Staff, MacCreadyWorks, Hibbs.con@avinc.com
[6]Mars Helicopter Chief Engineer, Robotics Technologist, JPL Mobility and Robotic Systems Section, Balaram@jpl.nasa.gov
[7]Mars Helicopter GNC and Aerodynamics Lead, Robotics Technologist, JPL Guidance and Control Section, Havard.F.Grip@jpl.nasa.gov
[8]Mechanical Engineer, Payload and Small Spacecraft Mechanical Engineering Section, Jack.J.Pempejian@jpl.nasa.gov

Copyright © 2019 by the American Institute of Aeronautics and Astronautics, Inc. All rights reserved.

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

## I. Introduction

The Mars Helicopter mission is designed to advance the use of aerial robots for planetary exploration through a small-scale technology demonstrator deployed from the Mars 2020 rover. Aerial exploration of Mars with rotorcraft allows exploration at visual resolutions comparable to that of landers and rovers but over much longer ranges in a shorter amount of time. Such vehicles could also carry small scientific payloads and land at designated targets in a controlled manner. Rotorcraft could serve as scouts for rovers and human explorers, identifying safe routes and interesting scientific targets. They could operate as standalone science-craft or in conjunction with other landed assets. Mars rotorcraft may also be used for the timely retrieval of small science samples back to a Mars ascent vehicle for return to Earth.



**Figure 1. Mars Helicopter Technology Demonstrator**

There are many challenges of flying a rotorcraft on Mars, one of which is the thin carbon dioxide atmosphere with approximately 1% of the density of Earth's atmosphere (equivalent to Earth's atmosphere at approximately 115,000 ft.) Feasibility of operating in the Mars environment must be demonstrated before rotorcraft can be adopted for mission critical roles. In 1997, the Sojourner rover on the Pathfinder mission paved the way for numerous Mars rovers. In a similar manner, an initial technology demonstration of rotorcraft on Mars is desirable so as to inform the development of future missions. NASA JPL (Jet Propulsion Laboratory, California Institute of Technology) is leading a collaborative effort with AeroVironment Inc., and NASA centers at Ames and Langley to develop such a technology demonstrator, which will be carried to Mars on the Mars 2020 mission [1].

The Mars Helicopter is a co-axial, counter-rotating electric vehicle with a rotor diameter of 1.21m and total mass of approximately 1.8 kg. Power is provided by a lithium-ion battery that is recharged by a solar panel mounted above the rotors. The helicopter is controlled by varying the blade pitch through collective and cyclic control action on each rotor. The flight control software is hosted on avionics hardware consisting of multiple computing units, and makes use of sensor data from an onboard inertial measurement unit (IMU), a laser rangefinder, and a downward-looking navigation camera. Due to the low Martian atmospheric density, power required for flight is higher than it would be for a similar rotor in Earth atmosphere; as such, low mass and high propulsive efficiency are paramount. AeroVironment worked with JPL to perform initial sizing and configuration studies [2], as well as final design and fabrication of several subsystems that are being integrated into the flight version of the vehicle. Early tests included a fixed and single-axis propulsion system demonstration, two sub-scale tethered flight vehicles, and a full-size risk reduction vehicle designed to fly in a Mars-like atmosphere. In addition, two engineering development models (EDMs) called EDM-1 and EDM-2 were built to test the final flight design; one of these models was used for flight testing and characterization in a Mars-like atmosphere, while the other was subjected to an environmental test campaign. Assembly of the Flight Model (FM) that will be flown with the Mars 2020 rover was completed in late 2018, with integration onto the rover planned for Spring 2019. In this paper the authors will focus on the subsystems designed and built by AeroVironment, including the following elements:

- The rotor system consisting of the rotor blades, hub mechanism, propulsion motors, swashplates and linkages, control servos, and primary helicopter structure.
- The landing gear system consisting of 4 deployable legs, landing feet, and suspension mechanisms.
- Auxiliary structures, including the structural elements of the Helicopter Warm Electronics Box (HWEB) that encloses the electronic core module (ECM) and battery, and the solar array substrate that serves as the structural element of the solar panel system.

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620



**Fig. 2  Mars Helicopter Technology Demonstrator Subsystem Nomenclature**

## II. Design and Fabrication

### A.  Design Considerations

Designing a helicopter for operation on Mars presents a unique set of challenges that are not typically encountered by Earth-based vehicles. Accommodation and deployment constraints from the Mars 2020 rover limit the size of the helicopter, requires deployable mechanisms, and drives the location and number of structural interface points. Vacuum compatibility and low temperature survival down to -100°C drive mechanical design and material selection, and planetary protection and contamination concerns require special processing and handling during fabrication. Launch vehicle vibration (7.9$G_{rms}$ or 60G quasistatic acceleration) and deployment shock drive the sizing of the vehicle structure, and necessitate significantly more structural mass than would be required for flight operations alone. Thermal management is complicated by the low atmospheric density, and during operation excess heat is primarily stored adiabatically by the propulsion system components. The low density reduces the amount of thrust available from a rotor of a given size, and increases the amount of power required for flight relative to the vehicle mass; as such, minimizing the vehicle mass is of utmost importance.

The flight dynamics of the Mars Helicopter is significantly affected by the low atmospheric density, as well as the low gravity (38% of Earth's gravity). Of particular importance is the dynamics of blade *flapping*, which involves out-of-plane flexing of the rotor blades. The rotating blade acts as a mass-spring-damper system, where the predominant source of damping is aerodynamic – as the blades move up and down, the angle of attack changes in such a way as to generate forces opposing the flap motion. However, because the low atmospheric density on Mars cannot be matched by a corresponding reduction in blade inertia, the relative damping of the flap mode is approximately an order of magnitude lower for the Mars Helicopter than for a typical Earth helicopter.

The reduced damping affects the helicopter dynamics in multiple ways, one of which is to introduce poorly damped, oscillatory *regressing* and *advancing* flap modes that couple with the body of the helicopter (see [1]). This is a potential issue for flight control, because a high-bandwidth attitude controller can potentially interact with and amplify the oscillatory modes, thereby destabilizing the system.

Downloaded by Paul Axtion on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

This issue is solved by making the rotor blades extremely stiff, thus driving the flap modes to high enough frequencies that interference with the control system is no longer an issue. Requirements on blade stiffness were designed with the purpose of ensuring a regressing flap mode frequency of at least 30 Hz. For the flight design, the non-rotating flap frequency can be estimated at approximately 65-70 Hz, which ensures that the requirement is met. For a more detailed discussion of the Mars Helicopter flight dynamics, see [2]. For discussion of the flight control system, see [4], [5].

## B. Rotor System Design

The rotor system (fig. 3) consists of the rotor blades and hubs, swashplates and control linkages, servo actuators and feedback system, propulsion motors and associated power electronics, main mast structure, and wiring harness. The upper rotor is an almost identical copy of the lower rotor with the exception of the rotation direction of the rotor blades. The direct-drive brushless propulsion motors are mounted to the rotor hubs and create an enclosed dust-free volume for the motor components as well as the main hub bearings. The main mast tube is a non-rotating hollow composite structure through which the 81-conductor wiring harness passes, allowing connectivity from the main helicopter electrical interface located on top of the solar panel to the ECM below the rotor system.



**Fig. 3 Rotor System, including the rotor blades and hubs, swashplates and control linkages, servos, propulsion motors, and main mast structure**

To reduce mass the structure is highly integrated and relies on permanently bonded assemblies which are non-serviceable and non-replaceable. Carbon fiber composites form the major structural elements of the helicopter rotor system and landing gear. Due to the complexity of the composite components, variability in workmanship, and uncertainty in as-built material properties for composites, the design team relied on destructive load testing and modal testing to determine structural properties which were then fed back into analytical models. To verify workmanship all of the major components used in the flight model were proof tested to demonstrate margin beyond the design limit load.

### 1. Rotor Blade Design and Fabrication

Aerovironment's PROP code, Mark Drela's XROTOR [7], and Wayne Johnson's CAMRAD II were used for design and analysis of the helicopter rotor blades. XROTOR is a tool developed to analyze arbitrary propellers and produce minimum-induced-loss (MIL) blade geometries. XROTOR's MIL design routine was used for design of the initial twist and chord distribution of the Mars Helicopter rotor blade with a linear lift coefficient ($c_l$) distribution. This geometry was modified based on structural and fabrication considerations and to provide better off-design performance by decreasing twist and chord at the root and modifying the lift distribution at the root and tip. Aerovironment's PROP code is a Glauert strip theory/Blade Element Momentum Theory (BEMT) code, which was designed and validated for low Reynolds number propellers designed by Aerovironment, such as those on the Gossamer Condor, Gossamer Albatross, Helios, Switchblade, Raven, and Puma, as well as several hundred hovering rotors. Historically this code has demonstrated good agreement with experimental data, although typically at slightly

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

different than predicted pitch angles. PROP was used to predict rotor performance during the blade design process and to provide performance predictions of the final Mars Helicopter rotor. More detailed analysis and blade twist optimization was provided by Wayne Johnson at NASA Ames using the CAMRAD II comprehensive analysis tool.



**Fig. 4   Normalized Mars Helicopter rotor blade untwisted planform**

A series of thin laminar flow airfoils was developed for the extremely low Reynolds number operating conditions experienced by the Mars Helicopter rotor. The CLF5605 airfoil used for the outboard portion of the blade was based on an airfoil used on other propellers designed by Aerovironment, with the camber line modified for operation at higher lift coefficients. Section thickness was based on structural requirements; minimizing thickness reduces section profile drag which leads to corresponding performance benefits but limits spar depth. The unusually high first flapping frequency required for stable flight drove the design to a minimum thickness of 5% for the outboard sections and the airfoils inboard of r/R=0.52 increase in thickness to the round interface tube at the root.



**Fig. 5   Normalized CLF5605 airfoil used for outboard blade stations**

The blades are fabricated using a molded foam-core composite construction. A cyanate ester resin system was used for all of the composites to minimize outgassing and reduce microcracking at low temperatures. The blades are co-cured with bi-directional carbon fiber skins and high modulus unidirectional spar caps over a machined Rohacell foam core, producing blades which weigh around one ounce each. The root of the rotor blade is a composite tube with a solid wall (no foam core) to which tungsten carbide counterweights (or Chinese weights) and composite pitch horns are bonded. The hubs are molded from carbon fiber composites and interface to the blades through Silicon Nitride angular-contact bearing pairs.

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

## 2. Propulsion Motor Design

The Mars helicopter propulsion motors are direct-drive brushless 46-pole outrunner motors that were designed and built at AV. The stator is fabricated from laser-cut laminations and wound with rectangular copper wire (fig. 6). The magnet ring is bonded directly to a motor bell mounted on the hub (fig. 7.) The motors were designed using an in-house motor analysis code developed at Aerovironment, and performance was validated through dynamometer testing. The central motor hub is machined from AlBeMet AM162, which acts as a heat sink during operation and minimizes the CTE mismatch at the interface to the carbon fiber mast. Despite the low operating RPM and minimum mass, a motor efficiency of 80% was achieved at the nominal hover condition of 2390 RPM and 105 Watts output due to a copper packing factor of 62% and high pole count.



**Fig. 6 Mars Helicopter propulsion motor mounted to mast**



**Fig. 7 Mars Helicopter propulsion motor mounted in hub assembly**

## 3. Swashplate and Servo Assemblies

The swashplate is a rotating mechanism that transfers control inputs from the servos in the non-rotating reference frame to blade pitching motion in the rotating reference frame (Fig. 8). The mechanism is primarily fabricated from machined titanium with Silicon Nitride ball bearings. The pitch and swashplate links are machined from Polyether ether ketone (PEEK) and interface to the swashplate and servos with ball links. Dust protection is provided by a preloaded PEEK seal on the lower side of the swashplate and a fiberglass labyrinth shield on the top.



**Fig. 8 Rendering of Swashplate**

The servos which actuate the swashplate are geared DC motors, which have a magnetic Hall sensor feedback system on the output shaft (Fig. 9). The aluminum servo housing is bolted to a carbon fiber mount to minimize thermal stress at the bond line to the mast. The dynamics of the Mars Helicopter are fast due to its small size, and like most helicopters, it is unstable in open loop; a high bandwidth control system is therefore necessary for stability as well as performance in the presence of disturbances. Experimental test results for torque as a function of shaft speed for various servo load cases were used to generate a model of the gear motor. An analytical model of the servo, swashplate, and blades was created to estimate the pitch link loads and performance of the control mechanism. A discretized mass model of the blade geometry was used to optimize the design of inertial counterweights mounted at the root of the rotor blade, which reduced the required output torque of the gear motor and increased the achievable servo



**Fig. 9 Rendering of Servo Assembly**

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

bandwidth. Finally, an analytical tool combining rotor loads, servo model, and swashplate geometry was used to estimate the system response for any time-discretized set of servo inputs while accounting for time-dependent changes in aerodynamic, inertial, and centrifugal loads and swashplate geometry.

### 4. Rotor System Structural Design

The structural design of the rotor system is the result of an iterative approach involving both Finite Element Analysis (FEA) and both component and subsystem level structural tests. Preliminary sizing was based on several load cases:

- Quasistatic 60G load found from the Mass Acceleration Curve (MAC) which has been developed for appendages on the Mars 2020 rover.
- Operating loads including centrifugal forces at the blades and precession moments at the blades and hubs.
- Thermally induced stresses due to coefficient of thermal expansion (CTE) mismatches.

In addition to these preliminary load cases, several more detailed load models were developed as the design matured. This included a detailed finite element loads model of the helicopter integrated into the Mars Helicopter Delivery System (MHDS) and rover belly pan (Fig. 10); dynamic rotor and hub loads analysis during operation, performed by Dr. Anubhav Datta; and component-level FEA stress analysis.



Mars Helicopter mounted in MHDS (shown covered by debris shield)

Rover Belly Pan

**Fig. 10    Mars Helicopter and Mars Helicopter Deployment System Finite Element model (shown attached to Mars 2020 rover belly pan)**

### C. Landing Gear System

The Mars helicopter landing gear system is designed to accommodate a wide range of dynamic landing conditions and surface features. A large footprint with a side length of 577 mm (22.7 in) provides a stable base for the helicopter and reduces risk of tip-over. Rigid, lightweight, composite landing legs and feet with high resonant frequencies ensure that the landing gear modes do not interact with the control system. The four landing gear legs are attached to a molded composite interface plate, which is bonded to the main helicopter mast. Latching deployment hinges at the top of the legs allow the landing gear system to be folded and released from the stowed state required for rover accommodation. A titanium flexure with a yielding 1100-series aluminum damper is used for suspension during landing. Landing characteristics were evaluated and modified based on drop tests, using a surrogate vehicle with a constant-force gravity offset in a motion capture lab.

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620



**Fig. 11     Mars Helicopter Landing gear system**

*5.  Landing Gear Deployment Hinge and Flexure/Damper Mechanical Design*

The landing gear interface plate is located above the HWEB and ECM to provide unimpeded access to the batteries, avionics, and associated wiring during assembly and test. Each of the legs feature a redundant pair of deployment springs and is secured in a folded state by the rover until egress and release to the Martian surface. Two of the legs deploy passively as the aircraft is rotated away from the rover belly pan while the other two deploy passively once the aircraft is vertical and a pair of restraints are released. After deployment, each leg is locked in place by a redundant pair of spring-loaded pawls. Wedging latches are used to limit leg rattle due to slop in the latch. The shallow 5° wedging angle provides a high degree of back-out margin despite the wide degree of friction uncertainty typical for spacecraft mechanisms operating in a reduced atmosphere.

Expected landing velocities up to 2 m/s are arrested by a titanium flexure at the root of each landing leg, which can deflect as much as 15° to provide an effective vertical stroke of 92 mm (3.62 in).  An opposing flexure of 1100-



**Fig. 12     Landing gear deployment hinge and flexure/damper mechanism**

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

series annealed aluminum deforms plastically to provide a lightweight damping solution that is largely independent of temperature or atmospheric pressure.

### 6. Landing Gear Testing

Rather than developing an analytical model for landing on Mars, it was decided that practical tests would be performed using a 1:1 scale model with an approximation of the conditions for landing on Mars. A 1:1 scale model of the helicopter landing gear system was used to validate the geometry of the landing gear configuration and to tune the stiffness and damping characteristics of the landing leg suspension mechanism. The test setup (Fig. 13) consisted of a gravity offset winch system that was attached to the surrogate test vehicle (Fig. 14) in line with the center of mass to avoid imparting moments during simulated landings. The gravity offset winch was attached to a motorized horizontal gantry to simulate side velocities of up to 0.5 m/s, and a mechanical release device was built to allow the vehicle to be dropped with consistent initial conditions over multiple tests. The entire drop testing rig was assembled in a lab outfitted with a Vicon motion capture system, to determine vehicle delivery conditions as well as post-impact response.

The landing surface geometry and conditions were designed to simulate the limiting cases expected during operation on Mars. Flat concrete with a course finish was used to simulate hard bedrock. Quartz sand was used as a conservative limiting case to represent fine particulate. Rocks placed in various configurations with heights up to 5 cm were used to test interaction with sharp-cornered surface features, and the entire landing surface was tilted up to 10 deg.



Fig. 13    Landing gear drop testing setup



Fig. 14    Landing gear drop testing vehicle

### D. Solar Array Substrate

The solar array located above the blades (Figs. 15 and 16) is used to recharge the helicopter batteries during the day to provide power for flight operations and overnight thermal survival. Much like the rotor system and landing gear, high structural modal frequencies were required to prevent control/structure interaction. The structural design is similar to the rotor blades, with molded carbon fiber composite skins, high-modulus spar caps, and foam core co-cured around a solid composite central hub, which acts as an interface to the rotor system. The design was validated through benchtop modal testing as well as a system-level random vibration test at JPL's Environmental Test Laboratory (ETL).

### E. Helicopter Warm Electronics Box (HWEB)

After egress from the rover, the Mars helicopter is expected to encounter overnight atmospheric temperatures dropping to less than -100°C. To survive, the sensitive Electronics Core Module (ECM) and batteries are kept warm through a

Downloaded by Paul Axton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

thermal management scheme comprised of thin-film heaters, heat storage, and thermal insulation shrouds. The Helicopter Warm Electronics Box (HWEB) provides the outer-most layer of insulation around the ECM and serves as an environmental barrier to address contamination and planetary protection concerns. A selective-surface polyamide film membrane with high solar absorptivity and low emissivity is wrapped around a lightweight composite frame to provide an insulating gas gap that minimizes radiated heat loss. Optical windows in the bottom of the HWEB provide a clear field of view for the helicopter's return-to-earth and navigation cameras and laser altimeter.



**Fig. 15 HWEB and solar array substrate mounted on EDM-2**

**Fig. 16 HWEB and solar array substrate mounted on EDM-2**

## III. Overview of Test Campaign

### A. Vehicle System Identification and Flight Testing

Testing a Mars rotorcraft on Earth has the challenge of emulating the different gravity on Mars (3.71 m/s$^2$ vs 9.81 m/s$^2$), the low atmospheric density, and the winds on Mars. In addition, the helicopter must also be subjected to the spacecraft environment including vibration, launch and landing loads, pyro-shock release events, and extreme diurnal temperature cycles. The test program for the technology demonstrator makes use of the JPL Space Simulator (25-ft diameter, 80-ft high) to provide a simulated Mars environment for flight characterization and test flights (Fig. 17.) The chamber is evacuated to near vacuum and back-filled with $CO_2$ gas to the test density representative of the Mars atmosphere during flight operations. Vehicle thrust and control performance are identified with the rotorcraft mounted on a variety of fixed stands for thrust and trim testing, swing-arms for low-speed forward-flight emulation, and a 2 degree-of-freedom (DoF) gimbal test fixture for attitude dynamics. Response to winds and higher-speed forward-flight conditions is identified by placing the rotorcraft in front of a *wind wall*, which consists of an array of small fans and is capable of producing winds up to approximately 10 m/s. Free-flight testing (Fig. 18) is performed by suspending the rotorcraft from a gravity offload system, which uses a constant-force motor with closed-loop sensing of line tension.

The JPL Space Simulator has been used in several test phases: first with a demonstration vehicle to verify aerodynamic performance and to demonstrate controlled flight; then with an Engineering Development Model (EDM) of the Mars technology demonstrator design; and finally with the Flight Model (FM). For these tests, the facility was equipped with a 6-DoF force/torque sensor, a Vicon motion tracking system with 18 cameras, stroboscopic lighting, a thermal camera, temperature sensors, and vibration monitoring accelerometers. Additional testing related to the spacecraft environment is performed in a smaller 10-ft chamber and using various vibration and shock test stands.

Downloaded by Paul Axthon on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620



**Fig. 17      System characterization in the JPL 25-ft Space Simulator**



**Fig. 18      Free flight test of EDM1 in the JPL 25-ft Space Simulator**

11

Downloaded by Paul Axtton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

## B. Structural test campaign

In late 2017 the EDM-2 Mars Helicopter underwent random vibration testing at JPL's Environmental Testing Laboratory (ETL) to validate the mechanical design and provide correlation data for the helicopter structural FEA model. The helicopter was shaken at levels expected during launch, in a configuration that simulates the attachment to the Mars Helicopter Delivery System (MHDS) underneath the Mars 2020 rover. After random vibration testing, functionality and structural integrity were tested to ensure that no damage had occurred. The test setup with the helicopter mounted to the ETL vibration table is shown in Fig. 19.

The Mars Helicopter is mounted to the MHDS using Frangibolt separation devices that are bolted to fittings at each end of the helicopter mast. EDM-2 was subjected to several shock events in a representative configuration (Fig. 20) to identify any potential failure scenarios related to shock damage. In addition to these risk-reduction tests on the EDM-2 Helicopter, the FM helicopter will undergo several full deployment cycles and vibration testing. These tests are part of the proto-flight qualification process in which the helicopter design is verified by being subjected to the environments expected throughout the life of the mission.



**Fig. 19    EDM-2 assembled on JPL's ETL vibration table**



**Fig. 20    EDM-2 mounted on shock test fixture**

## IV. Conclusion

Design and development of the Mars Helicopter technology demonstrator has largely been concluded. Two Engineering Development Models have been built and successfully completed critical test campaigns, including system identification, structural proof testing, and thermal/vacuum tests. The Flight Model helicopter is nearing completion, with integration onto the Mars 2020 rover planned for late spring 2019.

## Acknowledgments

The research described in this paper was carried out at Aerovironment, Inc. under a contract with the Jet Propulsion Laboratory, California Institute of Technology. Research by Bob Balaram, Håvard Grip, and Jack Pempejian was carried out at the Jet Propulsion Laboratory, California Institute of Technology, under contract with the National Aeronautics and Space Administration.

The authors would like to thank Peter Zwaan, Jeff York, Chris Bang, Bob Barta, Viet Vo, Phil Tokumaru, Igor Panchenko, John Furumo, Jason Firanski, Hema Bagai, Mark Kehlenbeck, Loay Elbasyouni, Anna Davitian, Karl Klingebiel, Laurent Heughebaert, Marc Schmalzel, Makoto Ueno, Jim Hodges, Sam Ouernn, George Lacour, Sasha

Downloaded by Paul Axfton on April 30, 2020 | http://arc.aiaa.org | DOI: 10.2514/6.2019-0620

Colic, Rick James, MiMi Aung, Chris Porter, Jeff Umland, Joe Melko, Josh Ravich, Wayne Johnson, Anubhav Datta, Ed Konefat, and Katie Beckwith for their contributions.

## References

[1] Balaram, J., Canham, T., Duncan, C., Golombek, M., Grip, H. F., Maki, J., Quon, A., Stern, R., and Zhu, D., "Mars Helicopter Technology Demonstrator," Proc. AIAA Atmospheric Flight Mechanics Conference, 2017.

[2] Balaram, J., and Tokumaru, P. T., "Rotorcrafts for Mars Exploration," Proc. International Planetary Probe Workshop, Pasadena, CA, 2014. LPI Contribution No. 1795.

[3] Padfield, G.D., *Helicopter Flight Dynamics: The Theory and Application of Flying Qualities and Simulation Modeling*, AIAA, 1996.

[4] Grip, H.F., Johnson, W., Malpica, C., Scharf, D.P., Mandic, M., Young, L., Allan, B., Mettler, B., and San Martin, M., "Flight dynamics of a Mars helicopter*," Proc. European Rotorcraft Forum*, Milan, Italy, 2017.

[5] Grip. H.F., Scharf, D.P., Malpica, C., Johnson, W., Mandic, M., Singh, G., and Young, L., "Guidance and control for a Mars helicopter," *Proc. AIAA Guidance, Navigation, and Control Conference*, Kissimmee, Florida, 2018.

[6] Grip, H.F., Lam, J.N., Bayard, D., Conway, D.T., Singh, G., Brockers, R., Delaune, J., Matthies, L., Malpica, C., Brown, T., Jain, A., San Martin, M., Merewether, G., "Flight control system for NASA's Mars Helicopter," *Proc. AIAA Science and Technology Forum and Exposition*, 2018.

[7] M. Drela and H. Youngren. XROTOR: an interactive program for the design and analysis of ducted and free-tip propellers and windmills, 2011. [Software] Available at: http://web.mit.edu/drela/Public/web/xrotor/ [Accessed September 2015]

# EXHIBIT 10

ACCO,NORTHERN,(PLAx),APPEAL,CLOSED,DISCOVERY,MANADR,PPP,PROTORD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
### CIVIL DOCKET FOR CASE #: 2:20-cv-07438-AB-GJS

Paul E. Arlton et al v. Aerovironment, Inc.                     Date Filed: 08/17/2020
Assigned to: Judge Andre Birotte Jr                            Date Terminated: 09/13/2023
Referred to: Magistrate Judge Gail J. Standish                 Jury Demand: Both
Case in other court:  Federal CCA, 21-02049                    Nature of Suit: 830 Patent
                      Federal Circuit, 24-01084                Jurisdiction: Federal Question
                      Federal Circuit, 24-01159
Cause: 35:271 Patent Infringement

**Plaintiff**

**Paul E. Arlton**                       represented by    **Seth A. Gold**
*an individual*                                            Barnes and Thornburg LLP
                                                           2029 Century Park East Suite 300
                                                           Los Angeles, CA 90067
                                                           310-284-3880
                                                           Fax: 310-284-3894
                                                           Email: seth.gold@btlaw.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Deborah Pollack-Milgate**
                                                           Barnes and Thornburg LLP
                                                           11 South Meridian Street
                                                           Indianapolis, IN 46204
                                                           317-231-7339
                                                           Fax: 317-231-7433
                                                           Email: deborah.pollackmilgate@btlaw.com
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Jonathan Boustani**
                                                           Barnes and Thornburg LLP
                                                           2029 Century Park East Suite 300
                                                           Los Angeles, CA 90067
                                                           310-284-3880
                                                           Fax: 310-284-3894
                                                           Email: jboustani@btlaw.com
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Joseph L. Fehribach**
                                                           Barnes and Thornburg LLP
                                                           11 South Meridian Street
                                                           Indianapolis, IN 46204
                                                           317-231-7526

Fax: 317-231-7433
Email: joseph.fehribach@btlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roya Rahmanpour**
Barnes and Thornburg LLP
2029 Century Park East Suite 300
Los Angeles, CA 90067-2904
310-284-3880
Fax: 310-284-3894
Email: roya.rahmanpour@btlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David J. Arlton**                    represented by    **Seth A. Gold**
*an individual*                                          (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Deborah Pollack-Milgate**
                                                         (See above for address)
                                                         *PRO HAC VICE*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Jonathan Boustani**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Joseph L. Fehribach**
                                                         (See above for address)
                                                         *PRO HAC VICE*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Roya Rahmanpour**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Aerovironment, Inc.**                represented by    **Adrienne J. Kosak**
*a Delaware corporation*                                 Wiley Rein LLP
                                                         2050 M Street NW
                                                         Washington, DC 20036
                                                         202-719-7000
                                                         Fax: 202-719-7049
                                                         Email: akosak@wiley.law
                                                         *PRO HAC VICE*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Christina N. Goodrich**
                                                         KandL Gates LLP

10100 Santa Monica Boulevard, 8th Floor
Los Angeles, CA 90067
310-552-5000
Fax: 310-552-5001
Email: christina.goodrich@klgates.com
*ATTORNEY TO BE NOTICED*

**Scott Andrew Felder**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202-719-7000
Email: sfelder@wiley.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wesley E. Weeks**
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
202-719-7569
Email: wweeks@wiley.law
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Zachary Thomas Timm**
KandL Gates LLP
10100 Santa Monica Boulevard, 8th Floor
Los Angeles, CA 90067
310-552-5000
Fax: 310-552-5001
Email: zach.timm@klgates.com
*ATTORNEY TO BE NOTICED*

**Interested Party**

**United States of America**      represented by **Conrad Joseph DeWitte , Jr**
US Department of Justice
1100 L Street NW Room 8532
Washington, DC 20005
202-307-0459
Fax: 202-307-0345
Email: conrad.dewitte@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/17/2020 | 1 | COMPLAINT Receipt No: ACACDC-27666819 - Fee: $400, filed by Plaintiffs Paul E. Arlton, David J. Arlton. (Attorney Seth A Gold added to party David J. Arlton(pty:pla), Attorney Seth A Gold added to party Paul E. Arlton(pty:pla))(Gold, Seth) (Entered: 08/17/2020) |
| 08/17/2020 | 2 | CIVIL COVER SHEET filed by Plaintiffs David J. Arlton, Paul E. Arlton. (Gold, Seth) (Entered: 08/17/2020) |

| 10/12/2022 | [114](#) | ORDER GRANTING IN PART PLAINTIFFS' MOTION TO COMPEL DISCOVERY by Magistrate Judge Gail J. Standish. The Court having considered Plaintiffs Paul E. Arlton and David J. Arlton's ("Plaintiffs" or the "Arltons" Motion to Compel Discovery from Defendant AeroVironment, Inc. (Defendant or "AeroVironment") and all filings and arguments in support of and in opposition to the Motion, and after conferring with District Judge Hon. Andr Birotte Jr., hereby GRANTS IN PART and DENIES IN PART. [SEE DOCUMENT FOR DETAILS] (et) (Entered: 10/13/2022) |
|---|---|---|
| 11/08/2022 | [115](#) | STATUS REPORT *(Joint) Regarding Discovery and Request for Order* filed by Plaintiffs David J. Arlton, Paul E. Arlton. (Attachments: # [1](#) Proposed Order)(Rahmanpour, Roya) (Entered: 11/08/2022) |
| 11/09/2022 | [116](#) | ORDER by Judge Andre Birotte Jr.: The Court GRANTS the parties' Joint Status Report Regarding Discovery and Request for Order [115](#) and enters the following case schedule: Close of Limited Fact Discovery 2/28/2023; Plaintiff's Deadline for Filing Brief in Support of Denial of Summary Judgment 3/16/2023; Defendant's Deadline for Filing Brief in Support of Reaffirming of Summary Judgment Grant 3/30/2023. Thereafter, the matter will be under submission. Defendant's Application to File Under Seal [111](#) is DENIED AS MOOT. (gk) (Entered: 11/10/2022) |
| 01/24/2023 | [117](#) | Joint STIPULATION to Extend Discovery Cut-Off Date to March 14, 2023, Joint STIPULATION for Extension of Time to File Brief in Support of Denial and Brief in Support of Reaffirming Summary Judgment Grant filed by plaintiffs David J. Arlton, Paul E. Arlton. (Attachments: # [1](#) Proposed Order)(Rahmanpour, Roya) (Entered: 01/24/2023) |
| 01/30/2023 | [118](#) | ORDER by Judge Andre Birotte Jr.: The Court APPROVES the parties' Stipulation for Extension of Time for Discovery and Briefing Schedule [117](#) , and ORDERS that the below dates govern this case: Close of Limited Fact Discovery 3/14/2023. Plaintiffs' Deadline for Filing Brief in Support of Denial of Summary Judgment 3/30/2023. Defendant's Deadline for Filing in Support of Reaffirming of Summary Judgment Grant 4/13/2023. (gk) (Entered: 01/31/2023) |
| 03/30/2023 | [119](#) | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiff's Complaint [35](#) filed by Plaintiffs David J. Arlton, Paul E. Arlton. (Attachments: # [1](#) Statement of Disputed Facts, # [2](#) Declaration of Roya Rahmanpour, # [3](#) Exhibit A, # [4](#) Exhibit B, # [5](#) Exhibit C, # [6](#) Exhibit D, # [7](#) Exhibit E, # [8](#) Exhibit F, # [9](#) Exhibit G, # [10](#) Exhibit H, # [11](#) Exhibit I, # [12](#) Exhibit J, # [13](#) Exhibit K, # [14](#) Exhibit L, # [15](#) Exhibit M, # [16](#) Exhibit N, # [17](#) Exhibit O, # [18](#) Exhibit P, # [19](#) Exhibit Q, # [20](#) Exhibit R, # [21](#) Exhibit S, # [22](#) Exhibit T, # [23](#) Exhibit U, # [24](#) Exhibit V, # [25](#) Exhibit W, # [26](#) Exhibit X, # [27](#) Exhibit Y)(Rahmanpour, Roya) (Entered: 03/30/2023) |
| 03/30/2023 | [120](#) | APPLICATION to file document *titled Renewed Opposition to Motion for Summary Judgment and Related Exhibits* under seal filed by Plaintiffs David J. Arlton, Paul E. Arlton. (Attachments: # [1](#) Declaration of Roya Rahmanpour, # [2](#) Proposed Order) (Rahmanpour, Roya) (Entered: 03/30/2023) |
| 03/30/2023 | [121](#) | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *titled Renewed Opposition to Motion for Summary Judgment and Related Exhibits* under seal [120](#) filed by Plaintiffs David J. Arlton, Paul E. Arlton. (Attachments: # [1](#) Memorandum In Opposition to Motion for Summary Judgment (Unredacted), # [2](#) Exhibit A, # [3](#) Exhibit H, # [4](#) Exhibit I, # [5](#) Exhibit N, # [6](#) Exhibit O, # [7](#) Exhibit P)(Rahmanpour, Roya) (Entered: 03/30/2023) |
| 03/30/2023 | [122](#) | CERTIFICATE OF SERVICE filed by Plaintiffs David J. Arlton, Paul E. Arlton, re Sealed Declaration in SupportDeclaration, [121](#) served on March 30, 2023. (Rahmanpour, Roya) (Entered: 03/30/2023) |

| 04/03/2023 | [123](#) | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *titled Renewed Opposition to Motion for Summary Judgment and Related Exhibits* under seal [120](#) filed by Defendant Aerovironment, Inc.. (Attachments: # [1](#) Declaration of Scott A. Felder)(Timm, Zachary) (Entered: 04/03/2023) |
|---|---|---|
| 04/04/2023 | [124](#) | NOTICE OF ERRATA filed by Plaintiffs David J. Arlton, Paul E. Arlton. correcting MEMORANDUM in Opposition to Motion,, [119](#) *for Summary Judgment* (Rahmanpour, Roya) (Entered: 04/04/2023) |
| 04/13/2023 | [125](#) | MEMORANDUM in Support of NOTICE OF MOTION AND MOTION for Summary Judgment as to Plaintiffs Complaint [35](#) filed by Defendant Aerovironment, Inc.. (Attachments: # [1](#) Declaration of Scott A. Felder, # [2](#) Exhibit 1, # [3](#) Exhibit 2 (Redacted), # [4](#) Exhibit 3)(Timm, Zachary) (Entered: 04/13/2023) |
| 04/13/2023 | [126](#) | APPLICATION to file document *Memorandum in Support of Motion for Summary Judgment and Exhibit to Declaration of Scott A. Felder* under seal filed by Defendant Aerovironment, Inc.. (Attachments: # [1](#) Redacted Document Memorandum in Support of Motion for Summary Judgment, # [2](#) Redacted Document Ex. 2 to Declaration of Scott A. Felder, # [3](#) Proposed Order)(Timm, Zachary) (Entered: 04/13/2023) |
| 04/13/2023 | [127](#) | SEALED DECLARATION IN SUPPORT OF APPLICATION to file document *Memorandum in Support of Motion for Summary Judgment and Exhibit to Declaration of Scott A. Felder* under seal [126](#) filed by Defendant Aerovironment, Inc.. (Attachments: # [1](#) Unredacted Document Memorandum in Support of Motion for Summary Judgment, # [2](#) Unredacted Document Ex. 2 to Declaration of Scott A. Felder)(Timm, Zachary) (Entered: 04/13/2023) |
| 04/21/2023 | [128](#) | ORDER GRANTING DEFENDANT AEROVIRONMENT, INC.'S APPLICATION TO FILE DOCUMENTS UNDER SEAL by Judge Andre Birotte Jr.: The Court finds that Defendant AeroVironment's Application for an Order to file under seal Unredacted Exhibit 2 to the Declaration of Scott A. Felder and Unredacted Brief in Support of Reaffirming Summary Judgment, makes a sufficient showing under Local Rule 79-5 to permit filing under seal [126](#) . The Court ORDERS Plaintiff shall file under seal the unredacted Exhibits. See document for further details. (gk) (Entered: 04/24/2023) |
| 04/21/2023 | [129](#) | ORDER GRANTING PLAINTIFFS' APPLICATION FOR LEAVE TO FILE UNDER SEAL by Judge Andre Birotte Jr.: The Court hereby GRANTS Plaintiffs' Application for Leave to File Under Seal [120](#) . Therein, Plaintiffs requested the Court issue an order to file under seal several documents containing confidential information filed in connection with Plaintiffs' Renewed Opposition to Motion for Summary Judgment. See document for further details. (gk) (Entered: 04/24/2023) |
| 04/25/2023 | [130](#) | SEALED DOCUMENT *Memorandum in Support of Motion for Summary Judgment and Exhibit to Declaration of Scott A. Felder* re Memorandum in Support of Motion, [125](#) , Order on Motion for Leave to File Document Under Seal,, [128](#) filed by Defendant Aerovironment, Inc.. (Attachments: # [1](#) Exhibit 2 to Declaration of Scott A. Felder) (Timm, Zachary) (Entered: 04/25/2023) |
| 04/25/2023 | [131](#) | SEALED DOCUMENT re APPLICATION to file document *titled Renewed Opposition to Motion for Summary Judgment and Related Exhibits* under seal [120](#) , Order on Motion for Leave to File Document Under Seal, [129](#) filed by Plaintiffs David J. Arlton, Paul E. Arlton. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit H, # [3](#) Exhibit I, # [4](#) Exhibit N, # [5](#) Exhibit O, # [6](#) Exhibit P)(Rahmanpour, Roya) (Entered: 04/25/2023) |
| 04/25/2023 | [132](#) | CERTIFICATE OF SERVICE filed by plaintiffs David J. Arlton, Paul E. Arlton, re Sealed Document, [131](#) served on April 25, 2023. (Rahmanpour, Roya) (Entered: 04/25/2023) |

# EXHIBIT 11

Seth A. Gold (SBN 163220)
Seth.Gold@btlaw.com
Jonathan J. Boustani (SBN 274748)
Jonathan.Boustani@btlaw.com
Roya Rahmanpour (SBN 285076)
Roya.Rahmanpour@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 284-3880
Facsimile:  (310) 284-3894

Deborah Pollack-Milgate (Admitted Pro hac vice)
Deborah.PollackMilgate@btlaw.com
Joseph L. Fehribach (Admitted Pro hac vice)
Joseph.Fehribach@btlaw.com
**BARNES & THORNBURG LLP**
11 S. Meridian Street
Indianapolis, IN 46204
Telephone: (317) 236-1313
Facsimile:  (317) 231-7433

Attorneys for Plaintiffs
Paul E. Arlton and David J. Arlton

(*additional counsel listed on following page*)

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL E. ARLTON, an individual and DAVID J. ARLTON, an individual, | Case No. 2:20-cv-07438-AB (GJSx) |
| Plaintiffs, | [Assigned to the Hon. André Birotte Jr.] |
| v. | **JOINT STATUS REPORT** |
| AEROVIRONMENT, INC. a Delaware corporation, | |
| Defendant. | |

**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California 90067
Telephone: 310.552.5000
Facsimile:  310.552.5001
Christina N. Goodrich (SBN 261722)
Christina.goodrich@klgates.com

**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
Telephone: 202.719.7000
Facsimile:  202.719.7049
Scott A. Felder (Admitted pro hac vice)
sfelder@wiley.law
Wesley E. Weeks (Admitted pro hac vice)
wweeks@wiley.law
Adrienne J. Kosak (Admitted pro hac vice)
akosak@wiley.law

Attorneys for Defendant
AeroVironment, Inc.

**JOINT STATUS REPORT**

Pursuant to this Court's June 24, 2021 Order Regarding Plaintiffs' Motion for Relief from Judgment (ECF Dkt. 77), Plaintiffs Paul E. Arlton and David J. Arlton ("Plaintiffs" or "the Arltons") and Defendant AeroVironment, Inc. ("Defendant" or "AeroVironment") (collectively, the "Parties"), by and through their respective counsel, hereby submit this Joint Status Report outlining the requested discovery and proposed discovery schedule. The Parties have met and conferred as directed by the Court in communications between the Parties and in telephonic conferences between Plaintiffs' counsel and Defendant's counsel on June 30, 2021 and July 8, 2021.

## I.      DISCOVERY PLAN

Plaintiffs have provided copies to Defendant of their proposed discovery, which includes a Second Set of Requests for Production of Documents, a Deposition Notice to AeroVironment, pursuant to Fed. R. Civ. P. 30(b)(6), and a Subpoena to NASA/JPL for deposition. Briefly, Plaintiffs intend to seek discovery with regard to the following matters:

- Current and planned uses of Terry and similar helicopters, including any sales or sales efforts
- Incorporation of technology from Mars Helicopter Program into other helicopter products
- Knowledge and/or consent by NASA to uses of technology in Terry and other helicopter products

AeroVironment contends that the discovery sought by Plaintiffs exceeds the limited discovery into whether and to what extent AeroVironment intends to make commercial sales of helicopter products that were developed from the Mars Ingenuity program or that incorporate technology developed in that program.

Copies of the Arltons' proposed discovery are attached as Exhibit A hereto. Copies of AeroVironment's objections and responses to the Arltons' proposed discovery are attached as Exhibit B hereto.

## II.     DISCOVERY SCHEDULE

The Parties propose the following discovery schedule:

(1) July 16, 2021: Service of Discovery by Plaintiffs (assuming Court ruling on open issues between the Parties);

(2) August 6, 2021: Production of Documents by Defendant and service of written responses

(3) August 31, 2021: Close of Limited Fact Discovery

(4) September 14, 2021: Plaintiffs' Deadline for Filing of Brief in Support of Denial of Summary Judgment

(5) September 28, 2021: Defendant's Deadline for Filing in Support of Reaffirming of Summary Judgment Grant

The Parties agree that Plaintiffs may seek additional time from this Court to extend the agreed briefing schedule in the event that there are discovery disputes that cannot be resolved within the agreed time frame.


## III.     OPEN ISSUES BETWEEN THE PARTIES

### a.  Scope of Discovery

<u>Plaintiffs:</u>

Plaintiffs' discovery is relevant to whether this Court should affirm its summary judgment ruling. Plaintiffs' discovery is tailored to encompass all information related to Defendant's plans, commercial and otherwise, with regard to Terry, and the incorporation of technology developed through the Mars Helicopter Program into similar helicopters. Plaintiffs are also seeking discovery into the issue of consent by NASA. NASA has not stated that it consented to Terry. If the use of the Arltons' technology in Terry or similar products is not *de minimis*, then it is not protected by Section 1498 unless it is both for the Government and unless it is separately consented to by the Government, whether explicitly or implicitly. In order for Plaintiffs to challenge the application of Section 1498 as it relates to Terry and/or other similar

helicopters, Plaintiffs must be able to discover the facts necessary to determine whether Terry (or other similar helicopters) was by or for the Government *and* consented to.

Defendant argues that discovery into consent should not be permitted because such discovery is a "cart before the horse" argument. The Federal Circuit has made clear, however, that when ruling on a Section 1498 defense, specific findings must be made related to what uses a defendant has made of the technology at issue and which uses of the technology are or are not covered by a governmental authorization. *Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 604, 607 (M.D.N.C. 2006) (on remand, noting necessity of determining both whether party's use was "for the Government" and "with the authorization and consent of the Government"). Only if there is both does immunity apply. Accordingly, the type of use is inextricably linked to consent.

Consent under Section 1498 may be express or implied. *St. Gobain Ceramics & Plastics, Inc v. II-VI Inc.*, 369 F. Supp. 3d 963, 971 (C.D. Cal. 2019). Moreover, certain activities by a contractor may be expressly consented to, while others impliedly. *Id.* at 971-72, 978. Consent may be implied, for example, where later there is a purchase order, bid, or solicitation evincing consent. *Id.* at 980. It is true that if the "nongovernmental activity is sufficiently limited" (*de minimis non curat lex*), this Court could conclude that such use would not prevent judgment in favor of AeroVironment under Section 1498. *Id.* at 981. But the "*de minimis*" use doctrine relates to nongovernmental activity. Thus, the only cart before the horse attempt here is by Defendant, who would preclude discovery into whether its use was for the Government or consented to by the Government, improperly assuming that discovery will show its nongovernmental use is *de minimis*.

Here, it is clear that there was no express authorization from the Government to make or use Terry. Indeed, Defendant argued that there was implicit consent in its papers opposing the Plaintiffs' Motion to Vacate, squarely putting the question of "for the Government" and consent at issue. Dkt. 69-1 (Decl. Matt Keennon, testifying with regard to purported instructions from Government). Discovery on the issue of consent

with regard to all uses of the Plaintiffs' technology (aside from the Mars Helicopter) should be permitted now given that such discovery is clearly relevant to a determination on summary judgment with regard to whether such uses were for the Government and consented to or not. This information would have been properly discoverable pursuant to a motion under Fed. R. Civ. P. 56(d) motion, too, had Defendant been candid about the existence of "Terry" (or other uses of the Plaintiffs' technology). If the Court were to find that the nongovernmental use of "Terry" were *de minimis*, and the Federal Circuit were to disagree, the record would be insufficient for this Court to make the findings it would need to make on remand. In sum, the question of consent is necessary for a developed record on the issue of Section 1498.

In addition, the doctrine of *de minimis* infringement is strictly applied in the recognition that the unauthorized use of an invention may quickly cross the line into a commercial use. *See Neff Instr. Corp. v. Cohu Elecs., Inc.*, 269 F.2d 668, 673 (9th Cir. 1959) (citing cases for proposition that one manufacture is sufficient to create infringement and noting that "even the threat to use patented subject matter may give a right to a cause of action"); *Systron-Donner Corp. v. Palomar Sci. Corp.*, 239 F. Supp. 148, 152 (N.D. Cal. 1965) ("While the discussion in the *Neff* case may be obiter dictum, there is a clear inference that the rule of *de minimis* must be strictly applied. The non-government sale must be 'so unusual that it will not be repeated in quantities not de minimis,' and it must be shown that defendant 'has no intention to sell the article in question to non-government buyers, and that it has not sought such sales.'" (citations omitted); *see also Baxter Diagnostics, Inc. v. AVL Sci. Corp.*, 924 F. Supp. 994, 1016 (C.D. Cal.), *modified at* 954 F. Supp. 199 (C.D. Cal. 1996) ("Experimentation with the single-layer breadboard surpassed the de minimis stage when Baxter had a cognizable commercial purpose for the experimentation.") *Neff* is particularly instructive in that there, the defendant's "sworn facts were proved to be in error at least to some degree" and "the defendants foreclosed a full factual inquiry." *Neff Instr. Corp.*, 269 F.2d at 673.

Defendant also argues that Plaintiffs are not entitled to discovery into the technical details of the Accused Products. To be clear, "Accused Products" as that term is used in the Plaintiffs' discovery, does not apply to the Mars Helicopter. Thus, the Plaintiffs are only seeking discovery related to Terry or other uses of the Mars Helicopter technology (that Defendant denied was occurring). Defendant's complaint, moreover, misses the mark. This Court specifically permitted discovery into helicopters incorporating technology from the Mars Helicopter Program. This scope clearly covers the technical details and is not limited to the incorporation of a co-axial rotor system or a non-rotating mast. The Arltons were provided with draft objections from the Defendant as related to the Document Requests and the Rule 30(b)(6) deposition notice. The Arltons respond as follows.

Request Nos. 3-6:

To the extent understood, Defendant is arguing that the Court has ordered discovery limited to determining whether there has been a commercial sale of a helicopter product incorporating the Mars Helicopter technology, that Plaintiffs are not entitled to any details with regard to the technology Defendant is using. Plaintiffs believe that this position misunderstands the Court's order and is illogical. The Plaintiffs must understand precisely what technology is being used to argue about the significance of the commercial sale or planned commercial or substantial activities. The Court's Order clearly provides Plaintiffs with the opportunity to learn what technology from the Mars Helicopter Program has been incorporated elsewhere. Nor should this be burdensome when the Defendant has suggested previously (albeit in error) that its use of the Mars Helicopter technology was limited to the Mars Helicopter.

Request Nos. 9-10:

To the extent understood, the Defendant is objecting to provide basic information with regard to even the timeline of the development of Terry or others involved with Terry because these facts are supposedly not related to the discovery ordered by the Court. The Plaintiffs believe that basic facts regarding the timeline along with the

persons involved bears heavily on the Defendant's planned use of the technology and the potential for commercial application. If (by way of example only) Terry was developed over a year, using dozens of personnel, for example, such activities might suggest that Defendant's interest was much more than only research-oriented. The involvement by the business team in such endeavors would also suggest the same.

Request No. 11.

It is believed that the dispute over this Request relates to the issue of consent. As set forth above, whether there is consent to a use of the Plaintiffs' technology is integral to the determination of whether a use is covered or not under Section 1498. This discovery should be provided.

Request No. 16.

To the extent understood, Defendant argues that it should not have to provide any documents not directly related to coaxial rotors or a non-structural mast because the only claim in this lawsuit is a patent infringement claim. Plaintiffs believe that the Court's order plainly permits Plaintiffs discovery into all instances in which the technology of the Mars Helicopter was incorporated elsewhere. According to the Defendant's prior statements, this universe was either small or nonexistent. Now that the scope of its activities has been revealed to go beyond its representations to the Plaintiffs, discovery into all uses should be permitted, in line with the breadth of Fed. R. Civ. P. 26. In addition, the Plaintiffs sought leave to amend their complaint to add a trade secret claim. The Court denied the Plaintiffs' request to re-consider their motion "at this time." Dkt. 77 at 6. The Plaintiffs believe that Defendant should be required to provide documents demonstrating their further intentions related to the Plaintiffs' trade secrets in view of the scope of the Court's order and such that the parties have a full accounting of Defendant's nongovernmental activities.

In sum, the Court has limited discovery to determine Defendant's intentions regarding commercial uses of the Terry Helicopter or other similar helicopters. This scope would include discovery into all uses of technology from the Terry Helicopter or

8

other similar helicopters to allow Plaintiffs to make its arguments without Defendant being the gatekeeper of this information.

In advance of the submission of this Report, the Arltons were provided with draft objections from the Defendant as related to the 30(b)(6) Deposition Notice. The Arltons respond as follows:

Topic 2:

Defendant has objected to providing a witness to testify with respect to "Governmental authorization and/or consent, or lack thereof, to infringe any and all patents, including the '763 patent, by making, using, selling, or offering to sell any Accused Product." As previously outlined above, governmental consent fits squarely within the limited discovery framework outlined by the Court because of the relationship between *de minimis* non-governmental uses and uses where the government has actually provided authorization and consent. Thus, Defendant should be required to produce a witness to testify to this Topic.

Topics 4-7:

With regards to topics 4-7, Defendant has improperly limited the scope of discovery only to "helicopters incorporating a coaxial-rotor with a non-rotating structural mast." As outlined above, the limited discovery ordered by the Court extends beyond this narrow construction.

Topic 9:

Defendant has objected to providing a witness to testify to Plaintiffs' Second Set of Document Requests. Defendant previously indicated that this universe was either small or nonexistent. Now that the scope of its activities has been revealed to go beyond its representations to the Plaintiffs, discovery into all uses should be permitted, in line with the breadth of Fed. R. Civ. P. 26.

<u>Defendant</u>:

The Court ordered limited discovery into whether and to what extent AeroVironment intends to make commercial sales of helicopter products that were developed from the Mars Ingenuity program or that incorporate technology developed in that program.  Dkt. No. 77 at 6.  Plaintiffs' proposed discovery, however, goes far beyond that limited scope.  For example, the Arltons seek documents "related to the any [sic] alleged governmental authorization and/or consent, or lack thereof, to infringe the '763 patent by making, using, selling, or offering to sell any Accused Product" (RFP 11) and documents "sufficient to show the design, structure, development, testing, manufacture, assembly, acquisition, or operation of any Accused Product" (RFP 3).

The Court, however, did not authorize further discovery into authorization and consent.  While Plaintiffs argue that they are "seeking discovery into the issue of consent by NASA" because "NASA has not stated that it consented to Terry," this puts the cart before the horse.  The Court has already held that "to the extent Defendant has no intention of selling the 'Terry' helicopter or other similar helicopter commercially, then these helicopters are also subject to § 1498" and thus, "[u]nless Plaintiffs show that Defendant sold or offered to sell these helicopters commercially, or otherwise used them commercially in a substantial way, the Court will reaffirm its grant of summary judgment in favor of Defendant."  Dkt. 77 at 6.  Plaintiffs' attempt to short circuit their burden of proving a substantial commercial use should be rejected.

Similarly, the Court did not open discovery into infringement.  Indeed, because the technical details of Accused Products are irrelevant to any commercial uses of any Accused Product, it is clear that proposed RFPs seeking such details are nothing more than a back-door effort to gather evidence for the trade secret misappropriation claims that the Court has now twice told Plaintiffs' are untimely.

While the Court authorized discovery into "helicopter products that were developed from the Mars Ingenuity program or that incorporate technology developed in that program," (Dkt. No. 77 at 6), AeroVironment understands the Court to be

10

referring to the technology relevant to the asserted patents (which relate to the use of a non-rotating structural mast and coaxial rotors) and has objected to providing discovery on technology having nothing to do with Plaintiffs' patents—Discovery that would be broader than that permitted by the Federal Rules. *See* Fed. R. Civ. P. 26(b)(1) (" Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case").

Plaintiff's proposed subpoena to "NASA/JPL" should also be denied. To begin with, the proposed discovery is again primarily targeted at whether the Government provided authorization and consent, which is outside the scope of the limited discovery ordered by the Court (it is, of course, doubtful that NASA or JPL would have any information relevant to whether AeroVironment intends to make commercial sales of any device). In addition, given the realities of obtaining non-party discovery from the Government, Plaintiffs' proposed subpoena would likely require an extended timeline inconsistent with the limited discovery ordered by the Court.

In short, Plaintiffs' argument that the Court should allow broad discovery into consent and infringement issues is essentially a request for the Court to reconsider its decision on the reconsideration motion—a request the Court should deny. AeroVironment has attached its specific objections and responses to the Arltons' proposed discovery as Exhibit B. But for clarity, AeroVironment proposes to provide the following discovery:

- Documents sufficient to identify products and devices incorporating a coaxial rotor system on a non-rotating structural mast, as is used on the Mars Helicopter. This is the only technology relevant to the patent asserted by Plaintiffs in this case.

- Documents sufficient to show an accounting of costs incurred in connection with the manufacture or development of Terry and any other products and devices incorporating a coaxial rotor system on a non-rotating structural mast.

11

- Documents concerning any business plans, or intended use, for any products and devices incorporating a coaxial rotor system on a non-rotating structural mast.
- Documents related to the 60-minutes episode aired on May 9, 2021, featuring the Terry helicopter, and the Ingenuity Press Event of May 13, 2021.
- Deposition testimony regarding the same topics.

b. **Protective Order**

The requested discovery implicates AeroVironment's confidential information. To aid in the efficient production of discovery, the Parties request that the Court enter the attached protective order (attached as Exhibit C).

Dated:  July 9, 2021                    **BARNES & THORNBURG LLP**

                                        By:  */s/ Jonathan J. Boustani*
                                            Jonathan J. Boustani
                                            Deborah Pollack-Milgate
                                            Joseph L. Fehribach
                                            Seth A. Gold
                                            Roya Rahmanpour

                                        Attorneys for Plaintiffs Paul E. Artlton
                                        and David J. Arlton

Dated:  July 9, 2021                    **K&L GATES LLP**

                                        By:  */s/ Wesley E. Weeks*
                                            Wesley E. Weeks
                                            Christina N. Goodrich

                                        Attorneys for Defendant
                                        AeroVironment, Inc.

## **ATTESTATION**

All signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

*/s/ Jonathan J. Boustani*

# EXHIBIT 12

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-07438-AB-GJS | Date: | July 23, 2021 |
|---|---|---|---|

| Title: | *Paul E. Arlton et al v. Aerovironment, Inc.* |
|---|---|

| Present: The Honorable | **ANDRÉ BIROTTE JR., United States District Judge** |
|---|---|

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**   **[IN CHAMBERS] ORDER REGARDING THE PARTIES' JOINT STATUS REPORT (DKT. NO. 78)**

On June 24, 2021, the Court granted Plaintiffs' motion for relief from judgment under Fed. R. Civ. P. 60 or to alter the judgment under Fed. R. Civ. P. 59. ("Order," Dkt. No. 77.) In that Order, the Court ordered the parties to produce a joint status report addressing any discovery needs on or before July 9, 2021. On July 9, the parties filed a joint status report including a discovery schedule and several disputes as to the scope of discovery. (Dkt. No. 78.) The parties also included a proposed protective order with their joint status report. (Dkt. No. 78-3.)

The principle dispute is whether Plaintiffs are entitled to discovery regarding the authorization and consent of the government for the Terry product. The Court clearly stated in its previous order that "[t]he 'Terry' helicopter was developed as part of the Mars Ingenuity helicopter program and thus is covered under the government's same broad grant of authorization and consent that the Mars Ingenuity helicopter received." (Dkt. No. 78 at 6.) The Court opened discovery for the limited purpose of whether the Terry product is sold for purposes other than "for the government." The Court declines to consider Plaintiffs' renewed attempt to relitigate this issue and will not permit Plaintiffs to seek discovery on this issue either. Further, Plaintiffs do not identify any separate basis

#
#

1

for its proposed subpoena to "NASA/JPL," and thus the Court will not allow this subpoena either.

The parties also dispute whether Plaintiffs are entitled discovery into the technical details of the Accused Products, specifically with regard to products that incorporate technology from the Mars Helicopter program. Plaintiffs assert that this should not be "limited to the incorporation of a co-axial rotor system or a non-rotating mast." (Dkt. No. 78 at 7.) Defendant responds that this should be limited to "technology relevant to the asserted patents (which relate to the use of a non-rotating structural mast and coaxial rotors)[.]" (*Id*. at 11.) The Court agrees with Defendant. The purpose of reopening discovery was not to permit Plaintiffs an opportunity to go on a fishing expedition with regard to all of Defendant's products and unaccused functionality, but to focus on products that may incorporate the relevant patented features such as the ones allegedly incorporated into the Mars Helicopter product and Terry product. Further, Plaintiffs are not permitted to seek discovery on its trade secret claims, as the Court already denied Plaintiffs' requests for leave to amend the complaint to add these claims.

Nevertheless, there appears to be information in Plaintiffs' requests that goes beyond the categories of documents identified by Defendant but is still relevant. (*See* Dkt. No. 78 at 11-12.) For instance, "the timeline for design and development of Terry" may still be relevant to whether Defendant has any plans to sell the "Terry" commercially. (*See id*. at 7-8.) Accordingly, the Court orders the parties to meet and confer regarding the scope of the discovery in light of the Court's findings above. The Court also directs the parties to submit the proposed protective order to the magistrate judge for approval on or before August 6, 2021, as well as any further disputes about the scope of discovery. Finally, the Court approves the parties' proposed discovery schedule.

**IT IS SO ORDERED.**

#
#

# EXHIBIT 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-07438-AB-GJS | | Date: | August 15, 2023 |
|---|---|---|---|---|

| Title: | *Paul E. Arlton et al v. AeroVironment, Inc.* |
|---|---|

| Present: The Honorable | **ANDRÉ BIROTTE JR., United States District Judge** |
|---|---|

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:     [In Chambers] Further Order Regarding Defendant's Motion for Summary Judgement [Dkt. Nos. 35, 119, 125]**

This matter arises from alleged patent infringement by the Mars Helicopter, Ingenuity. In February 2021, Defendant AeroVironment, Inc. ("AeroVironment" or "Defendant"), the contractor who provided Ingenuity to the government, moved for summary judgement on its 28 U.S.C. § 1498 contractor-immunity defense. ("Motion," Dkt. No. 35.) The Court found that § 1498 shields Defendant's activities concerning Ingenuity from infringement liability and granted the Motion. ("MSJ Order," Dkt. No. 58.) About two months later, after Plaintiffs, Paul E. Arlton and David J. Arlton (collectively, "the Arltons" or "Plaintiffs"), discovered new evidence that Defendant made "Terry," an earth-based version of Ingenuity, the Court vacated the judgement and ordered the case reopened to allow Plaintiffs to take discovery. (Dkt. No. 77.) After examining whether Defendant was selling or making substantial commercial use of Terry, Plaintiffs filed their renewed opposition to the Motion for summary judgement. ("Opp.," Dkt. Nos. 119, 131 (sealed).) Defendant filed a brief in support of reaffirming summary judgement. ("Reply," Dkt. Nos. 125, 130 (sealed).)

After considering the parties' arguments, the Court again **GRANTS** summary judgment in favor of Defendant under § 1498 and **DENIES** Plaintiffs' request for further relief.

## I.  BACKGROUND

The Court recited the factual and procedural background of this case in detail in the MSJ Order. (*See* Dkt. No. 58 at 2-6.) The Court incorporates that discussion by reference. Because the parties are familiar with this case, the Court provides a summary only.

Three years ago, Plaintiffs filed a Complaint in this Court accusing Defendant of infringing U.S. Patent No. 8,042,763 (the "'763 Patent"), which is titled "Rotary Wing Vehicle," by making, using, offering to sell, and selling the Mars Helicopter. (Dkt. No. 1 ¶¶ 25-26.) In its Answer, Defendant averred that "Plaintiffs have no remedy against AeroVironment due to the applicability of 28 U.S.C. § 1498[.]" (Dkt. No. 19 ¶ 1.) The Court allowed Defendant to file an early motion for summary judgment on this defense, which confers patent infringement immunity on government contractors for infringing work done at the behest of the government. (Dkt. No. 33 at 2.)

In February 2021, Defendant filed its Motion. (Dkt. No. 35.) At that time, NASA filed a "Statement of Interest of the United States" stating that the United States granted its authorization and consent for Defendant's alleged use and manufacture of patented inventions claimed in the '763 Patent. ("Statement of Interest," Dkt. No. 37.)  Plaintiffs opposed the Motion, Defendant replied, and Plaintiffs filed a sur-reply. (*See* Dkt. Nos. 40, 41, 47.) After holding a hearing on the Motion, the Court granted it. (*See* MSJ Order.)

Shortly thereafter, Defendant introduced Terry, a terrestrial version of the Mars Helicopter Ingenuity that is manually controlled by a pilot with a hand controller. (Dkt. No. 66 at 2.) In view of this new information, Plaintiff moved for relief from judgment or to alter the judgment. The Court granted Plaintiffs' motion, vacated the judgement, and ordered the case reopened to allow Plaintiffs to address the new evidence regarding Terry. (Dkt. No. 77 at 7.)

After a lengthy discovery period, the Court set a discovery cut-off date and set a briefing schedule for Plaintiffs to file a supplemental brief in support of denial of summary judgment, and for Defendant to file a supplemental brief in support of reaffirming the grant of summary judgment. (Dkt. No. 116.) The Court provided

that, upon receipt of the briefs, the matter would stand submitted without a hearing. (*Id.*)

## II.    LEGAL STANDARDS

### A. Summary Judgement

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994); Fed. R. Civ. P. 56(c) (motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

### B. 28 U.S.C. § 1498

Section 1498 is an affirmative defense, not a jurisdictional bar. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990). Section 1498 "relieves a third party from patent infringement liability, and it acts as a waiver of sovereign immunity and consent to liability by the United States." *Madey v. Duke Univ.*, 307 F.3d 1351, 1359 (Fed. Cir. 2002). A § 1498 affirmative defense is a highly factual determination, whereby a defendant must establish that "(1) the [infringing] use is 'for the Government'; and (2) the [infringing] use is 'with the authorization

and consent of the Government.'" *Sevenson Env'l. Servs., Inc. v. Shaw Envtl., Inc.*, 477 F.3d 1361, 1365 (Fed. Cir. 2007). "The burden is initially upon the movant to establish the absence of any genuine issue of material fact and entitlement to judgment as a matter of law." *Crater Corp. v. Lucent Techs.*, 255 F.3d 1361, 1366 (Fed. Cir. 2001) (citing *Celotex*, 477 U.S. at 323–34).

## C. Analysis

In the MSJ Order, the Court agreed with Defendant that section 1498 shields Defendant from infringement liability for its work on the Mars Helicopter Ingenuity. The Court ruled that no disputed material facts exist concerning whether Defendant's work on the helicopter was "for the government" and done with the government's "authorization and consent." (MSJ Order at 9-13.)   In the Order granting relief from judgment, the Court advised that it would reinstate summary judgment in Defendant's favor unless Plaintiffs can "show that Defendant sold or offered to sell these helicopters commercially, or otherwise used them commercially in a substantial way." (Dkt. No. 77 at 6.) Because Plaintiffs have failed to do so, the Court again **GRANTS** Defendant's request for summary judgment.

Plaintiffs acknowledge that "the question is whether AeroVironment, 'used [the helicopters] commercially in a substantial way,' and not simply for educational purposes or future Mars helicopter research, which the Court concluded would be de minimis." (Opp. at 15 (quoting Dkt. No. 77 at 6).) To answer this question, Plaintiffs aver that "AeroVironment clearly intended to use, and did use Terry commercially to draw market attention to its technical prowess and position itself alongside aviation industry giants," and used the patented technology to "build brand recognition and garner coveted aerospace industry awards such as the Collier Trophy," none of which Plaintiffs contend is "de minimis." (*Id.* at 15.)   Thus, Plaintiffs argue that summary judgment is unwarranted in view of Defendant's "pervasive and widespread marketing" of the technology. (*Id.*)

More specifically, Plaintiffs aver that this "widespread commercial use" includes Defendant "marketing itself far and wide as the developer" of Ingenuity, and "using Terry to leverage [its] business and technical reputation." (*Id.* at 15-16.) In support of this theory, Plaintiffs identify Defendant's alleged commercial use of the technology to include using it to "gain the interest of SpaceX, UP.Partners, Impulse Space and UAVSI attendees (among others);" presenting it to UP.Partners, an early-stage venture capital firm comprised of officials, executives and aerospace enthusiasts; demonstrating Terry at the Wright Brothers National Memorial; and articulating "an ongoing plan to leverage the helicopter technology AeroVironment

used for Ingenuity in the private sector." (*See id.* at 8-12.) Plaintiffs aver that Defendant has also used it "to obtain additional projects," such as "assisting Applied Physics Laboratory with a study of multi-rotor co-axial blades, in connection with Johns Hopkins work on a NASA Mission to Titan," and to obtain prestigious industry awards. (*Id.* at 12-13.)

Defendant responds that Plaintiffs have failed to show any substantial commercial use of the accused technology. (Opp. at 7.) Setting aside the Ingenuity-focused events that the Court already deemed insufficient, Defendant argues that the Terry-related activities on which Plaintiffs rely cannot constitute infringing use because Defendant was using Terry as a proxy for Ingenuity, *i.e.*, to discuss or demonstrate the Mars Helicopter because the actual helicopter is millions of miles away on Mars. (*Id.* at 9-10.) This includes Defendant's presentation at AUVSI, "Flying on Mars: Development of the Ingenuity Mars Helicopter." (*Id.* at 10.) Similarly, Defendant argues that the industry recognition it received was based on its work on Ingenuity, which is protected under § 1498. (*Id.* at 11.) This also includes various educational and public service events such as "demonstrations of Terry at the Wright Brothers National Memorial (a National Park Service event), at Syracuse University (an educational institution), for Petter Muren (Mr. Keennon's personal friend, and for students at the Naval Test Pilot School (a United States Government entity)." (*Id.* at 12 (citation omitted).)

Finally, Defendant argues that, to the extent any of its marketing-related activities can be "use" under the Patent Act, they are covered by the de minimis use exception. (*Id.* at 12-13.) This category includes a proposed meeting with Elon Musk that never happened; cursory discussions with a potential commercial space partner that terminated quickly; and the presentation to UP.Partners at which Defendant did not intend to sell Terry and which resulted in no proposed or actual investment. (*Id.* at 13-14.) Defendant avers it is not aware of anyone who has "developed a business relationship" with it because of any presentation showcasing the accused technology. (*Id.* at 14.) Relatedly, Defendant avers that an internal document summarizing a forward-looking potential five-year plan is speculative and does not represent any action taken. (*Id.*)

The parties do not dispute that Defendant never offered to sell or sold the accused technology to another entity. Rather, they dispute whether Defendant's non-sales activities constitute substantial commercial use. To avoid summary judgment on this question, Plaintiffs must show a disputed issue of material fact concerning whether AeroVironment's use of the protected technology is both non-governmental and not de minimis. *See Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*, 369 F.

Supp. 3d 963, 981 (C.D. Cal. 2019). But the "use" identified by Plaintiff is either governmental (*i.e.*, "for" or "authorized by" the government), or non-actionable.

*First*, much of the use identified by Plaintiffs relates to Defendant's work on Ingenuity, which relates to the protected activity that was done for and authorized by the government and is shielded by § 1498. (*See* MSJ Order.) This includes Defendant's AUVSI ("Flying on Mars: Development of the Ingenuity Mars Helicopter") presentation, and education and public service events that presented Terry as a proxy for Ingenuity (*e.g.*, Wright Brother's National Memorial, Syracruse University, Naval Test Pilot School). It also includes industry awards Defendant received for its work on Ingenuity.

By arguing that these activities fall outside the scope of § 1498, Plaintiffs advocate for a rule that government contractors are prohibited from discussing work they did for the government where the work itself is subject to § 1498. Plaintiffs present no authority for this proposition. Indeed, imposing this rule would run contrary to the purpose of § 1498, which was implemented "to permit the government to purchase goods or services for the performance of governmental functions without the threat that the work would not be carried out because its supplier or contractor was enjoined from or feared a suit for infringement of a patent." *Windsurfing Int'l, Inc. v. Ostermann*, 534 F. Supp. 581, 587 (S.D.N.Y. 1982). If § 1498 protection came with a gag order preventing contractors from discussing their successful work for the government, it would disincentivize them to work with the government. The Court declines to impose such a rule.[1]

*Second*, the remaining activities identified by Plaintiffs are either non-infringing or fall under the de minimis exception that applies in the § 1498 context. In this context, "[i]f the defendant's nongovernmental activity is sufficiently limited, the court may dismiss the whole action on the principle of de minimis non curat lex ('the law does not concern itself about trifles')." *Saint-Gobain*, 369 F. Supp. 3d at 981 (quoting 5 Chisum on Patents § 16.06 (2019)) (dismissing suit under § 1498 when, setting aside government use, defendants produced single infringing sapphire sheet for an industry trade show and to be photographed for plaintiff's website, finding this use de minimis and non-actionable).

Construing the facts in the light most favorable to Plaintiffs as the non-

---

[1] Even if these Ingenuity-proxy activities were not themselves shielded by § 1498, the Court would find them non-actionable or de minimis for the same reasons explained below with respect to other Terry activities.

movants, Defendant's presentation to UP.Partners, at which Defendant did not intend to sell Terry and which resulted in no investment or other transaction, and Defendant's engineer's demonstration of Terry to a personal friend, are de minimis. *See id.* at 981; *compare Med. Sols., Inc. v. C Change Surgical LLC*, 541 F.3d 1136, 1140 (Fed. Cir. 2008) (collecting cases that found "the mere demonstration or display of an accused product, even in an obviously commercial atmosphere is not an act of infringement for purposes of [35 U.S.C.] § 271(a)," and finding no infringing use where product was displayed at trade show but not put into service) (internal quotations omitted) *with Raymond Eng'g, Inc. v. Miltope Corp.*, No. 85 Civ. 2685, 1986 WL 488, at *5 (S.D.N.Y. May 23, 1986) (displaying accused product "at two trade shows for military hardware which are open to the public and attended by representatives of foreign countries" does not amount to private, commercial usage of the item to overcome the § 1498 defense).

The other activities on which Plaintiffs rely would not be actionable even outside the § 1498 context. For example, a proposed but never commenced meeting to discuss the accused technology, a discussion with a potential commercial business partner that never led anywhere, and an internal, forward-looking five-year plan about potential commercial activities do not constitute "use" for patent infringement purposes. *See* 35 U.S.C. § 271. Likewise, they also cannot be infringing where § 1498 applies. *See, e.g.*, *BAE Sys. Info. & Elec. Sys. Integration Inc. v. Aeroflex Inc.*, No. CIV. 09-769, 2011 WL 3474344, at *12 (D. Del. Aug. 2, 2011) (§ 1498 applied where contractor submitted proposal to commercial customer but ended up not selling the product).

Plaintiffs argue there is no de minius exception to infringement, even in the context of § 1498. (*See* Opp. at 20-21.) But the weight of authority considering this affirmative defense—including cases in this district—acknowledges such an exception. *See, e.g.*, *Saint-Gobain*, 369 F. Supp. 3d at 981 ("Multiple courts have found trivial, non-governmental infringement to constitute de minimis infringement do not bar dismissal, pursuant to a § 1498 defense.") (collecting cases).

In sum, Plaintiffs have failed to show any offers for sale or commercial sales of the accused technology. And the activities on which they rely either relate to discussing or demonstrating the use protected by § 1498; are de minimis under § 1498; or are nonactionable in any event. Evidence showing that AeroVironment *might* leverage Ingenuity and Terry for commercial applications in the future is insufficient to show substantial commercial use of the accused technology right now. *BAE Sys.*, 2011 WL 3474344, at *12 ("[w]here no sales have occurred, speculation about future non-US government sales are just that: speculation."). Should

AeroVironment make any non-government-approved offers to sell or sales of the accused technology, Plaintiffs may bring a suit based on that non-protected, commercial activity.

Lastly, the Court observes that Plaintiffs have filed an infringement action in the Court of Federal Claims, which is the appropriate path to relief when § 1498 applies. The Court is unable to afford further relief in this context where Plaintiffs have not identified any commercial activity that falls outside of § 1498 and would be actionable under § 287. Thus, the Court **DENIES** Plaintiffs' request for further relief, including revising its decision concerning leave to amend.

### D. CONCLUSION

For the foregoing reasons, the Court again **GRANTS** summary judgement to Defendant and **DENIES** Plaintiffs' request for further relief. Within 14 days of this Order, Defendant shall file an updated proposed Judgment reflecting this ruling. Plaintiffs may file any objection to the form of judgment within 7 days of its filing.

**IT IS SO ORDERED**.

# EXHIBIT 14

Seth A. Gold (SBN 163220)
Seth.Gold@btlaw.com
Jonathan J. Boustani (SBN 274748)
Jonathan.boustani@btlaw.com
Roya Rahmanpour (SBN 285076)
Roya.Rahmanpour@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 284-3880
Facsimile: (310) 284-3894

Deborah Pollack-Milgate (Admitted Pro hac vice)
Deborah.PollackMilgate@btlaw.com
Joseph L. Fehribach (Admitted Pro hac vice)
Joseph.Fehribach@btlaw.com
**BARNES & THORNBURG LLP**
11 S. Meridian Street
Indianapolis, IN 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433

Attorneys for Plaintiffs
Paul E. Arlton and David J. Arlton

# IN THE UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL E. ARLTON, an individual and DAVID J. ARLTON, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>AEROVIRONMENT, INC. a Delaware corporation,<br><br>Defendant. | Case No. 2:20-cv-07438-AB (GJSx)<br><br>[Assigned to the Hon. André Birotte Jr.]<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60 AND MOTION TO ALTER JUDGMENT PURSUANT TO FED. R. CIV. P. 59**<br><br>Hearing Date:   June 25, 2021<br>Time:              10:00 a.m.<br>Location:        Courtroom 7B<br><br>Complaint Filed:  August 17, 2020 |

1

# TABLE OF CONTENTS

**Page(s)**

**I.**   INTRODUCTION ................................................................................. 1

    **A.**   AeroVironment's Response Proves That Terry Is *Not* a Use by or for the Government. ............................................................................ 4

    **B.**   AeroVironment Neglects to Address Its Failure to Disclose Terry, or Disclose any Details Regarding the Timeline of Its Development. ............... 7

    **C.**   The Arltons Are Irreparably Harmed by AeroVironment's Ongoing Use of "Terry" During Their Patent Term. ................................................. 10

**II.**   CONCLUSION ................................................................................... 11

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*BAE Sys. Info & Elec. Sys. Integration Inc. v. Aeroflex Inc.*,
No. 09-cv-769, 2011 U.S. Dist. LEXIS 90959 (D. Del. Aug. 2, 2011) ...................... 5

*BMMSoft, Inc. v. White Oaks Technology*,
*No.* C-09-4562 MMC, 2010 WL 1875727 (N.D. Cal. May 7, 2010).......................... 8

*Carrier Corp. v. United States*,
208 Ct. Cl. 678 (1976) ........................................................ 6

*Garrett v. TP-Link Research Am. Corp.*,
No. 20-cv-03491-SI, 2020 WL 6873419 (N.D. Cal. Nov. 23, 2020)........................ 10

*Honeywell Int'l, Inc. v. Acer Am. Corp.*,
655 F. Supp. 2d 650 (E.D. Tex. 2009)................................................. 9

*Invensas Corp. v. Renesas Elecs. Corp.*,
287 F.R.D. 273 (D. Del. 2012) .................................................... 9

*Kellogg v. Nike, Inc.*,
No. 8:7CV70, 2007 WL 4570871 (D. Neb. Dec. 26, 2007)........................... 9

*Madey v. Duke Univ.*,
413 F. Supp. 2d 601 (M.D.N.C. 2006) ............................................. 6

*Parker Beach Restoration, Inc. v. United States*,
58 Ct. Cl. 126 (2003) ........................................................... 6

*Prism Techs., LLC v. Adobe Sys., Inc.*,
No.8:10CV220, 2011 WL 6210292 (D. Neb. Dec. 14, 2011)........................... 9

*Saint-Gobain Ceramics & Plastics, Inc. v. III-VI Inc.*,
369 F. Supp. 3d 963 (C.D. Cal. 2019) .................................................2, 5

*Tesseron, Ltd. v. R.R. Donnelley & Sons Co.*,
No. 1:06 CV 2909, 2007 WL 2034286 (N.D. Ohio July 10, 2007) ........................... 9

ii

*Youngevity Int'l v. Smith*,
No. 3:16-cv-704-BTM-JLB, 2020 U.S. Dist. LEXIS 227171 (S.D. Cal.
Sept. 8, 2020) ....................................................................................................11

**Statutes**

28 U.S.C. § 1498 ....................................................................................................1

35 U.S.C. § 271 ......................................................................................................3

**Other Authorities**

48 C.F.R. § 31.205-18(a)(2) ...................................................................................4

Fed. R. Civ. P. 56(d) .....................................................................................4, 8, 9

Fed. R. Civ. P. 60(b) ............................................................................................11

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P.
60 AND MOTION TO ALTER JUDGMENT PURSUANT TO FED. R. CIV. P. 59**

## <u>REPLY MEMORANDUM OF POINTS AND AUTHORITIES</u>

**I.  INTRODUCTION**

In this action, Plaintiffs Paul E. Arlton and David J. Arlton (the "Arltons") alleged that Defendant AeroVironment, Inc. ("AeroVironment") infringed their patent—U.S. Patent No. 8,042,763 (the "'763 patent")—by using the inventions described therein, as reflected in the Mars Helicopter Ingenuity. In response, AeroVironment contended that it was immune from all liability pursuant to 28 U.S.C. § 1498 – and immune even from discovery – *inter alia*, because its use of the technology was limited to the Mars Helicopter Ingenuity and its flight on Mars in connection with government contracts.

This was, as AeroVironment's Opposition concedes, doubly wrong. AeroVironment's use is limited neither to the Mars Helicopter Ingenuity flying on Mars nor government contracts. Rather, AeroVironment has ongoing plans to use "almost a carbon copy of Ingenuity," "to develop and demonstrate the next-generation technologies for the science helicopter concept to JPL and NASA" and as "an educational tool to demonstrate the capabilities of Ingenuity here on Earth." (Dkt. 69-1, at ¶¶ 5-6.) As stated publicly by AeroVironment's CEO, "[w]hat we learn here or there is cross-applicable to all of our products and businesses." (Dkt. 66-1 & Ex. A.) Additionally, AeroVironment claims that it developed Terry with its own independent research and development funds. (Dkt 69-1, at ¶ 4.) Therefore, the Arltons' Motion should be granted because there is no dispute that Terry is a carbon copy of Ingenuity, that AeroVironment failed to disclose the Terry Helicopter, and that Terry is not part of the contract upon which AeroVironment's summary judgment motion was based.

*First*, as is clear from the regulations applicable to independent research and development ("IR&D") funds—which AeroVironment claims to have used for Terry—such funds are, as the name suggests, *independent* of any government contract or even a proposal. AeroVironment's witness confirms this (Dkt 69-1, at ¶ 4). Indeed, such funds exclude funds for "effort expended in developing and preparing technical data

specifically to support submitting a bid or proposal." (*Id.*) Because AeroVironment claims Terry was made with IR&D funds, it was not made pursuant to any government contract or in connection with any government bid or proposal. As such, Terry was not made by or for the Government. The only evidence AeroVironment offers in an attempt argue to the contrary is a declaration containing hearsay that suggests the Government was *not* interested in using Terry or investing any government funds in it. Thus, the record now shows that Terry would not fall under Section 1498 immunity and if the Arltons were afforded discovery into this issue, it would make a difference to the summary judgment decision.

*Second*, the failure of AeroVironment to be candid with this Court and the Arltons, *even now*, underscores the merits of the Arltons' motion. AeroVironment avoids any discussion of when Terry was developed, or why it was not disclosed to this Court or to the Plaintiffs, saying only that AeroVironment discussed "the new helicopter" with JPL on November 12, 2019 (Dkt. 69-1, at ¶ 3) and "completed" it on April 11, 2021.[1] (Dkt. 69-1, at ¶ 7.) This means that Terry may have been in process for the duration of this litigation, and yet no disclosure was made. AeroVironment's argument that Terry does not matter, moreover, is wrong under the law. As recited in *Saint-Gobain Ceramics & Plastics, Inc. v. III-VI Inc.*, 369 F. Supp. 3d 963 (C.D. Cal. 2019), "'[s]ection 1498 does not shield the manufacturer or seller of an infringing product simply because it eventually ends up in the hands of the United States Government'." (citing Chisum on Patents § 16.06 (2019)). Unlike the cases relied on by AeroVironment, there is no government contract into which preparatory activities could be wrapped to shield it

---

[1] AeroVironment maintains that the Arltons have admitted that the use of the Mars Helicopter Ingenuity was by or for the Government. (Dkt. 69, at 6.) This is not so. The Arltons continue to believe that there was insufficient evidence to establish such use was by or for the Government and that in view of the unique facts presented, discovery was warranted to permit the Court to rule on a full record. The Arltons also continue to believe that they diligently pursued their motion to amend.

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60 AND MOTION TO ALTER JUDGMENT PURSUANT TO FED. R. CIV. P. 59**

from immunity. Nor are the intended uses for Terry known because the Arltons were denied discovery. To say that Terry does not matter because it would not have changed the Court's decision to deny discovery, therefore, is both wrong and speculative, because AeroVironment deprived the Court of any opportunity to weigh the significance of Terry. It is clear that the Arltons were entitled to discovery with regard to Terry as a "carbon copy" of the Mars Helicopter Ingenuity or a "reasonably similar" product under the law, for use here on Earth.

*Third*, the Arltons are irreparably harmed by AeroVironment's use of Terry, which is prohibited by 35 U.S.C. § 271 (precluding making, using, selling, or offering for sale another's patented technology). AeroVironment's infringement has clear repercussions in the private sector, where there is no debate with regard to the Arltons' ability to enforce their exclusive rights. AeroVironment is not entitled to use the Arltons' technology to promote itself to the world as an innovator of this technology as it has done, to further develop the technology on the backs of the Arltons, or to gain a foothold in the market or a head start in competition with the Arltons, prior to the expiration of their patent term. These harms are separate and apart from the loss of Phase III follow-on contracts with the government regarding the Arltons' technology and the associated loss of Phase III data rights. The Arltons specifically sought to preclude any further manufacture or use of such technology as Terry by requesting injunctive relief in their Complaint.

In sum, Plaintiffs were entitled to discovery into *all* uses of their technology and whether those uses were by or for the Government. Having been denied that opportunity on the false premise that there were none, the Arltons are entitled to have the Judgment vacated. Given AeroVironment' lack of candor, moreover, the Arltons again submit that discovery should be permitted such that this Court can rule on a full record, and that the Arltons should be permitted leave to re-submit their motion to amend. The Arltons have shown that evidence existed at the time of the ruling that could not have been

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60 AND MOTION TO ALTER JUDGMENT PURSUANT TO FED. R. CIV. P. 59

discovered through due diligence, and that would have changed the disposition of this matter with regard to Rule 56(d).

## A. AeroVironment's Response Proves That Terry Is *Not* a Use by or for the Government.

In its reply in support of its summary judgment motion, AeroVironment accused the Arltons of "pure speculation" that "should not be "excused" with regard to other uses of their technology. (Dkt. 41 at 12-13.) Yet all along AeroVironment was aware of a use that was *not* by or for the Government. Indeed, Matthew Keennon's declaration demonstrates in and of itself that AeroVironment's making and using of Terry was not by or for the Government. He claims that Terry was built using independent research and development funds, known as "IR&D funds." The regulation regarding Independent research and development funds provides as follows:

> "Independent research and development (IR&D) means a contractor's IR&D cost that consists of projects falling within the four following areas: (1) basic research, (2) applied research, (3) development, and (4) systems and other concept formulation studies. *The term does not include the costs of effort sponsored by a grant or required in the performance of a contract. IR&D effort shall not include technical effort expended in developing and preparing technical data specifically to support submitting a bid or proposal.*"

48 C.F.R. § 31.205-18(a)(2) (emphasis added)

Thus, this Section expressly excludes from IR&D funds those funds related to a government contract, bid or proposal. In turn, this Section confirms that efforts not associated with a bid, proposal, or contract are *not* uses by or for the Government. This regulation disposes of AeroVironment's argument that somehow the mere possibility that AeroVironment might sometime in the future do more work for NASA/JPL is sufficient to wrap Terry into a use by or for the Government.

Defendant notes that some infringement occurring outside the scope of a contract may be tolerated under Section 1498. (Dkt. 69, at 8-10 (*e.g.*, citing *BAE Sys. Info & Elec. Sys. Integration Inc. v. Aeroflex Inc.*, No. 09-cv-769, 2011 U.S. Dist. LEXIS 90959 (D. Del. Aug. 2, 2011).) In *BAE*, the court concluded that the activities at issue were by or for the Government where the activities challenged were necessary to a bid proposal and where there had been only a single offer for sale, finding sales of the infringing product speculative. *BAE*, 2011 U.S. Dist. LEXIS 90959 at *32-37. But neither of these justifications applies here. Nothing recited by AeroVironment supports the notion that Terry's use may be by or for the Government because it might be relevant to an unidentified, hypothetical future bid or proposal involving the Arltons' technology yet again. Aside from inadmissible hearsay, nothing supports the proposition that NASA or JPL cares at all about Terry in connection with future development efforts. Nor does anything put forward by AeroVironment demonstrate that the Government has consented to AeroVironment's infringement. The Arltons' challenge is further distinguishable from *BAE* in that they are challenging the actual manufacture and use of Terry, as opposed to speculation about a future offer for sale to the private sector during their patent term.

AeroVironment's reliance on *Saint-Gobain Ceramics & Plastics*, 369 F. Supp. 3d at 963, similarly fails. There, the research and development activities accused of infringement were related to the government contract in issue. *Id.* at 978. The only other use at issue was the display of a single potentially infringing product on a website. *Id.* at 981. None of the cases recited by AeroVironment endorses the apparent long-term, substantial use of another's technology as a free pass merely because hypothetically the Government might again be interested in that technology.

Section 1498 requires a two-prong analysis: (1) whether the infringing use is for the Government; and (2) whether the Government expressly or impliedly consented to the use. *BAE*, 2011 U.S. Dist. LEXIS 90959 at *24. In the case of the Mars Helicopter

5

flying on Mars, AeroVironment pointed to contracts with the Government, and NASA filed a Statement of Interest stating that it had consented. AeroVironment argued that this was an example of express consent, which the Arltons contested as invalid in view of their Phase III SBIR contract rights. With Terry, in contrast, there is *no* contract and *no* statement from NASA assuming liability for Terry. Thus, even under AeroVironment's interpretation of the law, it still needs to at least prove implied consent as part of its affirmative defense. And for this, discovery is required. *See Parker Beach Restoration, Inc. v. United States*, 58 Ct. Cl. 126, 133-34 (2003) (outlining testimony and documents considered as part of summary judgment and finding that Government had not impliedly consented to infringement). Specifically, to determine whether there is implied consent, the court considers "contracting officer instructions, [] specifications or drawings that impliedly sanction and necessitate infringement, [or] post hoc intervention of the Government in pending patent infringement litigation against the individual contractors." *Id.* at 132-33 (quoting *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901 (Ct. Cl. 1976)); *see also Madey v. Duke Univ.*, 413 F. Supp. 2d 601, 609 (M.D.N.C. 2006) (outlining implied consent may be demonstrated where "(1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement.").

In sum, the Government does not consent to all infringement by a contractor merely by contracting with a party for some services. *Carrier Corp. v. United States*, 208 Ct. Cl. 678 (1976) (concluding that because there was no requirement by the Government to infringe plaintiff's patent in connection with removal of garbage from an Air Force base, plaintiff was not entitled to recover from the Government in the Court of Claims). And here, AeroVironment's effort to demonstrate government consent through the introduction of extrinsic facts to argue that its carbon copy of the Mars Helicopter was somehow part of an earlier consent reinforces that the Arltons' current motion

6

should be granted to permit discovery to move forward. AeroVironment unilaterally characterizes Terry as its own terrestrial version of the Mars Helicopter Ingenuity in an attempt to associate itself with NASA's successful Mars Mission, and in doing so admits that Terry was not part of the contract which the Court ruled provided AeroVironment immunity for the Ingenuity helicopter.

AeroVironment's testimony that Terry was constructed with independent research funds outside of a government contract or bid proposal demonstrates that Terry was not constructed by or for the Government. At most, in discovery AeroVironment could attempt to demonstrate that the Government impliedly consented (which the Arltons doubt).

**B.  AeroVironment Neglects to Address Its Failure to Disclose Terry, or Disclose any Details Regarding the Timeline of Its Development.**

In the summary judgment phase, AeroVironment represented it was not using the technology of the '763 Patent other than in connection with the Mars Helicopter Ingenuity on Mars. The Court adopted AeroVironment's argument that the Arltons' Requests were speculative, stating that:

> Moreover, "the evidence sought by Plaintiff[s] is the 'object of pure speculation.'" *Richter v. United States*, No. 2:01-CV-5240, 2002 WL 31031777, at *7 (C.D. Cal. Apr. 2, 2002) (*quoting Exxon Corp. v. Federal Trade Comm'n*, 663 F.2d 120, 127 (D.C. Cir. 1980)) (denying Rule 56(f) request for additional discovery). For instance, Plaintiffs argue that "Request [for Production] No. 4 is also relevant to the question of any plans to otherwise utilize the Arltons' technology[,]" but concede that "Defendant has indicated there are no such plans" and offers no other support for its request. (Dkt. No. 58 at 20.)

Despite the fact that AeroVironment clearly did have "plans" and was in the midst of putting the final touches on Terry when the Court heard AeroVironment's motion for

summary judgment, AeroVironment fails to explain why it did not disclose Terry to the Arltons or this Court. AeroVironment was clearly considering Terry in 2019 when it discussed ideas for future helicopter products with JPL. Even if Terry was not fully assembled prior to the hearing on AeroVironment's summary judgment motion, AeroVironment would have fully developed Terry as a computer engineering model, ordered or built specialty parts and developed internal project schedules to support its interview and flight demonstration with Anderson Cooper, leaving a long and discoverable paper trail. Yet, AeroVironment selectively discloses only that Terry was completed on April 11, 2021, as if it had no duty to disclose anything about Terry until the final coat of paint had been applied.

Indeed, AeroVironment argues that it had no duty to disclose Terry at all because it is not an Accused Product. On this, AeroVironment contradicts itself. Terry cannot be *different* from the Mars Helicopter for purposes of deciding whether it is an Accused Product and simultaneously a "carbon copy" for purposes of asserting Section 1498 immunity.

On the contrary, in admitting that Terry is a carbon copy, AeroVironment is admitting that Terry is clearly encompassed within the definition of Accused Product and, thus, that it should have been disclosed in response to the Arltons' Rule 56(d) motion that specifically sought such information. This case is not a "fishing expedition" akin to the only case relied on by AeroVironment for that proposition. *See BMMSoft, Inc. v. White Oaks Technology, No.* C-09-4562 MMC, 2010 WL 1875727, at *3 (N.D. Cal. May 7, 2010) (Dkt. 69, at 7.). In *BMMSoft*, the plaintiff sought discovery for a fraud claim that did not exist. *Id.* In *BMMSoft*, moreover, the plaintiff's Rule 56(d) motion was not supported by affidavits, and there was failure by the defendant (as here) to reveal additional infringing activity. *Id.*

Even if Terry were not a "carbon copy" or did not fall within the definition of Accused Product, moreover, the Arltons still would be entitled to discovery to uncover

8

additional infringing products—which is exactly what it sought to do. This makes sense because it is too easy for a defendant to conceal additional uses of a plaintiff's technology until after the court has ruled. Therefore, a plaintiff is entitled to discovery with regard to "reasonably similar" products to those accused of infringement. *See Advanced Micro Devices, Inc. v. Samsung Elecs*. Co., No. C 08-986 SI, 2009 WL 1834147, at *13-14 (N.D. Cal. Jun. 24, 2009) (denying summary judgment and permitting discovery into reasonably similar products despite the fact that product was not accused); *Invensas Corp. v. Renesas Elecs. Corp.*, 287 F.R.D. 273, 279 (D. Del. 2012) (citing cases from various districts, all holding that discovery is permissible with regard to reasonably similar products, especially where the plaintiff identifies the element of the system that has to be present for infringement to occur); *accord Prism Techs., LLC v. Adobe Sys., Inc.*, No.8:10CV220, 2011 WL 6210292, at *5 (D. Neb. Dec. 14, 2011); *Honeywell Int'l, Inc. v. Acer Am. Corp.*, 655 F. Supp. 2d 650, 656 (E.D. Tex. 2009); *Tesseron, Ltd. v. R.R. Donnelley & Sons Co.*, No. 1:06 CV 2909, 2007 WL 2034286 (N.D. Ohio July 10, 2007); *Kellogg v. Nike, Inc*., No. 8:7CV70, 2007 WL 4570871 (D. Neb. Dec. 26, 2007).

Stated simply, whether Terry fits within the definition of Accused Product, or is "reasonably similar," the Arltons were entitled to know about Terry. They specifically asked for such information in connection with their Requests and in their Rule 56(d) motion and were assured that a product such as Terry did not exist when in fact it did.[2] Nor is there any way, without discovery, to know the true significance of Terry, including for example, whether AeroVironment charged Terry's development cost to a commercial account, promoted Terry to other potential customers, or offered Terry for future sale. The Arltons are entitled to know what AeroVironment's true intentions are,

---

[2] Keennon's Declaration also reveals the existence of "prototypes." This is another example of AeroVironment failing to be fulsome in its recitation of the facts. The Arltons' requests were broad enough to encompass prototypes, too.

for example, based on its internal marketing presentations, email communications, development documents, or financial reports.

### C. The Arltons Are Irreparably Harmed by AeroVironment's Ongoing Use of "Terry" During Their Patent Term.

Lastly, the harm to the Arltons resulting from AeroVironment's use of Terry cannot be overstated. The Government, in contravention of the SBIR Phase III mandate, has awarded Phase III contracts to AeroVironment for the Mars Helicopter Ingenuity that rely on Arltons' technology to fly on Mars. Now AeroVironment also boasts that Terry will enable it to obtain future Phase III contracts that would undermine the Arltons' rights to license their technology in connection with future Phase III contracts. Although future contracts are speculative, AeroVironment is so strongly motivated by the mere possibility that it claims it has already invested its own IR&D funds in Terry and infringed Arltons' patent yet again.

The ripple effects are clear: the Arltons' contribution to the historic first flight on Mars is entirely unknown to the public. AeroVironment, meanwhile, has appeared on national television touting the Arltons' patented technology as its own (and even the Arltons' trade secrets related to the rotor blades). This use of the Arltons' patented technology by itself constitutes an act of patent infringement that is actionable. *See, e.g., Garrett v. TP-Link Research Am. Corp.*, No. 20-cv-03491-SI, 2020 WL 6873419, at *5 (N.D. Cal. Nov. 23, 2020) (noting that even testing of the accused product may be an infringing use and citing *Centillion Data Sys., LLC v. Quest Commc'ns Int'l, Inc.*, 631 F. 3d 1279, 1282 (Fed. Cir. 2011) (defining use as "'put[ting] the system into service, i.e., exercis[ing] control over, and *benefit[ting] from*, the system's application.'") (emphasis in original)).

If not stopped, moreover, AeroVironment will continue to promote Arltons' invention as its own, use the technology and its IR&D funds to develop new products, secure future customers and contracts and be ready to jump into the commercial market

10

as soon as Arltons' patents expire. In the meantime, the Arltons' will generate no business or have any economic basis for investment. Consequently, the value of the Arltons' patent is greatly diminished, both in the government and private sectors.

Under Rule 60(b)(2), "the movant must show the [newly discovered] evidence (1) existed at the time of the [ruling], (2) could not have been discovered through due diligence, and (3) was of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Youngevity Int'l v. Smith*, No. 3:16-cv-704-BTM-JLB, 2020 U.S. Dist. LEXIS 227171, at * 23 (S.D. Cal. Sept. 8, 2020) (quoting *Jones v. Aero/Chem Corp.,* 921 F.2d 875, 878 (9th Cir. 1990)). Pursuant to Fed. R. Civ. P. 60(b)(3), and where discovery is withheld such that a party was not permitted to "fully and fairly" present its case, a party seeking relief "need not establish that the result of the case would have been altered." *Id.* (citations omitted.) Instead, a party need only establish "substantial interference" with the presentation of the case by showing the likely value of the evidence, "or by elucidating its value as a tool for obtaining meaningful discovery." *Id.* (citations omitted).

Here, the Arltons have clearly more than met that burden. To hold otherwise would be an injustice, particularly in view of AeroVironment's failure to disclose Terry, and its failure, even now, to explain why.

## II.    CONCLUSION

For good cause shown, the Court should vacate its Order dated April 22, 2021 and its Judgment dated May 12, 2021, in view of AeroVironment's misrepresentation to this Court, and newly-discovered evidence justifying relief pursuant to Fed. R. Civ. P. 60(b)(2)(3)(6), Fed. R. Civ. P. 59(e), and C.D. Cal. L. R. 7-18. The Court should also grant the Arltons' Motion pursuant to Fed. R. Civ. P. 56(d) (Dkt. 40), and permit the Arltons to refile their Motion to Amend (Dkt. 46) for consideration in due course.

Dated:  June 11, 2021

**BARNES & THORNBURG LLP**

By: */s/ Jonathan Boustani*
    Deborah Pollack-Milgate
    Joseph L. Fehribach
    Seth A. Gold
    Jonathan Boustani
    Attorneys for Plaintiffs Paul E. Arlton and
    David J. Arlton

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT UNDER FED. R. CIV. P. 60 AND MOTION TO ALTER JUDGMENT PURSUANT TO FED. R. CIV. P. 59**

# EXHIBIT 15

Seth A. Gold (SBN 163220)
Seth.Gold@btlaw.com
Roya Rahmanpour (SBN 285076)
Roya.Rahmanpour@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 284-3880
Facsimile: (310) 284-3894

Deborah Pollack-Milgate (Admitted Pro hac vice)
Deborah.PollackMilgate@btlaw.com
Joseph L. Fehribach (Admitted Pro hac vice)
Joseph.Fehribach@btlaw.com
**BARNES & THORNBURG LLP**
11 S. Meridian Street
Indianapolis, IN 46204
Telephone: (317) 236-1313
Facsimile: (317) 231-7433

Attorneys for Plaintiffs
Paul E. Arlton and David J. Arlton

# IN THE UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL E. ARLTON, an individual and DAVID J. ARLTON, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>AEROVIRONMENT, INC. a Delaware corporation,<br><br>Defendant. | Case No. 2:20-cv-07438-AB (GJSx)<br><br>[Assigned to the Hon. André Birotte Jr.]<br><br>**STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: TBD—Filed Pursuant to Dkt. NOS. 116 & 118 |

## STATEMENT OF GENUINE ISSUES

As part of its renewed opposition to Defendant AeroVironment, Inc.'s ("AeroVironment") motion for summary judgment, Plaintiffs Paul E. Arlton and David J. Arlton ("Arltons") submit the following statement of genuine issues and additional facts in connection with Dkt. No. 35-1[1].

| Plaintiffs Alleged Undisputed Facts | Disputed / Undisputed and Evidence |
|---|---|
| 1. Plaintiffs' Complaint alleges that the Mars Helicopter infringes a single patent— United States Patent No. 8,042,763B2 ("the '763 patent"). ECF No. 1, Compl. at ¶¶ 24-53. | Undisputed.. <br><br> Not material given AeroVironment's non-disclosure of "Terry" and other possible infringing products. (Dkt. No. 77.) |
| 2. All design, development, and build work AeroVironment undertook concerning the Mars Helicopter was done under government contracts or subcontracts for NASA in furtherance of NASA's Mars Exploration Program. Compl. at ¶¶ 8, 9, 17, 18; Declaration of Joseph Beckman ("Beckman Decl.") ¶¶ 9, 15; Ex. 1 at AV-00000511; Ex. 2 at AV- | Disputed due to insufficient information. The Arltons lack information with regard to the full scope of design, development, and build work that was undertaken by AeroVironment in connection with the Mars Helicopter Ingenuity. Discovery is needed. <br><br> Not material given that Ingenuity is not the only product through which |

---

[1] The Arlton's concurrently-filed opposition brief to AeroVironment's motion for summary judgment is limited to the specific issues the Court indicated were the basis for vacating the Court's Judgment. However, the opposition brief incorporates by reference the Arltons' Opposition to AeroVironment's Motion for Summary Judgment and Sur-reply (Dkt. Nos. 40 & 47). As such, and for comprehensiveness, this statement includes all of the Arltons' disputed facts and additional facts.

| | |
|---|---|
| 00000526; Ex. 3 at AV-00000764; Ex. 4 at AV-00000071. | Plaintiff contends AeroVironment infringes the '763 patent. (Dkt. No. 77.) |
| 3. AeroVironment was subcontracted by the Jet Propulsion Laboratory ("JPL") to design the Mars Helicopter.<br><br>Beckman Decl. ¶¶ 7-9; Ex. 1 at AV-00000511; Ex. 2 at AV-00000526; Ex. 3 at AV-00000764. | Disputed in that there was already a design for a Mars Helicopter. The Arltons had already developed technology that was then used by AeroVironment and JPL. Arlton Decl. (Dkt. No. 40-2), ¶¶ 14, 16, & 18.<br><br>Furthermore, contracts provided by AeroVironment raise questions about which design elements were provided by JPL.  *See, e.g.*, Modification No. 6 to Subcontract No. 1512602 (Pollack-Milgate Decl., Ex. D (Dkt. No.40-12) at AV-00000575-576); Modification No. 11 to Subcontract No. 1512602 (*Id*., Ex. E (Dkt. No. 40-13) at AV00000585-588); *see also generally* AV-00000511-AV00000868 (showing scope of work performed, has only been submitted in excerpts).<br><br>The Arltons do not know the origin of all design elements of the Mars Helicopter. Discovery is needed. |

STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION
TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| | Not material given the existence of Terry and other possible non-governmental infringing products (Dkt. No. 77.) |
| 4. The subcontracts between JPL and AeroVironment fall "UNDER JPL's NASA PRIME CONTRACT." Beckman Decl. ¶ 7; Ex. 1 at AV-00000511, 513 ("constituting a subcontract under Prime Contract NNN12AA01C"); Ex. 2 at AV-00000526, 528 ("constituting a subcontract under Prime Contract NNN12AA01C"); Ex. 3 at AV-00000764; Ex. 4 at AV-0000001 (identifying document as Contract No. NNN12AA01C), 007. | Undisputed.<br><br>Not material given the existence of Terry and other possible non-governmental infringing products (Dkt. No. 77.) |
| 5. JPL's prime contract with NASA includes the FAR authorization and consent clause, Alternate I (FAR 52.227-1, Alt. I). Beckman Decl. ¶10; Ex. 4 at AV-00000152. | Undisputed.<br><br>Not material given the existence of Terry and other possible non-governmental infringing products (Dkt. No. 77.) |

**STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| 6. All subcontracts between JPL and AeroVironment related to the design, development, and build of the Mars Helicopter also include the FAR authorization and consent clause, Alternate I (FAR 52.227-1, Alt. I).<br><br>Beckman Decl. ¶¶ 11-12; Ex. 1 at AV-00000512; Ex. 2 at AV-00000527; Ex. 3 at AV-00000765; Ex. 5 at AV-00000876-77; Ex. 6 at AV-00000820; Ex. 7 at AV-00000948. | Disputed as to Contract No. 1621356. The FAR 52.227-1, Alt. I clause only applies to contracts in which the primary purpose is R&D work. Contract No. 1621356 is a "Labor-Hour Subcontract." Dkt. No. 36 (Ex. 3 at AV-00000764 & Ex. 7 at AV-00000948). In addition, it is not clear what AeroVironment designed or developed. Discovery is needed.<br><br>Not material given the existence of Terry and other possible non-governmental infringing products (Dkt. No. 77.) |
| 7. The FAR authorization and consent clause, Alternate I (FAR 52.227-1, Alt. 1), reads as follows: "(a) The Government authorizes and consents to all use and manufacture of any invention described in and covered by a United States patent in the performance of this contract or any subcontract at any tier."<br><br>48 C.F.R. § 52.227–1; see also Beckman Decl. ¶¶ 10. | Undisputed.<br><br>Not material given the existence of Terry and other possible non-governmental infringing products (Dkt. No. 77.) |

STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION
TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT

| 8. The Mars Helicopter subcontracts have not been modified to remove or otherwise change the FAR 52.227-1, Alternate I, Authorization and Consent clause. Beckman Decl. ¶14. | Disputed. The contracts may have been modified explicitly or otherwise so as to overrule FAR 52.227-1, Alternate I, Authorization and Consent clause. 48 C.F.R. § FAR 52.227-3. Discovery is needed. |
| --- | --- |
| | Not material given the existence of Terry and other possible non-governmental infringing products (Dkt. No. 77.) |

## STATEMENT OF MATERIAL FACTS

| Disputed Material Facts | Supporting Evidence |
| --- | --- |
| 1. Whether the Defendant independently developed some, all, or even part of the technology incorporated into the Mars Helicopter, or whether Defendant infringes upon the Arltons' patent rights. | Modification No. 6 to Subcontract No. 1512602 (Pollack-Milgate Decl., Ex. D (Dkt. No. 40-12) at AV-00000575-576); Modification No. 11 to Subcontract No. 1512602 (*Id*., Ex. E (Dkt. No. 40-13) at AV00000585-588); *see also generally* AV-00000511-AV00000868 (showing no independent development by AeroVironment); Arlton Decl. (Dkt. No. 40-2), ¶¶ 20-22 & Exhibit A thereto (Dkt. No. 40-3). |

STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| | Discovery is needed. Plaintiffs served document requests on November 19, 2020. |
| 2. Whether the government authorized and consented to infringement of the '763 patent. | Discovery is needed. Plaintiffs served document requests on November 19, 2020. |
| 3. Whether the Arltons were entitled to be awarded the Mars Helicopter Ingenuity Program as a Phase III SBIR Contract. | Arlton Decl. (Dkt. No. 40-2), ¶¶ 7-18. |
| 4. Whether NASA/JPL provided substantial design elements in connection with the Mars Ingenuity Program and whether those design elements were copied from the Arltons. | Discovery is needed, including third party discovery; the contracts produced to date indicate specifications and requirements provided by JPL, but the attachments to the contracts were not provided; Arlton Decl. (Dkt. No. 40-2), ¶ 21. *See also* concurrently filed Declaration of Roya Rahmanpour ("Rahmanpour Decl."), Ex. A at Dep. Tr. 140:17-25. |
| **Additional Material Facts** | **Supporting Evidence** |
| 5. The Arltons have been working on UAV technology for nearly three | Arlton Decl. (Dkt. No. 40-2), ¶ 3 & Ex. A (Dkt. No. 40-3). |

STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT

| decades, including small helicopters known as coaxial rotor UAVs or coaxial rotor drones. These small helicopters are easily distinguished from other types of drones because they have two main rotor systems that rotate in opposite directions around a common shaft and do not need the small tail rotor found on single-rotor helicopters. | |
|---|---|
| 6. The Arltons are inventors and co-owners of United States Patent No. 8,042,763, which issued on October 25, 2011. The '763 patent focuses on coaxial rotor UAV technology, which they improved in the '763 patent by, among other things, providing a hollow, non-rotating mast tube running vertically between the upper and lower rotors of a coaxial rotor helicopter that acts as a central conduit for electrical wiring. This feature allows electrical system components located above, | Arlton Decl. (Dkt. No. 40-2), ¶ 4 & U.S. Patent No. 8,042,763. |

7

| | |
|---|---|
| between, and below the rotor blades to easily communicate with each other. In this arrangement, the mast tube also supports control system components and electric motors to drive the rotor blades. The effect of these improvements was to reduce the number of parts on coaxial rotor UAVs by about 90% and provide a lighter, stronger, and a much less complicated design than what was the state of the art. | |
| 7. Since issuance of the '763 patent, The Arltons have provided a non-exclusive license to Lite Machines Corporation, as needed, to commercialize this technology as the Voyeur UAV and the Tiger Moth UAV. Both the Voyeur UAV and Tiger Moth UAV include the features of at least claim 1 of the '763 patent. | Arlton Decl. (Dkt. No. 40-2), ¶ 5. |
| 8. Since 2005, Lite has been awarded over $30 million in Small Business Innovation Research ("SBIR") and Small Business Technology | Arlton Decl. (Dkt. No. 40-2), ¶ 6. |

8

| | |
|---|---|
| Transfer ("STTR") sole-source prime contracts under 15 U.S.C. 638 (the "SBIR Statute") to develop and demonstrate the Voyeur UAV and Tiger Moth UAV for the Navy, Air Force, Army and Special Operations Command. In all cases, the contracts relied on the '763 patent. | |
| 9. The SBIR program, codified in 15 U.S.C. § 638, is comprised of three phases. Phase I regards feasibility, Phase II regards prototype development, and Phase III regards commercialization. Lite has been awarded numerous Phase I and Phase II contracts and three Phase III contracts. In particular, Lite was awarded an SBIR Phase III sole-source prime contract by the Air Force numbered FA8651-10-C-0337 on September 29, 2010, to refine the Tiger Moth stability and control system for the United States Special Operations Command ("USSOCOM"). | Arlton Decl. (Dkt. No. 40-2), ¶ 7. |

STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT

| 10. Under contract FA8651-10-C-0337, Lite awarded a subcontract to the helicopter subject matter experts in the Army Aeroflightdynamics Directorate at NASA Ames to support control system development and flight testing of the Tiger Moth UAV. | Arlton Decl. (Dkt. No. 40-2), ¶ 10. |
|---|---|
| 11. As required by contract FA8651-10-C-0337, the Arltons optimized the rotor blade design, collective pitch control system and drive motor system shown in the '763 patent for the Tiger Moth UAV and worked with the helicopter scientists at NASA Ames to tune the flight control system. They performed untethered outdoor flight demonstrations of a fully operable Tiger Moth system to USSOCOM in 2011. The Tiger Moth system met all contractual requirements for stability and control authority and the flight test results were accepted by the Government. | Arlton Decl. (Dkt. No. 40-2), ¶ 11. |

**STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION
TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT**

| 12. | They completed the Tiger Moth project with NASA Ames at Technology Readiness Level 7 ("TRL 7"). Technical readiness levels are the way in which NASA characterizes the technical maturity of new aircraft systems. Each level represents a significant increase in maturity from the level below. TRL 7 means that a system prototype has been demonstrated in an operational environment. TRL 7 is also an indication that a system is ready to proceed to production. | Arlton Decl. (Dkt. No. 40-2), ¶ 12. |
|-----|-----|-----|
| 13. | In May 2012, the Arltons presented a scientific research paper titled, "Control System Development and Flight Testing of the Tiger Moth UAV" at the American Helicopter Society 68th Annual Forum. The paper was coauthored by the lead helicopter expert and senior scientist at NASA Ames and described the unique design of the Tiger Moth UAV and the operational characteristics of its | Arlton Decl. (Dkt. No. 40-2), ¶ 13 & Ex. C (Dkt. No. 40-5). |

**STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION
TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| high-performance flight control system. | |
| 14. By January 2016, the Arltons had further refined and miniaturized the Tiger Moth UAV and were preparing for high volume serial production. Lite had previously manufactured and sold over 15,000 radio-controlled helicopters in the 1990's, and they were in the process of developing a state-of-the-art R&D and manufacturing facility in Carlsbad, California, to produce the Tiger Moth UAV and support Lite's future government research and development contracts. They planned to invest at least $9 million in facilities and equipment and arranged a $5.2 million bank loan and $1 million in tax abatements over five years from the State of California. They also planned to hire at least 90 full-time employees. The technology included in the Tiger Moth system, and all of our knowledge of rapid | Arlton Decl. (Dkt. No. 40-2), ¶ 14. |

STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| prototyping and special manufacturing processes developed over years of production operations was immediately available to NASA for use in the Mars Helicopter program at all times after 2012. | |
| 15. Between 2013 and 2015 the Air Force authorized payment of license fees to the Arltons for the '763 patent on multiple occasions. In October 2015, they proposed a new technology license to the Air Force for the '763 patent, but the Air Force did not respond to the proposal. | Arlton Decl. (Dkt. No. 40-2), ¶ 15. |
| 16. In 2015, and up to January 2016, Lite was negotiating with the Air Force for three new SBIR Phase III research, development, and commercialization contracts that included the Mars Helicopter. The negotiations concerned the '763 patent and the Tiger Moth UAV technology the Arltons developed and described in their SBIR Phase III research paper with NASA | Arlton Decl. (Dkt. No. 40-2), ¶ 16. |

**STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Ames in 2012 under contract FA8651-10-C-0337. They expected to receive an SBIR Phase III sole-source prime contract for all follow-on work including the Mars Helicopter program pursuant to 15 U.S.C. § 638(r)(4) which states: "To the greatest extent practicable, Federal agencies and Federal prime contractors *shall* –. . . (B) issue, without further justification, Phase III awards relating to technology, including sole source awards, to the SBIR and STTR award recipients that developed the technology." (Emphasis added.) | |
| 17. The Arltons expected Lite Machines to receive an SBIR Phase III sole-source prime contract for the Mars Helicopter program. But that all changed dramatically on February 5, 2016, when they were suddenly and unexpectedly informed that there was no funding for the Tiger Moth UAV or any follow-on work. | Arlton Decl. (Dkt. No. 40-2), ¶ 18. |

STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| Without Lite's core business and SBIR funding they were forced to close Lite, lay off its workforce, and abandon their drone production facility in California. | |
| 18. By this time, the complete UAV Tiger Moth system, including electronics, software and a sophisticated rotor system based on the '763 patent had already been integrated into the flight control design software at NASA Ames, analyzed by the senior helicopter scientist for the Army at NASA Ames, demonstrated to NASA Ames and USSOCOM at TRL 7 and was immediately available to NASA. | Arlton Decl. (Dkt. No. 40-2), ¶ 19. |
| 19. The Arltons learned about the continuation of the Mars Helicopter Program in 2020 and discovered that the Mars Helicopter Ingenuity incorporates the technology of the '763 patent. | Arlton Decl. (Dkt. No. 40-2), ¶ 20. |
| 20. Mars Helicopter Ingenuity derives from Lite Machines' Tiger Moth | Arlton Decl. (Dkt. No. 40-2), ¶ 21. |

**STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| SBIR Phase III program with the Air Force and NASA Ames. The Arltons were entitled to the opportunity to develop the Mars Helicopter as part of the Tiger Moth SBIR program. | |
| 21. AeroVironment was not technically suited to take on the challenge of the Mars Helicopter. Given its primary focus on fixed-wing aircraft and lack of relevant experience with coaxial rotor UAVs, AeroVironment was not a logical candidate for further development efforts by NASA and JPL. | Arlton Decl. (Dkt. No. 40-2), ¶ 22. *See* Rahmanpour Decl., Ex. A at Dep. Tr. 44:17-46:3, 69:3-70:14, 95:7-23, 96:12-99:7, 105:15-107:9, 131:9-132:4, & 140:17-25 (prior to the Mars Helicopter program, AeroVironment had no relevant experience in space exploration, helicopter development, or coaxial rotor helicopters with a hollow non-rotating mast); *see id.*, Exs. B & C. |
| 22. AeroVironment's first subcontract with JPL on November 20, 2013 for "Mars 2020 Heli-Scout Support and Testing" (Subcontract No. 1494045) involved developing a "Program Plan" for the "Propulsion" and "Fuselage portions" of the Heli-Scout as well as generating test data for "Mars | Dkt. No. 36-1, Beckman Decl., Ex. 1 generally and at AV00000514 (Contract No. 1494045); *compare* Arlton Decl. at Exhibit A (Dkt. No. 40-3) *with* https://www.nytimes.com/2020/06/23/science/mars-helicopter-nasa.html (describing early development of |

**STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| Heli-Scout Subsystems." This technology was entirely distinct from that of the Arltons and the '763 patent. | Scout as compared to Mars Helicopter Ingenuity). |
| 23. AeroVironment's second contract with JPL on September 8, 2014 (Subcontract No. 1512602) related to what NASA/JPL called the Heli-Scout System and a "coax VTOL" (coaxial rotor Vertical Take-Off and Landing) air vehicle. It involved a "Mars 2020 Heli-Scout Conceptual Design Study" of "a simplified mechanically stabilized coax VTOL that is capable of liftoff and stable vertical flight." (*Id.* at AV00000529.) | Dkt. No. 36-2, Beckman Decl., Ex. 2 at AV00000526, 529. |
| 24. The conceptual Heli-Scout was a small stick-like model that lacked a practical control system. | *See* https://www.nytimes.com/2020/06/23/science/mars-helicopter-nasa.html. |
| 25.While the statement of work for Subcontract No. 1512602 called for AeroVironment to "build on previous coaxial helicopter design work developed under Subcontract 1494045" (i.e. the small stick-like | Pollack-Milgate Decl., Ex. E (Dkt. No. 40-13) at AV00000585 (Modification 11); Dkt. No. 36-2, Beckman Decl., Ex. 2 at AV00000529. |

17

| | |
|---|---|
| model), in 2016, AeroVironment instead diverged from the statement of work to incorporate the technology of the '763 patent. | |
| 26. AeroVironment has developed its "Terry" helicopter, a privately funded, non-government copy of the Mars Helicopter, that likewise incorporates the technology of the '763 patent. | Dkt. Nos. 66 & 77.<br><br>Rahmanpour Decl., Ex. A at Dep. Tr. 32:20-33:3, 50:24-55:25. |
| 27. Terry is **not** only for the Government and educational purposes; non-governmental and/or commercial uses of Terry include AeroVironment using Terry for self-promotion—to draw attention to its business and build brand recognition, as a marketing visual aid to promote AeroVironment's technical capabilities, to help with recruiting, to show that AeroVironment has exciting technology, etc. | Rahmanpour Decl., Ex. A at Dep. Tr. 36:5-37:2. |
| 28. AeroVironment has sought to use and has used its helicopters with the Arltons' technology in a substantial commercial manner, | Rahmanpour Decl., Ex. A at Dep. Tr. 75:19-76:25, 108:19-112:5, 115:2-118:16, 119:5-120:15, 123:12-22, |

STATEMENT OF DISPUTED FACTS AND ADDITIONAL MATERIAL FACTS FOR RENEWED OPPOSITION TO AEROVIRONMENT'S MOTION FOR SUMMARY JUDGMENT

| including using Terry to engage in widespread marketing of Arltons' innovative helicopter technology to solidify AeroVironment's reputation in the aviation industry and obtain high-profile business relationships and development contracts. | 129:13-131:8, 147:15-150:1; *see id.*, Exs. D, E, F, G, H, I, J, K, L, M, O, & P.<br><br>*See also*<br>https://www.youtube.com/watch?v=ROj6YtXD0vY. |
|---|---|
| 29. AeroVironment is widely touted by the media as the developer of critical systems of Ingenuity, and associates itself at every opportunity with the first flight on Mars. | *See, e.g.*, Rahmanpour Decl., Ex. R. |
| 30. AeroVironment has leveraged the Arlton's technology to obtain additional projects. | Rahmanpour Decl., Ex. A at Dep. Tr. 81:15-84:13 & 88:2-18. |
| 31. AeroVironment has accepted prestigious industry awards for its work that incorporates the Arlton's patented technology. | Rahmanpour Decl., Exs. S, T, U, V, W, X, & Y. |

Dated:  March 30, 2023

**BARNES & THORNBURG LLP**

By: *Roya Rahmanpour*
Deborah Pollack-Milgate
Joseph L. Fehribach
Seth A. Gold
Roya Rahmanpour
Attorneys for Plaintiffs Paul E. Artlton and David J. Arlton

19

# EXHIBIT 16

1  **K&L GATES LLP**
   10100 Santa Monica Boulevard
2  Eighth Floor
   Los Angeles, California 90067
3  Telephone: 310.552.5000
   Facsimile: 310.552.5001
4  Christina N. Goodrich (SBN 261722)
   Christina.goodrich@klgates.com
5  Zachary T. Timm (SBN 316564)
   Zach.timm@klgates.com
6
7  **WILEY REIN LLP**
   2050 M Street NW
8  Washington, DC 20036
   Telephone: 202.719.7000
9  Facsimile: 202.719.7049
   Scott A. Felder (*Admitted pro hac vice*)
10 sfelder@wiley.law
   Wesley E. Weeks (*Admitted pro hac vice*)
11 wweeks@wiley.law
   Adrienne J. Kosak (*Admitted pro hac vice*)
12 akosak@wiley.law
13
14
   Attorneys for Defendant
15 AeroVironment, Inc.

16           **IN THE UNITED STATES DISTRICT COURT**
17           **CENTRAL DISTRICT OF CALIFORNIA**

18
   PAUL E. ARLTON, an individual and          Case No. 2:20-cv-07438-AB (GJSx)
19 DAVID J. ARLTON, an individual,
                                               [Assigned to the Hon. André Birotte Jr.]
20                    Plaintiffs,
                                               **DEFENDANT AEROVIRONMENT,**
21 v.                                          **INC.'S BRIEF IN SUPPORT OF**
                                               **REAFFIRMING SUMMARY**
22                                             **JUDGMENT**

23 AEROVIRONMENT, INC., a                      **FILED UNDER SEAL PURSUANT TO**
   Delaware corporation,                       **ORDER OF THE COURT DATED**
24                                             **APRIL 21, 2023**
                      Defendant.
25                                             Hearing Date:    TBD
26                                             Time:            TBD
                                               Location:        Courtroom 7B
27                                             Complaint Filed: August 17, 2020
                                               Trial Date:      Vacated
28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................... 1

II.    ARGUMENT ........................................................................................... 3

    A.    To Avoid Summary Judgment, Plaintiffs Must Show That AeroVironment Offered to Sell or Sold the Accused Aircraft Commercially or Otherwise Made Substantial Commercial Use of the Accused Aircraft. ...................... 3

    B.    Plaintiffs Do Not Show That AeroVironment Offered to Sell or Sold the Accused Aircraft Commercially. ................................................................ 4

    C.    Plaintiffs Do Not Show That AeroVironment Has Made Substantial Commercial Use of the Accused Aircraft .................................................. 7

        1.  Press and media appearances about Ingenuity are not substantial commercial uses of Terry. ........................................................ 9

        2.  Educational and public service events are not substantial commercial uses of Terry. ......................................................... 12

        3.  Allegedly infringing marketing activities are covered by either § 1498 or the de minimis exception. ................................................ 12

    D.    No Other Basis Exists Not To Reaffirm Summary Judgment .................... 15

        1.  Plaintiffs do not need additional discovery ............................... 15

        2.  Plaintiffs have a remedy at the Court of Federal Claims. ........... 17

III.   CONCLUSION ..................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Astornet Techs. Inc. v. BAE Sys., Inc.*,
  802 F.3d 1271 (Fed. Cir. 2015)........................................................................8

*BAE Sys. Info. & Elec. Sys. Integration Inc. v. Aeroflex Inc.*,
  No. CIV. 09-769, 2011 WL 3474344 (D. Del. Aug. 2, 2011) .........................13, 15

*Blue & Gold Fleet, L.P. v. United States*,
  492 F.3d 1308 (Fed. Cir. 2007)......................................................................11

*Embrex, Inc. v. Serv. Eng'g Corp.*,
  216 F.3d 1343 (Fed. Cir. 2000)......................................................................15

*Gonzalez-McCaulley Inv. Grp. Inc. v. U.S. Dep't of Veteran Affs.*,
  No. CV 13-06877, 2014 WL 12610145 (C.D. Cal. Feb. 10, 2014)....................11

*Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.*,
  372 F.2d 263 (2d Cir. 1967)..........................................................................13

*Med. Sols., Inc. v. C Change Surgical LLC*,
  541 F.3d 1136 (Fed. Cir. 2008)......................................................................10

*Neff Instrument Corp. v. Cohu Elecs., Inc.*,
  269 F.2d 668 (9th Cir. 1959) .........................................................................15

*NTP, Inc. v. Rsch. In Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005)........................................................................8

*Raymond Eng'g, Inc. v. Miltope Corp.*,
  No. 85 Civ. 2685, 1986 WL 488 (S.D.N.Y. May 23, 1986)..............................13

*Res. Conservation Grp., LLC v. United States*,
  597 F.3d 1238 (Fed. Cir. 2010)......................................................................11

*Richmond Screw Anchor Co. v. United States*,
  275 U.S. 331 (1928).....................................................................................8, 9

*Saint-Gobain Ceramics & Plastics, Inc. v. II-VI Inc.*,
  369 F. Supp. 3d 963 (C.D. Cal. 2019) ............................................................12

*TVI Energy Corp. v. Blane*,
  806 F.2d 1057 (Fed. Cir. 1986).......................................................................9

*United States v. Tohono O'Odham Nation*,
  563 U.S. 307 (2011)......................................................................................19

**Statutes**

28 U.S.C. § 1498 .................................................................................................. *passim*

28 U.S.C. § 1500 ........................................................................................................19

35 U.S.C. § 271 ...........................................................................................................8

**Rules and Regulations**

FAR 52.227-1 ...............................................................................................................1

Fed. R. Civ. P. 56(d) .............................................................................................15, 16

## I.   <u>INTRODUCTION</u>

The Court reopened this matter to allow Plaintiffs Paul E. Arlton and David J. Arlton (collectively, "Plaintiffs" or the "Arltons") limited discovery into whether AeroVironment offers to sell, sells, or uses the Terry helicopter commercially. (Dkt. No. 77 at 6.)  The Court placed the burden of "show[ing] that Defendant sold or offered to sell these helicopters commercially, or otherwise used them commercially in a substantial way" squarely on Plaintiffs.  (*Id.*)  Plaintiffs have not carried this burden.

The Court has already concluded that AeroVironment's allegedly infringing acts related to Ingenuity are protected by the broad immunity conferred by 28 U.S.C. § 1498. (Dkt. No. 58 at 15.)  The Court has also concluded "that to the extent Defendant has no intention of selling the 'Terry' helicopter or other similar helicopter commercially, then these helicopters are also subject to § 1498."  (Dkt. No. 77 at 6.)

The record confirms that Terry has not been offered for sale or sold commercially, and that AeroVironment has no plans to do so in the future.  In fact, like its predecessor Ingenuity, Terry is now being used under subcontracts with United States Government that include the broad Authorization and Consent Clause at FAR 52.227-1, Alt. I.

Because they cannot establish that Terry has been sold commercially, Plaintiffs try to embellish how AeroVironment is using Terry (as well as Ingenuity, despite the latter being under the control of JPL, on another planet, and protected by § 1498) to argue that such uses should permit their patent infringement claims to move forward.[1]  Plaintiffs' arguments are nonsensical.

Central to Plaintiffs' argument is their apparent displeasure with the widespread recognition that AeroVironment and JPL have received for achieving the first successful extraterrestrial aircraft flight.  AeroVironment does not dispute that it has taken advantage of opportunities to describe its contributions to this effort or that it uses Terry as a visual aid when it makes such presentations.  For instance, in both the *60 Minutes* segment that

---

[1] AeroVironment refers to Ingenuity and Terry herein as the "Accused Aircraft."

1

1   is the foundation of the now-concluded limited discovery and AeroVironment's later

2   presentation at the Association for Unmanned Vehicle Systems International (AUVSI)

3   conference, Terry served as a stand-in for Ingenuity for the very simple reason that

4   Ingenuity is unavailable for such appearances.

5   Yet, Plaintiffs fail to demonstrate that these events and plaudits constitute

6   substantial commercial use unshielded by § 1498.  That is because they do not.  There is

7   no authority for the principle that a Government contractor can *perform* work for the

8   United States without exposing itself to traditional patent infringement liability, but it

9   may not *talk about or accept recognition for* such work, lest it lose its § 1498 immunity.

10   Such a result would be incongruous and would undermine the policy of § 1498 by

11   distorting the incentive structure for companies to undertake work for the United States

12   Government.  This is not the law.

13   Additional discovery will not change anything.  Plaintiffs have had nearly two

14   years to adduce evidence that AeroVironment is offering to sell or selling the Accused

15   Aircraft commercially or otherwise making substantial commercial use of the Accused

16   Aircraft.  If Plaintiffs truly believe that the record is insufficiently developed, they have

17   only themselves to blame.  In actuality, however, the record is extensively developed and

18   demonstrates that AeroVironment is *not* doing anything that would deprive it of its § 1498

19   defense.  Plaintiffs may not like that the evidence does not confirm their theory of the

20   case, but additional discovery will not alter reality.

21   Plaintiffs' generalized complaint that "[w]ithout injunctive relief and a declaration

22   from the Court that Ingenuity and Terry infringe the '763 Patent, the Arltons have no way

23   to counter AeroVironment's misappropriation of their patented technology and the

24   industry's perception that AeroVironment is the market leader in sophisticated helicopter

25   drones" (Dkt. No. 121-1 at 2) is also misguided.  Plaintiffs have a path outside of this

26   Court, namely, an action at the Court of Federal Claims under § 1498.  If successful, this

27   would provide both monetary compensation for any misuse of Plaintiffs' patented

28   technology and a judicial declaration that Plaintiffs could use to bolster their (baseless)

2

allegations that AeroVironment would not have succeeded without riding the Arltons' coattails. This remedy is **exclusive**, and no additional relief is available in this Court.

Plaintiffs are clearly upset that AeroVironment, rather than they, were selected for the Mars Helicopter contract and now enjoys the spotlight illuminating its successful performance on this high-profile Government program, but Plaintiffs are barking up the wrong tree. AeroVironment's accused conduct was undertaken for the Government and with the Government's authorization and consent. Neither Accused Aircraft has been sold or offered for sale commercially, AeroVironment has not made substantial commercial use of either Accused Aircraft, and AeroVironment has no plans to do any of these things in the future. Thus, § 1498 bars any recovery, and Plaintiffs are not entitled to any relief, in this Court for AeroVironment's alleged acts of patent infringement. Plaintiffs must instead seek redress in the Court of Federal Claims.

The Court should reaffirm summary judgment in AeroVironment's favor accordingly.

## II. **ARGUMENT**

> ### A. To Avoid Summary Judgment, Plaintiffs Must Show That AeroVironment Offered to Sell or Sold the Accused Aircraft Commercially or Otherwise Made Substantial Commercial Use of the Accused Aircraft.

Plaintiffs style their most recent pleading a "Renewed Opposition to Motion for Summary Judgment." (Dkt. No. 121-1) This is inaccurate.

The Court set forth what it expected of Plaintiffs in its Order reopening discovery:

> The Court agrees with Defendant, however, that to the extent Defendant has no intention of selling the 'Terry' helicopter or other similar helicopter commercially, then these helicopters are also subject to § 1498. The 'Terry' helicopter was developed as part of the Mars Ingenuity helicopter program and thus is covered under the government's same broad grant of authorization and consent that the

3

Mars Ingenuity helicopter received. The uses of the 'Terry' helicopter for 'educational purposes' and 'future Mars helicopter research,' as well as any sales to the government, would be 'for the government' or at least *de minimis* non-governmental uses. . . . ***Unless Plaintiffs show that Defendant sold or offered to sell these helicopters commercially, or otherwise used them commercially in a substantial way, the Court will reaffirm its grant of summary judgment in favor of Defendant***.

(Dkt. No. 77 at 6 (citation omitted).)[2]

Thus, it is ***Plaintiffs'*** burden to show that AeroVironment either (1) sold or offered the Accused Aircraft for sale commercially or (2) is making substantial commercial use of the Accused Aircraft. AeroVironment is entitled to reaffirmed summary judgment otherwise.

As set forth in detail below, Plaintiffs do not make the required showing.

## B. Plaintiffs Do Not Show That AeroVironment Offered to Sell or Sold the Accused Aircraft Commercially.

Neither Accused Aircraft has been offered for sale or sold commercially. Ingenuity, of course, was sold to the United States Government. This sale cannot justify allowing Plaintiffs to proceed in this Court.

Terry has not been offered for sale or sold ***at all***. The original idea for what was then called "EarthCopter" belonged to Bob Balaram, JPL's head engineer on the Mars Helicopter project, who "suggested that there could be a use for a helicopter that functioned as a stand-alone science vehicle" for future Mars missions. (Dkt. No. 69-1 ¶ 3.) Because JPL did not have funding available, however, "Bob suggested that AeroVironment invest its independent research and development ('IR&D') funds" to build EarthCopter, because "contractors can recover a portion of their IR&D costs as an allowable indirect expense on government contracts." (*Id.* ¶ 4.)

---

[2] All emphasis is added unless otherwise indicated.

**BRIEF IN SUPPORT OF REAFFIRMED SUMMARY JUDGMENT**

In the earliest days of its contemplation, and as part of the justification to establish EarthCopter as an IR&D project, thought was given to how it might be turned into a product.  To this end, Mr. Keennon's August 2019 request for approval to build EarthCopter outlined potential uses *for the United States Government*, such as "potential stealth UAV applications."  (Declaration of Scott Felder ("Felder Decl."), Ex. 1 (August 2019 IR&D Request Form).)  Even then, however, AeroVironment recognized that the primary benefits it would derive from EarthCopter would be public relations relating to its participation in the Ingenuity effort and attracting talented personnel to the company. (*Id.*)

In any event, these nascent ideas to turn EarthCopter into a *Government product* never came to fruition.  Instead, true to the focus of the original justification and EarthCopter's genesis as a project undertaken at JPL's instance, since its completion Terry has only functioned as a "visual aid" to demonstrate AeroVironment's technical prowess (including frequent appearances as a stand-in for Ingenuity), as a recruiting tool, for educational purposes, and as a research and test platform *under the very same contracts with JPL that the Court has already concluded are subject to § 1498*.  (*See* Felder Decl., Ex. 2 (Deposition of Matt Keennon ( "Keennon Tr.")) 36:5-23; *see also* Dkt. No. 69-1 ¶ 6; Dkt. No. 112-1 at 3 (describing JPL's use of Terry "to support ongoing acoustic investigations of Ingenuity on the surface of Mars, with the ground-truth data" under AeroVironment's existing JPL subcontracts); Dkt. No. 112-2 at 2 (describing "working with the team at JPL to flesh out a second generation Mars helicopter based heavily on Ingenuity," which involved modifying the "Ingenuity clone (Terry) with an arm and wheels to demo the [concept of operations] in person at JPL").)

Consistent with this, Mr. Keennon confirmed that:

- AeroVironment has not offered to sell or sold either Accused Aircraft to a buyer other than the United States Government (Felder Decl., Ex. 2 at 276:12-19);
- No entity, other than the United States Government, has inquired of AeroVironment about purchasing either Accused Aircraft (*Id.*, at 276:20-24);

5

- No entity, other than the United States Government, has ever paid AeroVironment for the use of either Accused Aircraft (*Id.*, at 277:4-7);
- AeroVironment has no plans to offer to sell or sell either Accused Aircraft to any entity other than the United States Government (*Id.*, at 277:8-12); and
- AeroVironment has no plans to charge any entity, other than the United States Government, for the use of either Accused Aircraft (*Id.*, at 277:17-21).

Plaintiffs suggest that AeroVironment has, in fact, commercially sold the Accused Aircraft in connection with its work for the Johns Hopkins University Applied Physics Laboratory (APL). (Dkt. No. 121-1 at 12.) This argument fails for three reasons.

***First***, AeroVironment is not creating any aircraft for or delivering any aircraft to APL. Rather, AeroVironment is helping APL conduct a study. (Felder Decl., Ex. 2 at 82:20-22.)

***Second***, AeroVironment's contribution to the study relates to rotor blades. (*Id.*, at 82:23-24.) Rotor blades by themselves, however, are not the subject of Plaintiffs' asserted patent, which claims a very particular aircraft configuration including "variable pitch rotor blades" having "cyclic pitch control."[3] U.S. Patent No. 8,042,763B2 at Claim 1 ("the '763 Patent"). Moreover, Mr. Keennon explained that it was unlikely that the multi-rotor aircraft under study by APL would include cyclic pitch control, as required by the '763 patent, because "[m]ulti-rotors don't use cyclic pitch." (Felder Decl., Ex. 2 at 83:10-17.)

***Third***, APL is a university affiliated research center (UARC). *About*, JOHNS HOPKINS APPLIED PHYSICS LABORATORY, https://www.jhuapl.edu/about (last visited April 10, 2023). "A [UARC] is a strategic United States Department of Defense (DoD) research center associated with a university." *University Affiliated Research Center*

---

[3] Plaintiffs' claim to own "trade secrets related to the construction of rotor blades . . . ." (Dkt. No. 121-1 at 10, n.3.) The Court has twice denied as untimely Plaintiffs' efforts to inject trade secret misappropriation claims into this patent infringement suit. (Dkt. No. 58 at 15; Dkt. No. 77 at 6.)

*(UARC)*, AᴄQNᴏᴛᴇꜱ (Oct. 6, 2020), https://acqnotes.com/acqnote/industry/uarc.  Thus, any work that AeroVironment is doing with APL is ultimately ***for the United States Government***, not a commercial purchaser.

In sum, Plaintiffs cannot stave off reentry of summary judgment on the basis that AeroVironment has offered for sale or sold an Accused Aircraft commercially.

### C. Plaintiffs Do Not Show That AeroVironment Has Made Substantial Commercial Use of the Accused Aircraft.

Faced with the reality that there are no commercial offers for sale or sales of the Accused Aircraft, Plaintiffs try to cast AeroVironment's promotion of its success as part of the Ingenuity team and the recognition AeroVironment has received for this success as "patent infringement not shielded by Section 1498." (Dkt. No. 119 at 2:18-19.)  Distilled to its essence, Plaintiffs' argument is that it is substantial commercial use, for which relief is available in this Court, for AeroVironment to leverage its work on a Government program, which ***cannot expose it to liability for patent infringement***, to burnish its reputation.  (*Id.* at 16:9-12 ("The Arltons respectfully submit that AeroVironment's continued use of the Arltons' technology – including to gain the interest of SpaceX, Up Partners, Impulse Space and UAVSI [sic] attendees (among others) – has been commercially substantial, especially in view of the enormous boost it has enjoyed in its commercial reputation.").  This is nonsense.

Incredibly, it is ***Ingenuity*** – an aircraft that is more than 100 million miles away and under the exclusive control of the United States Government – that is the centerpiece of Plaintiffs' argument.  In Plaintiffs' view, and notwithstanding the Court's determination that § 1498 applies to Ingenuity (Dkt. No. 58 at 11, 13, and 15),[4] this case should proceed because AeroVironment describes and takes credit for its successful

---

[4] The Court's Order reopening limited discovery was confined to "helicopter products that were ***developed from*** the Mars Ingenuity program or that incorporate technology developed in that program."  (Dkt. No. 77 at 6) (emphasis added).  By focusing on "the 'Terry' helicopter or other similar helicopters," *id.*, the Order implicitly leaves intact the Court's conclusion that ***Ingenuity itself*** is covered by §1498.

7

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2021-2049, 2024-1084, 2024-1159

**Short Case Caption:**  Arlton v. Aerovironment, Inc.

---

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

---

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes  3,249  words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/09/2024

Signature:  /s/ Deborah Pollack-Milgate

Name:  Deborah Pollack-Milgate

Save for Filing